IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:21-cv-14172-JEM

BRYAN G. WOOD, and KAYLEE
M. WOOD,

     Plaintiff,

vs.

PROGRESSIVE SELECT INS. CO.,

     Defendant.

_____/

VIDEOTAPED DEPOSITION OF YASSEL AMIAMA

TAKEN ON BEHALF OF THE PLAINTIFF

FEBRUARY 17, 2022
10:03 A.M. TO 12:05 P.M.

ALL PARTIES APPEARED REMOTELY
PURSUANT TO
FLORIDA SUPREME COURT ORDER AOSC20-23

REPORTED BY:
GABRIELA GONZALEZ, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

WOOD 098

Amiama ,Yassel  02-17-2022

**2**

APPEARANCES OF COUNSEL

ON BEHALF OF THE PLAINTIFF:
JEFFREY LIGGIO, ESQUIRE
LIGGIO LAW, P.A.
1615 FORUM PLACE
WEST PALM BEACH, FLORIDA 33401
561-616-3333
JLIGGIO@LIGGIOLAW.COM
(REMOTELY VIA ZOOM)
ON BEHALF OF THE DEFENDANT:
RICHARD WELDY, ESQUIRE
YOUNG, BILL, BOLES, PLAMER, DUKE & THOMPSON, P.A.
2 SOUTH BISCAYNE BOULEVARD SUITE 3195
MIAMI, FLORIDA 33131
305-222-7720
RWELDY@FLALAWYER.NET
(REMOTELY VIA ZOOM)
ALSO PRESENT:
NADINE GABAY-BABYACK
(REMOTELY VIA ZOOM)

**3**

INDEX OF EXAMINATION

WITNESS: YASSEL AMIAMA

PAGE

DIRECT EXAMINATION
BY JEFFREY LIGGIO, ESQUIRE          6

CROSS EXAMINATION
BY RICHARD WELDY, ESQUIRE          77
RE-DIRECT EXAMINATION
BY JEFFREY LIGGIO, ESQUIRE          85

**4**

INDEX OF EXHIBITS

EXHIBIT          DESCRIPTION          PAGE
(NO EXHIBITS MARKED)

**5**

VIDEOTAPED DEPOSITION OF YASSEL AMIAMA
FEBRUARY 17, 2022

THE COURT REPORTER:  Okay.  We're now on the record.  We're here today in the matter of Bryan G. Wood and Kaylee M. Wood vs. Progressive Select Insurance Company for the videotaped deposition of Yassel Amiama.  The Case Number is 2:21-cv-14172-JEM.

Today's date is February 17th, 2022, and the time is approximately 10:03 a.m.

My name is Gabby Gonzalez with Universal Court Reporting and I am the Court Reporter present.

Pursuant to Florida Supreme Court Order AOSC20-23, we are appearing remotely via Zoom.

For purposes of the record, would Counsel for the Plaintiff, please state their appearance?

MR. LIGGIO:  My name is Jeff Liggio and I represent the Plaintiffs, Mr. and Ms. Wood.

THE COURT REPORTER:  Perfect.  Thank you. On behalf of the Defendant?

MR. WELDY:  My name is Richard Weldy on behalf of Progressive Insurance Company, Defendant.

THE COURT REPORTER:  Perfect.  Thank you.

Thereupon:

YASSEL AMIAMA



877.291.3376
www.UCRinc.com

WOOD 099

Amiama ,Yassel  02-17-2022

6

was called as a witness, and after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. LIGGIO:

Q   Ms. Amiama, you're a Claims Adjuster for Progressive.  Is that right?

A   I was at the time, yes.

Q   You was at the time, but you still work for Progressive today, right?

A   Correct, yes.

Q   Okay.  But you have a different job title?

A   Correct.

Q   I'm going to share the screen because I'm -- even though I have all this white hair, you know, I want to Google people when I want to talk to them. So, I went ahead and I found your LinkedIn page.  And this is your LinkedIn page, Yassel Amiama?

A   Yes, that's me.

Q   And I'm saying it correctly, Amiama, yeah?

A   Amiama, yup, perfect.

Q   Okay.  All right.  And if I scroll down to your experience --

A   Um-hum.

Q   -- let's just go more -- you went to FAU?

A   Yup, I took a course in FAU.  I have -- but my

7

degree is in Northwood University.

Q   Okay.  At Northwood, okay.  All right.  And you worked at the Hilton at the airport, interstate hotels and when you first got hired by Progressive in 2013, did Progressive sponsor you to go ahead and get your Claims Adjuster's license with the state of Florida?

A   Yes.  They provided the materials and the access to be able to get my licensing.

Q   Okay.  And you've been licensed since and you've been reporting to the state in regard to your continuing education efforts.  Is that right?

A   That is correct.

Q   When is the last time that you had -- I am going to stop sharing this now.  When is the last time you had to report to the department if you can remember about your ongoing continuing education requirements?

A   I want to say, it was probably two years ago. I currently have it due this year before May.

Q   Okay.  All right.  And do you keep for yourself, a list of the continuing education courses that you completed?

A   I don't keep a list, no.

Q   Okay.  Did the training -- did the training folks at Progressive do that for you?

8

A   They do provide the list that is needed to continue my education, right.

Q   So, I want to -- because I'm kind of a detailed person, even though you might not believe that, to see what courses you've taken for continuing education, you could get them to send me a copy of your Lawyer letter, right?

A   I believe so, yeah.

Q   In other words, it's not a -- it's not a great effort to get that, right?

A   Right.  No.

Q   Okay.  And if I was curious further to look at the course materials, not of all of them, but some of them, could you get those for me too if I wanted to look at them?

A   I would have to check to see on the website if I could.  It usually gives you that information there I believe, so --

MR. WELDY:  You can direct those requests to me, Jeff.

MR. LIGGIO:  Sure, I will -- and I will. Thank you.

Q   (By Mr. Liggio) And assuming that because you've been in the claims area since you got your license, most of your training, if not all of it, is

9

directed towards claims administration and claims evaluation and the rules and protocols for adjusting claims in Florida, right?

A   Correct.

Q   Okay.  All right.  And can I assume that you had some training in regard to the Florida Adjuster's code of ethics?

A   Yes.

Q   Okay.  All right.  And okay.  Let's talk about this particular claim.  No, actually, let me talk about your background.  I know you got hired by Progressive in 2013 and what was your first job title?

A   My first job title was a Claims Generalist Trainee when I was hired back in 2013.

Q   Okay.  Claims Generalist, you said, Trainee?

A   Yes.

Q   Okay.  And you had that job title for how long?

A   I believe it was a few months.  And then, I was just a Claims Generalist after the training was completed.

Q   Okay.  So, it's a Claims Generalist Trainee and while you're in the trainee status, can I assume you're getting but both classroom type of training as well as on the job training by your supervisor or



Amiama ,Yassel  02-17-2022

10

supervisors?

A   At that time, it was just on online -- well, not online, classroom training.

Q   Okay.  You know it's a -- you know, I have trouble distinguishing that, you know, when I was your age, all the training was either in a classroom where they gave you the books.

A   Um-hum.

Q   So now, I got to think, is it online, is it a webinar or is it this, that, but that's good.  Okay.

A   Um-hum.

Q   So, you were Claims Generalist after a few months sometime later in 2013, I'm assuming.  Is that a good --

A   Right.

Q   -- assumption?

A   Right.

Q   And were there any specific types of claims that you were assigned as a Claims Generalist back in 2013 so if you --

A   Yeah, at that time, it was mainly property damage claim.

Q   Okay.  All right.

A   Um-hum.

Q   And when you -- we say property damage claims,

11

it wasn't homeowner claims, it was damage to cars --

A   Auto.

Q   -- or damaged caused by cars?

A   Yes, correct.

Q   Okay.  By auto.  All right.

A   Um-hum.

Q   And you were a Claims Generalist for how long?

A   A year.

Q   Okay.

A   Actually, two years, two years.  Then, after the two years and I started handling bodily injury claims with Attorney representation.

Q   Okay.  So, and the reason I ask that is I was looking at some of the documents that we were kindly provided from the claims log.  Give me a second and I'm going to pull up where I think I first saw your name, okay?

A   Okay.

Q   So, let's see here.  Hold on one sec.  Here it is.  And I'm going to -- I'm going to blow it up just a little bit, just to make sure that you see it okay.  So, let's go -- and everybody sees, I'm going to share the screen.

And we're looking at the Wood, Bryan claims notes. It's a 12 -- just to help you, everybody, Rich

12

and Nadine, it's Page 12 out of 95 in the PDF, but it has been bate stamped labeled in the bottom right PGR488.  Can you see that?

A   I can see that.

Q   Okay.  And I may have missed it, but it looks to me that the first entry where I saw your name is November 13th, 2015.  Was that when you first got involved with the Buckner vs. Wood claim?

A   From what I can recall and based on those notes, yes, it looks like 11/13/15.

Q   Now, you said though that at that time, you were a -- you were -- what did you call it, what was the job title then?

A   Claims Generalist.

Q   Okay.  And you said something about litigation claims?

A   No.  It was -- I'm sorry.  It was a bodily injury handling Attorney represented claim.

Q   When you say "Attorney represented claims", you didn't mean an Attorney assigned by Progressive, you mean an injured Claimant who had a Lawyer?

A   Right, that's correct.

Q   Okay.

A   Yeah.

Q   I understand.  Thank you very much.

13

A   You're welcome.

Q   So now, before visiting with me today, can I assume you've had the opportunity to review your notes in the claims log?

A   Yes.

Q   Okay.  So, am I correct that this was your first note on November 13th, 2015?

A   Yes.

Q   Okay.  And when you got into work at that time, I know you're not in the office now, you must maybe home, but when you sign into the system, is there a computer system or a database system that you log into when you're working during the day?

A   So, when I started my computer, we log in -- or I should say, I log into Claimstation and Avaya.

Q   Claims --

A   Avaya is our phone service.

Q   Slow down, slow down.  Claimstation --

A   Right.

Q   -- and I saw that, that's one word, --

A   Yeah, that's correct.

Q   -- C-L-A-I-M-S-T-A-T-I-O-N, that's your claims management system, if you will, that you sign into?

A   Right.  Correct.

Q   Right.  And like in my office, we have a -- we



Amiama ,Yassel  02-17-2022

14

have a -- we have a case management system they call it the law practice, and we use something called Legal Files. So, it sounds to me that there's similar. And did you --

A   Right.

Q   -- say Avaya? Is that -- did I hear that?

A   That's correct. Avaya, it's a phone service to be able to make calls.

Q   Avaya is A-V-A-Y-A. Is that right?

A   That is correct.

Q   Okay. So, you sit down, you get your cup of coffee or you get your tea whether you do or not, I'm just saying, and you sign into Claimstation and you sign into Avaya.

Are these notes that we're looking at and we're going to chat about today, are these notes that you made in Claimstation?

A   Yes, these are notes that I made in Claimstation.

Q   Okay. So, if I look at your first note, let me see if I read it correctly. Contact information, it was November 13th, 2015, at 10 -- a little bit after 10 o'clock in the morning.

What are those -- was -- is that your an internal Adjuster Number A093756? What is that?

15

A   Yeah, that's my Rep Code. Correct, my employee number.

Q   Okay. When you say -- what do you call it code?

A   Well, it's an employee number or my Rep Code.

Q   Rep Code, Rep Code. Okay.

A   Rep Code, yeah.

Q   You know, you young people, you talk faster, my ears --

A   I'm sorry.

Q   -- are old so, you know. Okay. So, it was authored by you. Let me see it if I read it right. "If feasible, please upload pics, for pictures and estimate of Claimant vehicle." CV is claiming vehicle, right?

A   Claimant vehicle, yes. But I'm sorry, that's actually not my first note.

Q   Oh it isn't? Okay. Well, let's --

A   This one is on file review, so --

Q   What was the -- what was the first note?

A   So, keep going. You actually passed it a little bit. So, a little bit up more. It's close to where you were before. It was just going down a little bit more. All righty. So, keep going one more.

Q   Oh, I see. I -- well, I see one at 10:28 that-- a little bit later.

16

A   Yeah.

Q   You're saying it was one before that?

A   Oh, actually, nope. It looks like you're right, sorry.

Q   Yeah, I thought I did. I think I was --

A   Yeah, you're right, that is the one.

Q   -- you know, I tried to go slow with this. Okay. So, the next note --

A   Yes.

Q   -- about 13 minutes later, again, you and -- let's see if we read it correctly. "Reviewed new loss event" --

A   Um-hum.

Q   -- "IV, insured vehicle made a left turn, lost control, spun and struck, stopped Claimant vehicle", right?

A   That's right, um-hum.

Q   At that time, did you have any estimate as to how fast the vehicles were going or any of that type of stuff?

A   From what I can recall that's why I think my first note was asking for pictures of the damages.

Q   Okay. All right. Thank you. Coverage, you listed coverages, three vehicles. What is that note, that line "No coverage issues at ATA/T/T". What is

17

that?

A   So, that means at this time, so when I first get into a claim, I review the coverage to make sure that coverage is adequate. And then, also check the liability to make sure that it's correct.

Q   Good. "Damages, Insured vehicle entire passage side -- pass -- I guess, passenger side. Is that right? The Claimant vehicle --

A   Yeah, that's the Insured vehicle.

Q   Uh-huh. "Rear driver's side and mirror damaged."

A   Um-hum.

Q   "Insured vehicle damage right front fender and door."

A   Um-hum.

Q   "Liability liable -- liability adverse to the insured vehicle", right?

A   Right.

Q   "Insured vehicle failed to maintain control of vehicle and struck stopped Claimant's vehicle. Agree with previous Adjuster's" -- what's DEC?

A   Decision. So, I agree with the Adjuster's liability decision that --

Q   Okay.

A   -- was completed on the claim.



Amiama ,Yassel  02-17-2022

18

Q   We can agree that liability was a 100% on my client, right?

A   Yes.

Q   Okay. All right. "Injury unknown, need to contact Attorney for details, reserves $10,000."  How did you get --

A   Right.

Q   -- that $10,000 reserve number?

A   Based on the information I have is a soft tissue injury, usually it starts the reserves at $10,000.  And this one, it says "unknown" but before that we -- based on the notes, there was an indication that it was a soft tissue.

Q   Okay. But I'm more curious into how that particular number was arrived at.  Was that a standard number that you would utilize that --

A   Yeah, based on the -- yeah, based on the venue back then, that would be what we -- what I would reserve for injury.

Q   And would you -- when you said based on the venue, was there some place in the computer you would look and say, "Okay, it's St. Lucie County, you know, the reserves for soft tissue case at $10,000".  How would you -- I'm trying to find out whether that came off the top of your head or you had some guidance to get

19

that $10,000 number?

A   It would be based on experience.  So, what those cases would typically we would need to reserve for those cases --

Q   Okay. You're going to need this --

A   -- in that venue.

Q   Okay. Was it based on, say what that is and go slow, what was that?

A   It's based on the venue and my experience.

Q   Okay. So, there's no database, there's no list of proposed reserves for various venues in Florida?

A   No, there isn't.

Q   I mean, frankly, at the time, you didn't have an awful lot of experience.  I am, kind of, you know, that's why I'm sort of asking this stuff.

MR. WELDY:  Object to the form.

Q   (By Mr. Liggio) I'm not picking on you, but, you know.  Did you get any guidance from any supervisors that -- and maybe ask them about their experience in that regard?

A   Well, this wasn't my first claim from what I remember.  I had already handled prior claims.  So, when my training starts, we review both claims, meaning, claims that were already being handled by another Adjuster and we get familiar with the process on how

20

they handle it.

So, that helps us or help me, I should say, to be able to get more experience when it comes to handling these claims and reserving the right amount based on what I currently have.

So, it's based on a few factors.  So, I'm sorry, I did mention the venue, but it also depends on the damage to the vehicles and whatever details I can see from just that claim currently.

Q   Did you utilize in the office at that time, any sort of software to assist you in valuing claims, where you put certain fields in and it comes up with a range of compensable value?

A   What do you mean?  For what kind of value? For--

Q   Well--

A   -- medical expenses?

Q   For whatever, for a settlement value, for a proposed resolution value.  Did you have any sort of a computer database or computer software that you would utilize that you would put some information in, that it would give you a recommended range of resolution?

A   So, right now, where we're reviewing the claim, it's kind of in the beginning stages, so you're meaning more towards the bottom when I start my

21

evaluation, if I use any tools?  Is that your question?

Q   Yes, ma'am.

A   Yes, I do.  We do have a tool to help us with the reduction of the bills to make sure that we're paying or that the medical provider is fairly charging for services provided.

Q   What's the name of that tool?

A   That tool is called MDP.

Q   I'm sorry, say it again?

A   It's called MDP.

Q   M-V-P?

A   No, I'm sorry, M-D-P.

Q   Okay. And so, you used MDP.  I heard you talking about the medical bills.  That's a medical to see what the appropriate amount for medical bills is. Is that right?

A   Right.

Q   Do you use any -- does that particular tool also assist you into developing a settlement range for injury claim?

A   No, it does not.

Q   Do you have any other tools that you utilize in the office at that time to help you come up with a settlement, proposed settlement range in an injury claim?



Amiama ,Yassel  02-17-2022

22

A    There's another tool --

Q    Okay.  What's it called?

A    -- that I do use.  It's called -- I'm going to spell it out.  LNAV, it's L-N-A-V.

Q    Okay.  And tell me how LNAV to your knowledge operates?  Tell me what you -- what things you put into LNAV and what you get out?

A    So, it's based on what I'm considering as far as the injury.  So, if I'm considering a soft tissue case, I would put that I'm considering the soft tissue case and then, I would put the auto pockets that I'm considering and it would tell me based on the venue and historic data, what that case would normally settle for in those venues.

Q    You know, I, kind of do a stream of consciousness.  I don't have any notes, you know, and I talk about it.  At any point when you were handling this claim, did you seek guidance from LNAV?

A    You know, it's so long ago, I can't remember if I had done this one manually or if I used that tool.

Q    Okay.  If you used LNAV, would it say something in the notes?

A    I don't remember.  I'm sorry.

Q    All right.  Let's keep going.  We're doing good though.  We're doing fine.  So, now we're --

23

A    Okay.

Q    -- we're still talking, we're now in Bates Stamped Page 489 and we're reading the bottom of that claim note that began on, again, at 10:28 in the morning on the November 13th, 2015.

We talked about liability injuries, we stopped at the reserves, needs.  These were things that you needed so that you could continue in the proper handling and evaluation of the claim, right?

A    Right.  It's like my to do list.

Q    Okay.  "Contact Insured, RO, rule out additional coverage", you mean, like, umbrella coverage?

A    Additional insurance.

Q    Okay.

A    Yeah, an umbrella.  Um-hum.

Q    "Course and scope", you want to see if Kaylee was in the course and scope of employment at the time, right?

A    Right.

Q    "Explain injury process."  What is that?

A    So, what that means is, when I first get a claim, we notify our Insured of what's going on with their claim, go over their coverage and just let them know the next steps in the claim and as well as see what questions or concerns they have on what's occurring

24

currently in their claim.

Q    Okay.  And, you know, Kaylee Wood's was I think a 16 or 17-year-old minor at the time.  Did that include contacting her dad, Mr. Wood, my other client?

A    Yes.

Q    Okay.  "Contact Claimant Attorney, nature and extent of injury", I'm trying to make the words.  If I put full words to your abbreviations that I get wrong, you got to tell me, okay?

A    I will.

Q    All right.

A    So far, you're doing good.

Q    "Secure letter LOR"-- Letter of Representation" --

A    Um-hum.

Q    -- "uptake Medicare screen and input FSN in claim."  What is Medicare screen?

A    Medicare screen is just a -- it's a screen - - it's a screen that verifies if they receive Medicare or not based on their age and eligibility.

Q    Is Medicare screen a screen in the Claimstation program?

A    Yes, it is.  Yes.

Q    I call them programs, but you know, at your age, you might call them apps, but I am going to call

25

them program, okay, all right?

A    Yes, I'm with you on the program.

Q    And what is FSN?  "Input FSN".  What's that?

A    Face sheet note.  So, that's putting a note into the claim.  We call them Face sheet notes.

Q    Okay.  So, is this particular note a face sheet note, the one that we're reading?

A    Yes, yeah.

Q    Okay.  "Contact PIP carrier, verify benefits, prepare policy disclosure, mail appendix to Insured."  What's the appendix that you would mail to the Insured?

A    So, that's the form that addresses the top, not only do I contact the customer and ask them for the information, I also send a request in writing for any additional information and to rule out omnibus.

Q    Okay.  Next note saying that you got right on this claim it's good for you, "OBC".

A    Um-hum.

Q    What is that?  What is OBC?

A    It stands for outbound call.

Q    "(772) 879-3000 spoke with Julie", and we already know between the Counsel that Julie is Julie Kurtosh -- I forget how to spell it, but that's Roger Messer's paralegal, right?

A    Um-hum.



Amiama ,Yassel  02-17-2022

26

Q   "Treating with ortho."  Is that an orthopedist?

A   Um-hum.

Q   Gerard.  This is information that Julie gave to you that you input in the --

A   That's correct.

Q   Okay.  All right.  "Unknown injuries ATT, at this time, same request medical records doesn't know of any priors."  Does that mean whether he had any prior injuries?

A   Right.

Q   Okay.  "Will call same next week for injury information."  Did I read it correctly?

A   Yes.

Q   Okay.  You're still on the claim, this is the Medicare thing.

A   Right.

Q   Now, in 10:45, "Mr. Buckner, is a young man not eligible for Medicare, not suffering from" -- what difference would it make if he's suffering -- as far as if the claim was -- the claim was handled in regard to whether he had end stage renal disease or ALS?

MR. WELDY:  Objection to form.

A   And to be honest, I'd say, yeah, it is a

27

generated form that the system does.  I just input the age and if they're eligible or not, so I'm not sure.

Q   (By Mr. Liggio) So, in other words, the system has, you know, has certain fields in the program that you fill in and all your job is to answer the question one way or the other, right?

A   As for this Medicare screen, yes.

Q   Fair enough.  Same day, "OBC outbound call, to CC."  Who's CC?

A   That stands for Claiming Carrier.

Q   That would be Mr. Buckner's insurance company?

A   That's correct.

Q   Okay.

A   I believe it was Allstate.

Q   Yeah.  "Same informed, unable to provide any injury medicals info without medical authorization" --

A   Um-hum.

Q   -- "provided coverage info only, basic PIP, no deductible, no med pay, UM 5100 stack times two."  Did I read it correctly?

A   Yes.

Q   It's few minutes later, you ran -- it says, "Ran ISO, I-S-O on COD as Claimant".

A   Owner driver.

28

Q   Okay.  What is ISO?  So, you know, if we ever read this to a Jury, they'll understand what it is?

A   ISO is a program that provides records if there's any other claims made in the past.

Q   Okay.  And you want to do -- and you can access that ISO -- I'm going to call it a database, you can access the ISO database right from your desk through the Claimstation program, right?

A   There's a link to the website.  Back then, you had to log into ISO to be able to run searches.

Q   Okay.  And you'd have to have some basic information to put into the search.  I assume you had to put in the name of the person you were looking up, right?

A   Yeah.  You could do name, address.

Q   Driver license number?

A   Yeah.

Q   Okay.

A   Social, date of birth.

Q   Okay.  And of course, you learned something on that day that Mr. Buckner apparently had an injury about 16 years before --

A   Um-hum.

Q   -- for neck and low back pain?

A   Correct.

29

Q   Okay.  So, and if he was 25 at this time, he had an injury when he was a nine-year-old kid, right?

A   I'm not good at math, but if you say so.

Q   Well, 25 minus 16 -- if 1999 is 16 years before 2015 and if he's 25 in 2015, he must have been a nine-year-old kid when he was hurt, right?

A   I'm sorry, but I believe he was 35 not 25. Wasn't he 35?

Q   Not what I saw in the claims notes, but maybe I'm wrong.  I don't know.  So, I couldn't tell you. Okay.  So, either he -- but either he was a nine-year-old or a 19-year-old kid --

MR. WELDY:  Object to form.

Q   (By Mr. Liggio) Okay.  All right.  And in the ISO database, was there any -- were you able to determine whether there was a claim that was made as a result of that injury in 1999?

A   It's been so long, from what I remember, it provided the date and the complaint.  I can't remember anything else.

Q   Were you able to access any of the medical records for Mr. Buckner back in 1999, through the ISO database?

A   No, it does not provide medical records.

Q   Do you know if he had a threshold, you know,



877.291.3376
www.UCRinc.com
WOOD 105

Amiama ,Yassel  02-17-2022

30

what the threshold is, right?

A   Right, like a permanent injury.

Q   Yeah.

A   So, from what I remember from handling this claim, I did ask the information from the Claimant driver's Attorney, and I -- and that the following note actually says that where I mailed requests for that prior injury that I located using the system.

Q   Well, when you say mailed request for priors to Attorney via EFF.  EFF is what?

A   So, that's the electronic file folder.  So, essentially, we can send a letter electronically and it'll be mailed out from our office.

Q   Okay.  So, what you were doing -- let me make sure I understand.  You weren't trying to reach out to an Attorney that was handling the 1999 claim or defending against the 1999 claim.

The letter you were sending was to Mr. Messer, who was handling the present claim, right?

A   Correct.  And in the conversation before with Julie where it says I asked if, you know, if there were any priors as well.

Q   Okay.

A   So, yes.  The letter was --

Q   What I'm asking -- what I'm -- you suddenly

31

jumped ahead and I'm not picking on you.  I understand how, maybe you -- I asked a bad question.

Was there anything in the ISO database to indicate whether that 1999 injury was a permanent injury?

A   ISO does not provide that information.  It only provides the insurance company, the date of the claim, and the basics and I guess, if they reported any injuries or if nothing was reported.

But it does not give detailed medical or any other type of information on that person's private medical history.

Q   So, correct me if I'm wrong, what you learned on November 13th, 2015, is there was a prior injury, but you didn't know what part of the neck or the low back and how bad it was, right?

A   Correct.

Q   Okay.

A   Right.

Q   So, what you did is, then you wrote to Mr. Messer, Mr. Buckner's present Lawyer to say, tell me about the prior injury, thank you, right?

A   Right.

Q   Okay.

A   Right.

32

MR. WELDY:  Object to form.

Q   (By Mr. Liggio) And if we go to the next note, I'm looking at these notes.  If we go -- I'm going to scroll back a little bit.  On the note for November 13th, 2015, at 10:38 in the morning, you have outbound to Attorney (772) 879-3000, right?

A   Um-hum.

Q   And then, there's a note on Bates Stamped Page 490 at the top, "Outbound call to who's the named owner"?

A   Yeah, named Insured owner.

Q   Okay.  So, that was to Mr. Wood, is that right?  That's what the 772 number, right?

A   Yeah, that's -- that was one of the phone numbers --

Q   Okay.

A   -- yeah, it was for Mr. Wood.

Q   All right.  Okay.  What LMOVM?

A   Last Message on Voicemail.

Q   Thank you.  Okay.  All right.

A   Um-hum.

Q   Listen, I'm still having trouble getting used to some of these depositions nowadays, okay?

A   All right.

Q   So, you left a voicemail for Mr. Buckner --

33

for Mr. Wood on his cell phone, yeah?

A   Yes.

Q   Okay.

A   I'm not -- well, I'm not sure if that was a cell phone, but that (772) 240-619 --

Q   On that number, I should say new number.

A   Yeah, on that number.  Yeah.

Q   Okay.  All right.  So, now, since that note was at 11:02, at 11:04, you said, "Contact Insured", --

A   Um-hum.

Q   -- "rule out the additional coverage, core scope, explain injury process, contact Claimant Attorney, nature and extent of injuries, secure Letter of Representation, prepare policy disclosure."

Was this sort of a summary though of what you were already doing on that claim?

A   Well, I was making the attempt to gather that information and whatever was left over because I was unsuccessful.  I put a to-do-list for myself to continue getting that information or completing those tasks.

Q   Thank you.  Next note -- well, just a few minutes later, "Please create" -- what is H/F and Appendix B/C, what is that?

A   So, H/F is hard file and then, the Appendix B and C is that written questionnaire for the addition of



877.291.3376
www.UCRinc.com
WOOD 106

Amiama ,Yassel  02-17-2022

34

insurance and to rule out omnibus.

Q   So, if I heard you right, there's an electronic file for this claim, but you also were creating a hard paper file that is kept somewhere, right?

A   Right.  But at that time, I wasn't 100% virtual.  So, I did have a hard file.

Q   Okay.

A   Um-hum.

Q   "DY sent to JFL0002."  What is that?

A   So, that stands for diary sent to a Claims Admin.  So, she could create a folder for me and put the forms in there for me.

Q   Terrific.  Thank you.

A   Um-hum.

Q   Now, just a few minutes later, you have made some other notes or things you wanted to look at.  Number one, have we confirmed all potential insurance, Omnibus Insureds?

Owner of insured vehicle is Bryan Grant Wood and Danny Deshane, D-E-S-H-A-N-E Wood per additional one, two, three, what is that additional Insured endorsement on the policy?  Is that what that is?

A   No.  So, ADD123 is a program that I ran to confirm who the owners of the vehicles are and based on

35

that search, it provide the owners as Bryan and Jamie.

Q   Okay.  "Policy Vehicle 95 Ford Mustang operator TOL."  What's TOL?  Type of Loss?

A   Time of loss.

Q   Okay.  "On the way to school from --

A   Dropping off.

Q   -- Karen."

A   Um-hum.

Q   "Not working at time loss, rule out omnibus."  Is that okay?

A   Right.

Q   "Does not have any other insurance policies in the household, does not have any excess umbrella policies enforced.  Parties to be released and why" and you list the -- Mr. and Mrs. Wood and their minor daughter, right?

A   Yeah, Mr. and Mrs. Wood and the daughter, um-hum.

Q   The next note is just somebody that Joanne Lapra, L-A-P-R-A.

A   Um-hum.

Q   Is she the person who was creating the hard file for you?

A   Yes.

Q   Okay.  All right.  Little bit later that

36

morning, less than an hour, "Inbound Call from named owner/spouse Jamie,"--

A   Um-hum.

Q   -- "same confirmed, sheet signed for the" -- for, I guess, Kaylee's driver's license, yeah?

A   Um-hum.

Q   You advised her of the BI process and same was already where the process being since -- what's ID?

A   Insured driver, so Kaylee.

Q   So, they got a young kid just driving and she's having a couple of accidents already.

A   Right.

Q   As a parent, I can empathize with that.  So, when there was a previous accident that Kaylee was involved in, did you then access to see if Progressive had another claim filed in regard to that other accident?  I'm just getting curious.

A   I don't recall.

Q   Okay.

A   I just remember having the conversation with her and explaining and she had told me that they were already aware of that process --

Q   Okay.

A   -- because they were already going through it, um-hum.

37

Q   Let me ask you a question.  When you advised of the BI process at that time, was there a script that you would use to make sure you covered everything when you talk to the named Insured?

A   No, there's no script.  Usually, what -- the way I handled it, I would introduce myself, let them know what portion of the claim I'm handling, let them know the coverage on their policy and what it means and then, what the next steps are in the claims process.

Q   Okay.

A   So, I think it's not a script per se, but it was the way I handled the claim.

Q   Fair enough.  Thank you very much.  "No other insurance will mail, Appendix B and C confirmed.  FOL", what's -- something of loss? What's that?

A   Facts of loss.

Q   Okay.  "An individual driver on the way to school from dropping her off, again rule out omnibus, seen to send pics of Insured vehicle and Claimant vehicle."

So, her mom agreed to send you the pictures that they had in the vehicles, right?

A   Right.

Q   Okay.  And did she do that?  Did they provide you the pictures that they had?



Amiama ,Yassel  02-17-2022

38

A   I know there're photos in the claim, but I don't recall if it came from them.

Q   Was it Kaylee took pictures of the vehicles at the accident scene?  And I don't know, so I'm just asking you, if you know.

A   I'm so sorry, it's been so long.  I can't remember.  I just know I have pictures in the claim.

Q   Not a problem.  "Sent an e-mail to Jamie Wood", that's Mrs. Wood.

A   Yes.

Q   And this is the -- this is what you said in e-mail, right?

A   Um-hum.

Q   Did Jamie Wood -- this what you said?  Okay. All right.  "Giving her an internet address" --

A   Um-hum.

Q   -- "to go online and look at the claim."

A   Um-hum.

Q   All right.  A couple of days later now, five days later.  Those days, would you -- did you have a tickler system of some kind, a diver system that every number of days you'd automatically look at certain claims?

A   No, it was more so -- my approach is try to get these claims resolved as quickly as possible.

39

Q   Good.

A   So, I try to do the most I can in the beginning.

Q   So, "On November 18th, 2015, received hard file from" -- and that's someone -- another claims person, right?

A   Yeah, that was the --

Q   A0 -- you know?

A   Yeah, that was the rep who had it before myself.

Q   Yeah.  And by the way, we know that A091159 is Ms. Knowles, right?

A   Right, correct.

Q   Okay.  "Letter of representation wasn't in file.  Diary sent to" -- who's YXM0013?

A   That's another admin support but now that we have --

Q   And you're asking that person give us the letter of representation, right?

A   Yeah, to please forward the letter.

Q   All right.  Five days later, "Acknowledge FSN", what is that?

A   Face sheet note -- face sheet note.

Q   Okay.  From Tanya Lovely because that's

40

TLB0038.

A   Um-hum.

Q   "Received the Attorney letter of representation."

A   Um-hum.

Q   What is -- this is discovery completed and mailed to Attorney on 11/19, right?

A   No, I'm sorry.  The disclosure was completed and mailed to Attorney.

Q   Oh, I see.  Thank you.

A   I don't have any --

Q   I'm going to try to -- I'm going to see if I can be fancy and switch pages.

A   Okay.

Q   I've got the various letters I think, and we'll go back there.  This is your first letter to Mr. Messer's office we're looking at, it is Progressive Bates stamped PGR001, right?

This was sent the previous day, November 13th, we talked about.  Isn't that right?

A   Yeah, that was the same day.

Q   Okay.  And then, October 21st, again wrote to Mr. Messer as we talked about, give us the PIP log, tell us some information about the meds, right?

A   Right.

41

Q   We'll go -- we'll get here in a minute.

A   Okay.

Q   Okay.  Let me go back to where we were. Well, hold on now.  "November 27th, 2015, received e- mail from named operator with" -- what is that?

A   That's named as Insured owner with insured vehicle and CV pics of the named Insured.

Q   Okay.  So, what -- when it says uploaded, you then would take those photographs, you get an e- mail from her, and you would make sure that the photographs were in the Claimstation system.  That's what "Uploaded to CS is, right?

A   Yes.

Q   Okay.  We're doing good together.  This is okay.  All right.  Now, there's a -- I guess, Robin Tammany that was -- is that somebody who's in the subrogation unit, if you know?

A   I don't know.  But based on that note, it looks like they were reviewing damages.  It could be subro, I'm not sure.

Q   All right.  But we know that Kaylee Wood was driving a Mustang.

A   Um-hum.

Q   So, can we safely assume that this 2001 Toyota Rav4 was the vehicle that Mr. Buckner was driving?



Amiama ,Yassel  02-17-2022

42

A   Yes.

Q   Okay.  All right.  It was an older vehicle, obviously, this was -- he was driving a 14 or 15- year-old vehicle -- 14 years old looks like?

A   Um-hum.

Q   Okay.  And the estimate to repair it was about $2,400, yeah?

A   You're rounding up, yeah.

Q   Yeah.  I'm just, you know --

A   Um-hum.

Q   All right.  And I want to make sure, when you would sign into Claimstation on a particular claim, did you have the advantage of what other adjusting personnel in different functions also put into the Claimstation in regard to that claim?

In other words, back at that time, would you be able to read what Mr. or Mrs. Wood and I apologize, but because Robin could be, you know, what, what Robin Tammany wrote?

A   Yes, that note would be available to me --

Q   Thank you.

A   -- if someone puts that into the claim.

Q   Okay.  All right.  Now, we have, you know, the next note from you is a number of months later, and I'm not picking on you for that.  That's okay, okay?

43

A   Um-hum.

Q   We're just going over that.  So, I -- so on March 11th, 2016, you placed an outbound call to -- then you spoke again to Julie Kurtosh, right?

A   Right.

Q   And you told her they have -- you had -- that you haven't heard from --

A   No, Julie was informing me, they haven't heard from the Claimant owner-driver in a while and --

Q   Okay.

A   -- will need to call me back with injury and treatment information.

Q   Okay.  That's why I'm struggling, you know, again, I'm struggling with the abbreviations and I'm -- thank you for helping me.

A   No problem.

Q   Okay.  So, then about a month-and-a-half later on April 29th, 2016, and I want to keep -- let me do this and I've got -- I've got things that I made notes for myself, so I want to make sure that I get and we're making very good progress, so --

MR. WELDY:  It's good to hear.

MR. LIGGIO:  All right.

THE WITNESS:  Um-hum.

44

Q   (By Mr. Liggio) All right.  So, now, the next page, let's go to bottom of that page on April 29th, 2016, you went --

A   Um-hum.

Q   -- through a note and it goes on to Bates Stamped Page PGR494.  "Outbound call to Claimant owner driver's Attorney, office closed at 04:30 p.m." So, you had made that call at 04:40 and they were closed for the day?

A   Right.

Q   How dare they be closed when -- and not take your call at 04:00 -- I'm kidding around.  Okay.  So, now, so you made a call and then, the next note is a few months later July 25th, 2016, "Outbound call to CC." Who's CC?

A   Claimant carrier, so Allstate.

Q   Allstate?  "Confirmed PIP is open and getting close but is not exhausted, Claimant carrier HA", what's HA?

A   Handling Adjuster.

Q   What?

A   Handling Adjuster.

Q   Okay. Couldn't provide the payout -- the PIP sheet.  So, that same day, you then called Julie at Mr. Messer's again.

45

A   Um-hum.

Q   "We'll have Attorney Roger pull the file and contact me with TX", what's TX?

A   Treatment.

Q   Treatment status update?  And you said, "Thank you for the time."

A   Um-hum.

Q   You sent an NMM letter to Mr. Messer for status and I think, we looked at that letter.  No -- no, hold on, now.  This is that July 25th, 2016, letter PGR002 for the Bates stamp, right?

A   Um-hum.

Q   Okay.  Hold on.  All right.  Now, if we -- you said that in that letter the next note is about four or five months later on November 17th, 2016.

A   Um-hum.

Q   Let me if I read it correctly.  "BI negotiation, that's bodily injury negotiation for Mr. Buckner", correct?

A   Um-hum.

Q   L/COV, what's that?

A   Where do you see that, I'm sorry?

Q   If we look -- I'll -- let me put it --

A   All right, there.  That stands for line coverage.


UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

WOOD 109

46

Q   Okay.  And RBI means?

A   That's a BI coverage that would apply for --

Q   Okay.  "Demand amount $50,000, expires in 12/19/2016 --

A   Um-hum.

Q   -- received" -- what is TLD?

A   Time limit demand.

Q   Okay.  "Via mail dated 11/10, forwarded to Yassel"?

A   Yes.

Q   How do I -- again, how do I say your first name because I've been calling you Ms. Amiama?

A   All right.  Yassel, like, you're selling something, Yassel.

Q   Yassel.  Okay.  Because I was just reading that.  I am not trying to be impolite, but I want to make sure it's right.  So, this is --

A   Yes, Yassel sounds like a curse word.

Q   You know, that's a terrible thing.  You should see what people do to my name after all these years, you have no idea.  Okay.  So, it's -- so Tanya Lovely, who is Tanya Lovely?

A   At the time, she was my supervisor.

Q   Okay.  All right.  So, was there a process or a protocol in the office at that time that when there

47

was a policy limits, time limits demand, it automatically went to a supervisor who then will either handle it themselves or send it to the person they're supervising?

A   From what I can recall from the process back then, it didn't really matter, the demand amount.  All time limit demands were reviewed by the supervisor and then, forwarded to the assigned Adjuster.

Q   And did Ms. Lovely, give you any instructions or suggestions other than what she wrote in the note here?

A   I can't recall.

Q   Is there some place we could look to see if she gave you any other guidance on that day?

A   Yeah, if there -- yeah, if there was, she would add in the note that guidance.

Q   So, if there was, she would have put something in here?

A   Yeah.

Q   Okay.  All right.  Okay.  And that -- and then, on that day or a few days -- or 11 days later, we see your first note that talks about that MDP program that we just talked about.

A   Right.

Q   Okay.

48

A   Right.

Q   And a few days later -- well, let me ask you this, was there any sort of tickler system or a reminder system that would put any sort of urgency on, you know, let's get things done within the 30 days?

A   That would be self-imposed.  So, if I know I have a due date coming up, I would try and get everything done before that due date.

Q   Fair enough.  Who is Edmaureen and -- Ms. Gonzales, I'm sorry, that you're looking at, you can see it's like one, kind of, first name together, and that may be that person's first name.  E-D-M-A-U-R-E- E-N Dixon-Sampson, who's that?

A   It looks like they were the person who processed that report for the MDP.

Q   Okay.  With some instructions, the next day, December 7th, 2016, "Outbound call to Claimant's carrier", that's Allstate?

A   Yep.

Q   "Confirmed PIP was closed and paid $9,600 and change, provided PIP Adjuster's CTC info", contact information?

A   Perfect.  You got it.

Q   All right.  Okay.  On that day, you had an outbound call to Kaylee Wood.  Why were you calling the

49

16 -- why are you calling a 16-year-old kid at that time? I'm just --

A   No -- no, it's -- the notes says, "Outbound call to named Insured owner, and the person who picked up was Kaylee, and she informed that that was her cell phone number."

Q   Okay.

A   So, I thanked her and then, I said, "I will call home number."

Q   Fair enough.

A   So, it sounded like she --

Q   Fair enough.  Thank you.

A   She was just indicating what was the right one.

Q   I mean, I wasn't picking on you.  I just, kind of, you know, all right.

A   I got you.  You know, it looks strange, but, yeah, that's not -- that what it meant.

Q   Okay.  So, now, the next note on that day, at 04:42 in the afternoon on December 7th, do you know December 7th, is Pearl Harbor Day?

A   No, I do not.

Q   Yeah.  Okay.  "BI negotiation for Buckner Robert L/COV"

A   Line coverage.



Amiama ,Yassel  02-17-2022

50

Q   Yeah, yeah, RBI, evaluation range.  Again, so where did you come with that evaluation range? I'm assuming that's $4,346 to $5,921.  Where did you come up with that?

A   Right.  So, that was based on the medical records that were provided at the time.  They're out of pocket, the severity of the -- not the injury, sorry, the damages to the vehicles, and the information I had received on the injuries itself plus the venue.

Q   Okay.  And this where -- like I said, I saw some other notes that said he was 25.  And now, this says 35, so that's --

A   Yeah, it's a mistake.  I have 35 here, but the same note at the bottom, you'll see 25, but it should have been 35 is the --

Q   All right.  So, did you utilize that program to come up with that range?  What do we call that -- the tool?  What do we call that tool?

A   Oh the MDP?

Q   Not MDP, the other one.

A   The LNAV?

Q   Yeah.

A   To be honest, I can't recall if I used that on this claim or not.

Q   Was it -- did you -- were you able to access

51

the LNAV through Claimstation or did you have to go out of Claimstation to do that elsewhere?

A   If I used it, it was it would have been through Claimstation.

Q   Okay.  So, what would I have to do if I wanted you to look and see if you used LNAV to come up with this range on December 7th, 2016?

A   To be honest, it's been so long.  I don't know how to access that system myself now.

Q   Okay.  I'll ask Mr. Weldy, because I want to--

A   Okay.

Q   -- what I'm curious to know is, you know, I want to know, if LNAV was used, what data was put into it?  And what would it split out?  You know what I'm saying?

A   Oh, I can tell you.  So, I would put the information into LNAV.  I would tell LNAV what I want, as far as the injury and the amount of treatment I'm considering.

And then, it would just let me know based on the venue, the data, so I would still be the one to make the determination on the value.

But as far as knowing if I used it or not, it has been so long that I think you have to go through the program and they would tell you, but I don't know. I

52

can't remember if that was used here or not.

Q   That's why you have a Lawyer who's very smart and I'm going to ask him.

A   Okay, okay.  Sorry.

Q   All right.  So, now, comments, you had comments.  "Mr. Buckner, 35 years old, he was a heavyset man, I guess a good way to put it.  He was in IT technology, priors per ISO 12/16/1999 neck and low back pain."  On the injuries, are these the current injuries or those injuries from 99?

A   No, those are the current injuries.

MR. WELDY:  Object to form.

Q   (By Mr. Liggio) Okay.  All right.  Let's see diagnosed with HNP, that's herniated -- whatever, you get -- it's a herniated disc, yeah?

A   Right.

Q   All right.  Then you wrote this note, "Not considering herniations because of nature of impact." Where did you get that?

A   That was based on the review of the photos of both vehicles and how the accident occurred.

Q   But where did you get that?  In other words, was it part of your training that you shouldn't consider herniations because of the nature or the direction of the impact or both?

53

A   Ask me the question in a different way, I'm sorry.

Q   Well, were you given any guidance from Progressive supervisors or your training or both, that you should in evaluating a claim, not consider herniations because of the nature of an impact?

A   I don't recall to be honest.  All I do know is that just looking at this, if I'm considering a soft tissue, I wouldn't consider herniation if the impact is a low impact, usually to have a more -- I wouldn't say more serious injury, but more to speak on the injury, if there was a heavier impact involved.

Q   No, but again, at the time, you were a Claims Adjuster for two years, and I'm trying to find out where you got that impression or were able to make that determination to disregard disc herniations because of the direction and the amount of an impact in evaluating a claim?

A   Right.  If you remember --

MR. WELDY:  Object to form, asked and answered, and you can answer.

THE WITNESS:  Oh, Rich, I'm sorry, I can or --

MR. WELDY:  You can.  To the extent you can, you can answer.

A   Okay.  No, from our, you know, our -- I think



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 111

Amiama ,Yassel  02-17-2022

54

you had a question regarding that in the beginning, and based on our training with the bulk files. So, we get a lot of claims, and based on that review of those claims, I'm able to see how those claims are evaluated, and make those determinations based on what we consider and what we don't. We're not considering based on a few factors, not just only the treatment, but more of the impact of the accident, priors, the medical expenses, the treatment that they did, those kinds of things.

Q    (By Mr. Liggio) You said training of a something file, what did you say?

A    The bulk files. So, when you're near to the--

Q    Bulk, bulk. Slow down, bulk. Spell it.

A    B-U-L-K, bulk.

Q    What are bulk files?

A    Bulk files are files that have been assigned to a previous Adjuster who was more tenured. And then, they get re-assigned to the newer folks to be able to learn the handling and then, also make our own decision based on what needs to be reviewed or completed on that file.

Q    So, you got guidance from your training as to the bulk files, which you felt would made you comfortable in disregarding herniated discs because of the nature of an impact, right?

55

MR. WELDY:  Object to form.

A    I would -- I wouldn't say that. Yeah, I wouldn't say that. I would say that the reason I didn't consider herniations for this particular case, I mean, all cases are different.

But for this particular claim, the reason I didn't consider the herniation was because of there was a prior claim that I had no information on. There was a low impact accident and the treatment he did was soft tissue.

So, for me to consider something additional based on the information I had at the time, this is why I considered not accepting the herniation.

Q    Can you and I agree that a disc herniation is not a soft tissue injury?

A    And I would say, no, herniated -- a herniated disc is not a soft tissue injury.

Q    Okay. Can you and I agree -- well, let me ask you this, in the demand package, did the treating physician for Mr. Buckner opine that within a reasonable degree of medical probability Mr. Buckner had a permanent injury?

A    Which record would that be that you're citing?

Q    I don't know. I want to make sure that in the demand package, did Mr. Messer provide medical records

56

to show that the physician treating Mr. Buckner had opined that he had a permanent injury?

A    From what I remember, they had discussed treatment option. I don't remember. I think if I look at my notes, I'll be able to answer the question a little bit better. I can't remember.

Q    Okay. Let's look at the bottom of the page under threshold. And let me see if I can read it correct. Again, it's Bates Stamped Page 495. "Threshold, based on the alleged injuries above, the Claimant did not miss any time from work, therefore does not appear the Claimant sustained permanent as a result of this accident. Therefore, threshold has not been breached. The PT documents" -- what is that? Physical therapy documents?

A    Exactly.

Q    PPI, what's the 12%?

A    That was the rating that they gave based on the physical therapy documents saying that he had a permanent -- sorry, a permanent injury of 12% or a PBI rating of 12%.

Q    Did you have a -- the benefit of the -- the AMA guides to permanent impairment that you could look at yourself in the office?

A    I don't know. I can't remember.  It was so

57

long ago.

Q    Do you know what those are?

A    It's -- I want to say, it's something that the medical professionals use to give that impairment rating.

Q    Okay.

A    As far as how it's rated, I would not know I'm not a medical professional, sorry.

Q    All right. So, but did you classify this as a permanent injury claim when you received it then, whether you disagreed with the extent of the injury or not?

A    For my knowledge back then, it would have been based on the doctor's recommendation or their own analysis. But this rating came from a physical therapist, I didn't see that with the ortho notes.

Q    Okay. All right. Let's see if there's anything else and then, ask you about. Hold on. I'm talking about it. Okay. Was there a health insurance lien if you know that Mr. Buckner had?

A    The Attorney didn't provide the lien if there was a lien. I could see in the bills that I believe Cigna may have paid for something, but he didn't provide the lien itself.

He also didn't provide a PIP log when I was



Amiama ,Yassel  02-17-2022

58

reviewing the medical records in the out-of-pocket. He did give, like a, breakdown -- the Attorney gave a breakdown of what he paid.

But I went based on my conversation with the carrier which they informed, they paid a lot more and that has been verified.

Q   So, you verified with Allstate itself about the PIP having been exhausted, right?  Whether this was sent it to you or not --

A   It didn't exhaust at that time.

Q   -- to verify with Allstate, right?

A   Say that again, I'm sorry?

Q   You verified with Allstate, right?

A   I verified the PIP payout with Allstate.

Q   There you go.  Okay.  Now, I notice here in your analysis, okay?

A   Um-hum.

Q   By the way, there was again, no question as to the liability picture.  The liability was unfortunately 100% on Kaylee Woods.  Isn't that right?

A   Right -- that's right.

Q   Did you ever change your evaluation of the liability picture?

A   No, I did not.

Q   Okay.  I'm looking here in your analysis, you

59

went -- you got this because you read the medical records I'm assuming, right?

A   Right.  This is information from the medical records that I took notes on.

Q   "The MRI revealed positive findings for cervical herniations", yeah?

A   Right.

Q   Did you have any indication that Mr. Buckner had been walking around with herniated discs since 1999?

A   The -- one of the medical records listed a prior in 2000 as well, when they were reviewing his treatment and what was going on with him.

Q   Sure.  As I said, if it's 2000, and it's now 2016, I'm asking you if you have any indication that he was walking around with multiple herniated discs since-- let's say, 2000.

A   So, outside of what was on the medical record, no.  The Attorney didn't provide any information from that prior injury that I had located, like if they have any.

Q   As of this date -- as of this date, 12/17 -- 12/07/2016, had a suit been filed?

A   12/07/16?  No, suit had not been filed --

Q   Okay.

60

A   -- as of yet.

Q   Okay.  Did you have any tools that you could use to answer some of these questions that you and I've just talked about whether Mr. Buckner was walking around with a herniated disk for 15 years?

A   No.  I don't have any tools for that one, no.

Q   Well --

A   It would be based on what the Attorney provides.  That's why I asked for the prior medical records to review and that was not provided.

Q   Did you have the capability back then to say to Mr. Messer, "We want to verify your client's injuries, will you agree to a pre-suit examination of a doctor that we choose?"

A   It at that time, I had spoken to the Attorney, but unfortunately, they never returned my calls, and they didn't really provide the information I requested.

So, I actually never spoke to the Attorney. It was always with the paralegal and she didn't have much info.

Q   Well, but you're being pretty vague. I'm talking about right here.

A   Okay.

Q   I'm being very specific as to the date.  You wrote this note 12/07/2016, right?

61

A   Um-hum.

Q   Was there any indication up to that date that Mr. Messer or Ms. Kurtosh would not provide you information or wouldn't return your call?  Did you make any notes up to that time?

MR. WELDY:  Object to form, asked and answered.

MR. LIGGIO:  No, it's not.

MR. WELDY:  You can answer.

Q   (By Mr. Liggio) You can answer it.

A   So, I guess, my answer would probably be the same that I know you're trying to not hear.  So, I guess, what's the question that you're -- because it sounds like you're asking about this time and I'm just making sure I understand that at this time, 12/07/16, did I have any information from the Attorney if this person had a prior injury?  Is that --

Q   No, that's not --

A   No.

Q   I'm not the one that's trying to change things.  Why don't we take a minute to stop -- why don't we take a minute?  And I'll tell you what, we've been going for a little over an hour --

A   Okay.

Q   -- why don't we take a 10-minute break? It's



62

now 11:15. We're going to 11:25. We're making good time. We'll be done 12:30 -- 1 o'clock at the latest.

A Okay.

Q But I want you to look at your prior notes, prior to December 7th, 2016, and to see if you made any note up to December 7th, 2016, that you weren't getting responding calls or weren't getting information from the Plaintiff's Lawyers.

You said they wouldn't return your phone calls. I want you when we get back, to show me a note, okay?

A Okay.

MR. LIGGIO: All right. Now, what I want everybody to do if you're on a computer, if I'm going to stop sharing the screen for a few minutes, if you go to the bottom left of your screen, there's two icons, one for microphone where you can mute it, and the other for the video where you could stop it.

So, stop your video, mute your microphone, and we'll pick this back up at 11:25, okay?

(Thereupon, a short discussion was held off record.)

(Deposition resumed.)

THE COURT REPORTER: We're back on the record.

63

Q (By Mr. Liggio) Now, I was asked -- I asked you to do a little homework on the break.

A Yes, you did give me homework.

Q Were there any notes prior to December 7th, 2016, to indicate that Mr. Messer or his office wouldn't answer your phone calls or give you information that you asked for?

A I have a note on 11/13/2015.

Q 2015?

A Yeah.

Q All right.

A That's where I sent the letter requesting for his prior records to the Attorney. And then, there's another note on 03/11/2016, when I called the Attorney's office, spoke to Julie, and she said that they would call me back with injury and treatment information. I didn't receive a call back.

And then, there was July 25th, 2016, where she said she would have the Attorney Roger, pull the file and contact me and they never contacted me.

Q Okay. So, you knew from ISO, right, that there was an injury in 1999, you just said something from 2000?

A Yeah, the record had 2000 on there.

Q Okay. So, again, I was asking you before the

64

break, did you have any information to indicate that Mr. Buckner was walking around with herniated discs in his neck for 15 years before the accident --

A No, I --

Q -- that we're talking about?

A No, I didn't have any of that.

Q And if there was no interim treatment, would that have been relevant to you at that time?

MR. WELDY: I think there were two questions there, right?

A Yeah.

Q (By Mr. Liggio) Well, it was irrelevant to you if there wasn't any ongoing treatment between 2002 and 2015 for herniated discs or neck pain by Mr. Buckner?

A I believe that would have helped my evaluation if they're claiming a herniated disc occurred from this accident, and I'm seeing a prior or the same areas of pain, and I don't have any records on those and they would -- it wasn't provided on events of demand.

Q Did you ever -- did you ever ask that Mr. Buckner have any treatment for his neck for the ensuing 15 years?

A Well, I couldn't even get in contact with the Attorney in that office, it was always with the paralegal, and she didn't know any prior records.

65

Q Now, that we're sitting here today, do you have any information even today that Mr. Buckner was walking around with herniated discs in his neck, several of them, for 15 years before the accident that started this process?

A Well, I can't speak on today. It depends on the records that were provided during the time of the evaluation.

Q And if there were no records because he didn't have any treatment for 15 years, was that pertinent in evaluating the settlement range of the claim?

A Well, the man at that time was claiming herniated discs from this accident and for me to be able to consider the herniation, I would need to see how this accident caused a herniation.

And when I was looking at the medical records provided, his treatment was saying it was soft tissue, that he was doing conservative treatment.

He also had told his doctor about a prior motor vehicle accident, and they had a different date than the date that I had found on ISO. So, as far as, you know, him walking around with herniated disk for 15 years, it is would be really unknown unless records were provided on if he did treatment or if he wasn't treating, I wouldn't know since I didn't get -- have


UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 114

Amiama ,Yassel  02-17-2022

66

those records.

Q   Did you have any tools?  I asked this before, we're going to go back again, that you could have used to resolve those questions back in December 2016?

A   No tools.  I didn't have a medical authorization.  The Attorney didn't provide that information and did not have the --

Q   And when you say you didn't have a medical authorization, did you ask?

A   I couldn't even get in contact with the Attorney.  The Attorney -- I even called after giving the offer and the first thing that I heard as a response was that they filed suit.

So, the Attorney's office never spoke to me about the claim or the evaluation.  I wasn't able to ask them this question and I asked in writing for that information prior to that demand.

Q   Did you ever, you know, I know you have what you're going to tell me, but I've asked this specific question.  Did you send Mr. Messer -- by-the-way, are you complaining because you talked to the paralegal as opposed to the Lawyer?

A   No.

Q   Did you not think she was talking on behalf of

67

her boss?

A   No, I'm not complaining.  I'm just letting you know what the facts were when I had the claim.

Q   Did you ever send to Ms. Kurtosh or Mr. Messer, "Give us a list of the doctors that Mr. Buckner may have treated with from 2000 to 2015, and give us a medical authorization so we can ask for the records."

Did you ever ask Mr. Kurtosh and Mr. Messer for that?

A   So, I mean, on my claim notes from 11/13/2015, when I mailed the request.

Q   I'm talking now in December of 2016, when you rejected a time demand for the policy limits.  I asked you about tools you had at that time, and I said, did you send them a medical authorization?

In December 2016, did you send the Ms. Kurtosh or Mr. Messer, a medical authorization?  That's all.

A   In December, I'm -- in December, I made an evaluation of their claim and I sent them the offer based on the information they sent to me.

As far as discussing the offer and what I needed to move forward, I called the Attorney's office and they didn't call me back.

Q   Did you send them in the mail a letter,

68

"Here's a medical authorization.  Please give me the list of medical providers that Mr. Buckner has seen in the last 15 years."  Did you, after December of 2016, yes or no?

A   At that point, there's a demand and I was responding to the demand.  So, if there was additional information, my offer would have said that in writing where it says, "Hey, this is the offer I'm presenting, but if there's anything that is in addition that I may have not considered, to please send to us."

Q   I'm going to share the screen.  Okay.  This is your response to the letter, was it not?

A   Yes.

Q   I don't see you asking them for any other information unless I missed it.  Show me where?

A   Let me look at my note because I can't remember, but I know I called them.

Q   Let's go back to the notes.  I'm going to switch.  We'll go back to the notes. Here's that note, December 7th, 2016, that we've been talking about at length.

A   Can we keep going down?

Q   I will.  You made a note of what you think you needed to support, you wanted to know about whether he had trouble with his act of daily living, right?

69

A   Okay.  Keep going down.

Q   Sure.  Mitigators, aggravators to consider.

A   Okay.  Can -- you see where it says 12/07/2016 --

Q   Yeah.

A   -- where it says I spoke to Alex?

Q   Spoke to Alex?  Who's Alex?

A   I don't recall. It was whoever I called and they answered the phone.  So, I always make sure to notate their name when they answer the phone from the Attorney's office and there, that's when I wanted to make sure to provide the information so it could be forwarded to Julie and the Attorney.

Now, in the offer in writing, it says, "Please discuss with your client."  And then, to discuss it - - what was the proper wording on that?  I can't remember what it was.

Q   You're looking at it -- you can look at it.

A   You have it on your screen?

Q   "In response to your demand, in November 10th, 2016, for your client, Robert Buckner, I'm extending an offer of $4,350 a settlement of your client's pending claim.

Please discuss this offer with your client and advise his or her intentions so that we may proceed with



Amiama ,Yassel  02-17-2022

70

settlement of this claim.  Thank you for your professional courtesy.

I'm looking forward to bringing this claim to a prompt an amicable resolution."  Did I read it completely?

A   Yes.

Q   Did you ask in that letter, we want to talk about medical treatment or get a medical authorization for the 15 years prior to this accident?  Yes or no?

A   Not specifically.  It does not say that, no.

Q   Okay.  I don't know if we have a -- now, that was the 2015 letter.

A   Um-hum.

Q   I'm trying to find 2000 --

A   Well, so based on just handling claims, usually the Attorneys will discuss the offer with you and that's where we can get into those discussions about the priors and ask him for the information again.

So, with this Attorney, I just never had the chance to do so.  I'm looking at my notes from what you just showed.  And no, it does not ask for that information again after the offer is made.

Q   So, you did not -- after the offer was made of $4,300, ask for a pre-suit medical evaluation, right?

A   Sorry, what do you -- what do you mean by a

71

pre-suit medical evaluation?

Q   You didn't reach out to Mr. Messer or Mr. -- Ms. Kurtosh, his paralegal, and say we'd like to have Mr. Buckner examined by a doctor of our choosing, correct?

A   Well, we were still in the beginning stages of the demand.  So, I got the demand, I reviewed it, and based on what they sent to me, I made an evaluation and reached out to them to discuss it -- discuss the offer.

Plus, I faxed the offer to the Attorney with the offer in writing. Usually, that prompts the Attorney to call and we can have a telephone conversation on the case and how -- what they feel that the value would be.

And then, I could let them know, "Hey, based on what they submitted, this is what I'm seeing to be able to help bridge that gap, but that never happened with this Attorney.  It was--

Q   We are going to -- we are going to move to strike the answer because it's non-responsive.  I know you want to tell me you tale.

MR. LIGGIO:  Gabriela, read the question back and I want a specific answer to my question, please?

THE COURT REPORTER:  Yes, give me one second, Mr. Liggio.

72

MR. LIGGIO:  Thank you.

THE COURT REPORTER:  Mr. Liggio, I apologize, I'm having computer issues right now.

Q   (By Mr. Liggio) Did you -- let's ask it again. It's reduced to memory.  Did you at any time after December 7th, 2016, request of Mr. Messer and Ms. Kurtosh to have Mr. Buckner examined by a doctor of Progressive's choosing?  Yes or no?

A   No.

Q   Did you at any time after December 7th, 2016, send a letter, a fax, a text, an e-mail to Mr. Messer or Ms. Kurtosh, requesting a list of Mr. Buckner's treating medical providers for the 15 years prior to 2015, and asking him to provide Progressive medical authorization? Yes or no?

A   No.

Q   What you did was, you waited to talk to the Lawyer and when they didn't talk to you, "That's our offer, take it or leave it", right?

MR. WELDY:  Object to form.

Q   (By Mr. Liggio) Right?

A   No.  Once I sent the offer, then that's when I learned that it was in litigation, and it was transferred to another representative to handle.

Q   When did it go to litigation?

73

A   If you look at my notes, I can't remember when, but the notes will say it.

Q   Okay.  We'll look at the notes.  So, 12/07/2016, we already noted that you sent the letter. Hold on a second.

A   Um-hum.

Q   On December 7th, that same day, you sent a letter offering $4,350, and there's no questions in that letter other than, "Please discuss it with the client and get back to me", right?

A   Right, right.

Q   Okay.  And I am kind of curious, right? Just before we get to the -- this, when that was in suit, the $4,350 -- okay, it was $4 more than your low end of the range, right?

A   Right.

Q   If Mr. Messer would come back and said anything above $5,900 at that time, what would you have done?

MR. WELDY:  Object to form.

A   Yes, I mean, it just -- that didn't happen in this case.

Q   Okay.

A   We didn't even get to discuss the specialty sent over to make sure I had everything accurate based



Amiama ,Yassel  02-17-2022

74

on what he was looking at for the policy.

Q   (By Mr. Liggio) Okay.  And again, we talked about what you -- what tools you had that you didn't use.  Okay.  By the way, in the ISO database, does it at least list the name of the Lawyers that were involved in that 1999 claim?

A   I don't recall if it listed a Lawyer for that claim.  But if there was, it would have that information.

Q   Okay.  If I wanted to look at the -- get a copy of that ISO screen, you could print it off for me, yeah?

MR. WELDY:  I think it's been produced to you.

MR. LIGGIO:  Has it?  Okay.

MR. WELDY:  Yeah.

MR. LIGGIO:  All right.

Q   (By Mr. Liggio) And I don't know what it said, so -- but was it your process or protocol at that time, if it did list the name of Lawyers, you'd reach out to them?

A   No.  We don't reach out to any Attorney but the current attorney handling the claim.

Q   Okay.  And by the way, Mr. Buckner sent in a medical record you said had an accident in 2000.  Was he confused as to the date between '99 and 2000 since it's

75

been 15 or 16 years and was there indeed a second injury in 2000?

A   I'm not sure what the conversation was between him and his provider.  But if you look on Page 65 of the demand, whoever he saw at that visit doesn't notate a prior motor vehicle accident in 2000.

Q   Thank you very much.  Now --

A   You're welcome.

Q   So, we were talking about when suit was filed, again after 12/07/2016, that's when you sent the demand, the response, right?

A   Um-hum.

Q   Did you make any phone calls -- I don't -- how many documented phone calls from you to the adjuster?

A   No.  No, I have a note on my to-do to follow up on the offer I presented.  And then, in January 10th, that's when I spoke to the Insured's wife, and she informed that they had received a summons yesterday, which would have been 01/09/2017.

Q   So, you make the offer three days before the 30 days runs, right?

A   Um-hum.

Q   And you didn't reach out to call Mr. Messer to see if you could protect your Insured as a --

76

A   Oh, I did on 12/07.

Q   You did on 12/07, all right.  I'm sorry.  Where did you -- where did you -- I see --

A   So, that was 12/07 --

Q   -- "Spoke with Alex, will forward message with offer to a Julie Attorney."

A   Um-hum.

Q   12/07.  That's it.  What about 12/08, 12/09, 12/10?  Did you follow up -- make a phone call?

A   Usually, I give them time to be able to discuss it with their clients.

Q   Okay.  Of course, the 30-day time frame was going to run on the 10th, yeah?

A   Is that what the note says that it was due?

Q   Yeah.

A   Okay.

Q   Does silence mean no when they don't respond to your offer?  We got 30 days, does silence mean no?  And I don't know.

MR. WELDY:  Object to form.

A   No, because I have it on -- my note here says to follow up on the offer.  So, when I was going to follow up again, that's when I spoke to the name Insured's wife, and she informed that they received a summons.

77

So, at that point, I stopped all offer negotiation since it's going to be handled by a Litigation Adjuster.

Q   (By Mr. Liggio) And there were no communications documented between you and Mr. Messer's Office between December 7th, 2016, and at least since you stopped communicating on January 10th, 2017, right?

A   Right.

Q   None initiated by you at all, because you would have logged it?

A   Correct.

Q   Okay.  And then, so when the suit gets filed, is that want it gets transferred to Ms. Sheffield?

A   That's correct.

Q   Okay.  And that was your final -- that's the last involvement you had with the claim?

A   That's correct.

MR. LIGGIO:  Do you have any question, Rich?  You want to read or waive?

MR. WELDY:  I have -- I just have a few follow up questions.  I'll be very brief.

MR. LIGGIO:  Okay.

CROSS EXAMINATION

BY MR. WELDY:

Q   Ms. Amiama, you were asked some questions



Amiama ,Yassel  02-17-2022

78

about programs available to assist you as an Adjuster in evaluating bodily injury claims.  Do you remember that?

A   Yes.

Q   When you do utilize these programs to make assessment, would you ever rely exclusively on the figures and information generated by those programs?

A   No, I would have to go line-by-line to make sure that it's accurate with my evaluation of the case.

Q   So, you would also conduct an independent evaluation based on your experience?  Is that fair?

A   Correct.

Q   Okay.  You're also asked some questions about a prior injury claim made by Mr. Buckner.  And you may have answered this, but how was that information first made available to you when you were assigned to this claim?

A   It was made available through ISO.

Q   Is that a tool that you use to investigate bodily injury claims?

A   It's a tool, yes, that helps to determine if there was any other accidents involved -- that the person was involved in and if they had any other injury claim.

Q   Okay. I'm going to try to share my screen.

MR. LIGGIO:  Oh, I'm sorry, did I -- let me

79

stop sharing.  I apologize.

MR. WELDY:  Oh, okay.  Maybe I was -- I didn't even realize --

MR. LIGGIO:  Now, it's your turn.  I apologize.  Go ahead.

MR. WELDY:  It's all right.

Q   (By Mr. Weldy) Okay.  Can you see?

A   Um-hum.

Q   Ms. Amiama, can you tell me the date of this correspondence?

A   The date reads on the document November 13th, 2015.

Q   And who are you sending this correspondence to?

A   Messer & Messer Law Offices.

Q   Can you explain to me what records and treatment information you're seeking here?

A   Here it says, "Please provide injury, treatment, and medical records pertaining to your clients per accident and/or Workers' Comp claim dated December 16th, 1999."

Q   Let me ask you, is there any other source that you could go to other than Mr. Buckner's Attorney to obtain information like this at this time?

A   No.

80

Q   Could you have gone to Mr. Buckner directly at this point?

A   No.

Q   Did you have any other information about this prior claim other than what you put here in this letter?

A   No.

Q   And did you reach out to Mr. Buckner's Attorney after the date of this letter to try to obtain information related to Mr. Buckner's prior claim?

A   From what I can remember, based on my notes, I did call back to get injury and treatment information a few times.

Q   Was the existence of a potential prior neck injury from a prior claim something important to your evaluation of Mr. Buckner's claim in this case?

A   I believe so.

Q   Okay.  We went over some notes dating from November 13th, 2015, up until the date the demand was received in November 2016.  Some notes reflecting phone calls that you made to Mr. Messer's office.  Do you remember who you spoke with in Mr. Messer's office?

A   I don't remember, but in my notes says I spoke to Julie most of the times when I called them.

Q   At any point when you called Mr. Messer's office between November 2015 and November 2016, did you

81

ever speak to Mr. Roger Messer on the phone?

A   No, never.

Q   Did he ever take any of your calls?

A   No.

Q   At any point during your involvement in this claim, did Mr. Messer ever pick up the phone and call you back?

A   No.

Q   With regard to the November 13th, 2015, letter that I showed you, did Mr. Messer ever send you a correspondence in response to that letter at any point?

A   No, no.

Q   And I think we reviewed also a July 25th, 2015, letter sent to Mr. Messer's office.  Do you remember that?

A   No, I'm sorry.

Q   That's okay.  I've got it right here and we can -- I'll give you just a moment to review that.

A   Yeah, this is what I would call my interim follow up letter.

Q   In this letter, did you also request a copy of Mr. Buckner's PIP log?

A   Yes.

Q   Did Mr. Messer ever provide you with a copy of Mr. Buckner's PIP log?



Amiama ,Yassel  02-17-2022

82

A   He did not.

Q   Okay. At any point did Mr. Messer provide you with any documents related to a prior claim made by Mr. Buckner?

A   No.

Q   Did Mr. Messer ever reach out in any way whether a letter or correspondence to inform you that there were no documents or records from a prior Workers' Compensation claim?

A   No, he did not.

Q   Give me just a moment.  As you think, is picking up a phone and reaching out to a Claimant's Counsel something that is commonly used as a tool in investigating bodily injury claims?

A   Yeah, that's usually how we get our primary information on their injuries and treatment.

Q   Is the first time that you received a correspondence from Mr. Messer, the date that you received the November 7th, 2016, demand?

A   Yes.

Q   Okay.  We talked about and I think you were asked some questions about you speaking to Julie -- with Julie Kurtosh, I think was the name, with Mr. Messer's office.  Was Julie an Attorney?

A   No.

83

Q   Was Julie ever able to provide you with information related to Mr. Messer's injuries?

A   No.

Q   Did Ms. -- did Julie ever inform you that Mr. Buckner was even treating for a neck injury?

A   She did not.

Q   You were asked some questions about your assessment of the nature of the impact of this collision and whether the herniations would be related to the accident.

Was the nature of the collision and the accident itself among the factors that you considered in evaluating this claim and whether the injuries claimed were causally related to the accident?

A   They were not the only sources.

Q   But it was among the things that you consider in evaluating this claim?

A   Yes.

Q   Was the damage sustained by Mr. Buckner's vehicle also a factor for consideration?

A   Yes, it was.

Q   Was the potential existence of a prior claim for a neck injury something relevant to your consideration even though you hadn't been provided those documents?

84

A   Yes.

Q   Was the fact that Mr. Messer never disclaimed that there was a prior neck injury or prior treatment, was that relevant to your evaluation at all?

A   Yes.

Q   Were there also portions of the medical records provided in the demand that were pertinent to your evaluation of this claim as a soft tissue injury?

A   Yes.

Q   When you received that demand packet, would you have taken the time to review those medical records?

A   Yes.

Q   Was there an MRI reading within that demand packet that you recall?

A   There was.

Q   What did that MRI reading indicate?

A   I don't remember what exactly it said.  I just remember from my notes, he had treated at the ER, the -- I'm sorry, with ortho and then, did some PP, but I don't remember what the MRI said exactly.

Q   Were there any notes that Mr. Messer had experienced some degenerative changes in the cervical spine in those medical records?

A   I believe his ortho had mentioned that, yes, and completed an additional exam.

85

Q   Do degenerative changes necessarily mean that Mr. Buckner had been walking around with a herniation for 15 years?

MR. LIGGIO:  Objection, predicate, but you're going to answer it anyway.

Q   (By Mr. Weldy) You can answer.

A   Yes, degenerative findings, yes.

MR. WELDY:  That's all the questions I have.

MR. LIGGIO:  By the way --

MR. WELDY:  Jeff, any follow ups?

RE-DIRECT EXAMINATION

BY MR. LIGGIO:

Q   Do you know -- do you have any experience as to whether someone could -- let's assume he had these injuries for 15 years, could someone recover in the Florida Court in a BI claim for aggravation of previous injury?

MR. WELDY:  Objection.

MR. LIGGIO:  Well, you asked her to give medical opinion, I'm asking this.

MR. WELDY:  And you objected, and you objected.

MR. LIGGIO:  She can answer, she can answer.

MR. WELDY:  She can answer, yes.

THE WITNESS:  So -- sorry, do you mind



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

WOOD 119

Amiama ,Yassel  02-17-2022

86

repeating that question one more time?  You were saying --

Q   (By Mr. Liggio) Sure. Do you factor into your evaluation whether previous injuries, if any, were aggravated by the accident that your Insured caused?

A   Are we talking about this specific one or just in general?

Q   Just in general and then, we'll talk about this specific one.

A   I don't really like to discuss generalities. I don't want to assume from just looking at this gentleman's particular medical records and the findings and the treatment he did, if it was an aggravation, I would have considered it if they would have provided those prior medical records.

Q   But you never sent an authorization and you never sent the letter asking a list of medical providers so we can get them ourselves to protect the Woods, right?

MR. WELDY:  Objection, asked and answered.

MR. LIGGIO:  No, it has not been.  You can answer.

MR. WELDY:  I believe it has, but she can answer regardless.

THE WITNESS:  Well, I wouldn't say that I

87

would automatically request that information. Usually, like I said, we'd like to --

Q   (By Mr. Liggio) Stop.  Answer my question. Read the question back computer or --

MR. WELDY:  Let her finish before you -- let her finish before you ask her to stop.

MR. LIGGIO:  I'm not getting direct answers to my question.  Answer the question.

MR. WELDY:  She can finish her answer to the question and then, you can ask the question again, if you don't like the answer.

MR. LIGGIO:  Answer the -- no, I'm not going to ask her the question again.  I have not gotten a straight answer.

Q   (By Mr. Liggio) I'll ask you one more time. Yes or no, you did not at any time from 2015 till you were relieved from this claim in 2017, a letter to Mr. Messer and proposed medical authorizations, tell the names of the doctors that Mr. Buckner treated with for the last 15 years and have him sign this medical authorization?

MR. WELDY:  Objection.  She has answered this question three times.

Q   (By Mr. Liggio) Answer yes or no?

MR. WELDY:  Answer it again, please.

88

A   After the demand and in December, no, I did not send that request.

Q   (By Mr. Liggio) Did you ever send a letter asking them to enumerate the doctors and to send medical authorizations before 2006 -- 2016?  Yes or no?

MR. WELDY:  Objection, asked and answered.

Q   (By Mr. Liggio) You can answer.

A   Before December, when the demand came, I did ask for the priors and injury and treatment information which I only got a response to a demand with the information as far as what he treated with and that's what I based my evaluation on.

Q   I did not ask that.  I asked you before December 7th, 2016, did you send Mr. Messer a letter, "Tell us the name of the doctors that Mr. Buckner treated with for the last 15 years and have him sign a medical authorization so we could get the medical records ourselves."  Yes or no?

A   Yes, for the interim.  No, for the medical authorization.

Q   Are you trained at Progressive on what you need to do to protect your Insured when the Lawyer for the Claimant is not responding to you the way you want them to?

A   I can't recall.  I'm not in that role any

89

longer and I haven't had that situation besides this one where the Attorney didn't get in contact with me and then it went to litigation.

So, the litigation rep would have the expertise on how to handle those.

Q   So, you -- but you testified Mr. Messer didn't cooperate with you, right?

A   He -- I never spoke to Mr. Messer.

Q   His office, Ms. Kurtosh, Mr. Messer's office did not cooperate with you.  Is that what you're telling us? Yes or no?

A   Based on my interaction with them, it was more like a messenger service.  But I never really got to talk to anyone about the case details.  I didn't get any information besides that demand.

Q   So, because they didn't give you the information that you say you requested, they didn't cooperate with you, right?

A   If you want to put in those terms.

Q   I'm just trying to get down to the basics of what you told us.  You said you asked for information, and Mr. Messer never gave it to you, right?

A   Right.

Q   Your duty was to the Woods, yes?

A   Right.



Amiama ,Yassel 02-17-2022

90

Q Did you ever tell the Woods that Mr. Messer wasn't cooperating with your request?

A I kept them updated with what was going on in the claim.

Q Did you ever tell the Woods that Mr. Messer was not cooperating with your request? Yes or no?

A I wouldn't include that information, no.

Q Did you ever tell the Woods in December of 2016, they were exposed to an excess judgment against them perhaps?

MR. WELDY: Is this within the scope of my cross? I mean, are we -- is there going to a new line of questions?

MR. LIGGIO: I think it is -- I think it is. It goes with the cooperation stuff.

Q (By Mr. Liggio) Did you ever tell the Woods after you got the time demand that they are exposed to an excess judgment potentially? Yes or no?

A The letter that explained the demand does provide that information on there.

MR. LIGGIO: Thank you. Now, I have no further questions. Read or waive?

MR. WELDY: You can read -- you can read -- just this is her first deposition. You can read through the transcript of the deposition just to be

91

sure that your answers are consistent with the answers that you provided or you can waive.

THE WITNESS: Okay. I have to choose now?

MR. WELDY: Yeah, you're welcome to waive, it's pretty common.

THE WITNESS: Okay. I would like -- that's fine, I'll waive it.

MR. LIGGIO: Okay. We didn't attach exhibits because we referred the Bates Stamped numbers. Are we all right with that? Do you want us to go back and attach the Bates Stamped numbered exhibits? Tell me the way you want to do them.

MR. WELDY: Are you asking me or are you asking Madam Court Reporter? I'm fine with the way you did it.

MR. LIGGIO: I wanted to see -- I wanted to see if we have an agreement between the lawyers first.

MR. WELDY: Yeah. I'm fine with that. I'm fine with the way we did it.

(Deposition concluded at 12:05 p.m.)

(Reading and signing of the deposition by the witness has been waived.)

92

CERTIFICATE OF REPORTER
STATE OF FLORIDA
COUNTY OF BROWARD

I, GABRIELA GONZALEZ, Court Reporter and Notary Public for the State of Florida, do hereby certify that I was authorized to and did digitally report and transcribe the foregoing proceedings, and that the transcript is a true and complete record of my notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Witness my hand this 4th day of March, 2022.

_____
GABRIELA GONZALEZ, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA

93

CERTIFICATE OF OATH
STATE OF FLORIDA
COUNTY OF BROWARD

I, GABRIELA GONZALEZ, the undersigned authority, certify that YASSEL AMIAMA, appeared before me remotely pursuant to Florida Supreme Court Order AOSC20-23 and was duly sworn on the 17th day of February, 2022.

Witness my hand this 4th day of March, 2022.

_____
GABRIELA GONZALEZ, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA
Commission No.: GG 953243
Commission Exp.: 02/23/2024


UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 121

Amiama ,Yassel  02-17-2022      Page 1 of 37

**$**

**$10,000** 18:5,8,11,23 19:1

**$2,400** 42:7

**$4** 73:14

**$4,300** 70:24

**$4,346** 50:3

**$4,350** 69:22 73:8,14

**$5,900** 73:18

**$5,921** 50:3

**$50,000** 46:3

**$9,600** 48:20

**0**

**01/09/2017** 75:20

**02/23/2024** 93:19

**03/11/2016** 63:14

**04:00** 44:12

**04:30** 44:7

**04:40** 44:8

**04:42** 49:20

**1**

**1** 62:2

**10** 14:22

**10:03** 1:17 5:10

**10:28** 15:24 23:4

**10:38** 32:5

**10:45** 26:18

**100%** 18:1 34:6 58:20

**10-minute** 61:25

**10th** 69:20 75:17 76:13 77:7

**11** 47:21

**11/10** 46:8

**11/13/15** 12:10

**11/13/2015** 63:8 67:11

**11/19** 40:7

**11:02** 33:9

**11:04** 33:9

**11:15** 62:1

**11:25** 62:1,21

**11th** 43:3

**12** 11:25 12:1

**12%** 56:17,20,21

**12/07** 76:1,2,4,8

**12/07/16** 59:24 61:15

**12/07/2016** 59:23 60:25 69:4 73:4 75:11

**12/08** 76:8

**12/09** 76:8

**12/10** 76:9

**12/16/1999**

52:8

**12/17** 59:22

**12/19/2016** 46:4

**12:05** 1:17 91:21

**12:30** 62:2

**13** 16:10

**13th** 12:7 13:7 14:22 23:5 31:14 32:5 40:19 79:11 80:18 81:9

**14** 42:3,4

**15** 42:3 60:5 64:3,22 65:4,10,22 68:3 70:9 72:13 75:1 85:3,15 87:20 88:16

**16** 24:3 28:22 29:4 49:1 75:1

**1615** 2:4

**16th** 79:21

**16-year-old** 49:1

**17** 1:17 5:2

**17th** 5:9 45:15 93:8

**17-year-old** 24:3

**18th** 39:4

**1999** 29:4,17,22 30:16,17 31:4

59:10 63:22 74:6 79:21

**19-year-old** 29:12

**2**

**2** 2:9

**2:21-cv-14172- JEM** 1:2 5:8

**2000** 59:12,14,17 63:23,24 67:6 70:14 74:24,25 75:2,7

**2001** 41:24

**2002** 64:13

**2006** 88:5

**2013** 7:5 9:12,14 10:13,20

**2015** 12:7 13:7 14:22 23:5 29:5 31:14 32:5 39:4 41:4 63:9 64:14 67:6 70:12 72:13 79:12 80:18,25 81:9,14 87:16

**2016** 43:3,19 44:3,14 45:10,15 48:17 51:7 59:15 62:5,6 63:5,18 66:5 67:13,17 68:3,20 69:21



**UNIVERSAL COURT REPORTING**

877.291.3376
www.UCRinc.com
WOOD 122

72:6,10 77:6
80:19,25
82:19 88:5,14
90:9

**2017** 77:7
87:17

**2022** 1:17
5:2,9 92:15
93:8,9

**21st** 40:22

**240-619** 33:5

**25** 29:1,4,5,7
50:11,14

**25th** 44:14
45:10 63:18
81:13

**27th** 41:4

**29th** 43:19
44:2

—————— 3 ——————

**30** 48:5 75:22
76:18

**305-222-7720**
2:10

**30-day** 76:12

**3195** 2:9

**33131** 2:9

**33401** 2:4

**35** 29:7,8
50:12,13,15
52:6

—————— 4 ——————

**489** 23:3

**490** 32:9

**495** 56:9

**4th** 92:15 93:9

—————— 5 ——————

**5100** 27:20

**561-616-3333**
2:5

—————— 6 ——————

**6** 3:3

**65** 75:4

—————— 7 ——————

**77** 3:5

**772** 25:21
32:6,13 33:5

**7th** 48:17
49:20,21 51:7
62:5,6 63:4
68:20 72:6,10
73:7 77:6
82:19 88:14

—————— 8 ——————

**85** 3:6

**879-3000** 25:21
32:6

—————— 9 ——————

**95** 12:1 35:2

**953243** 93:18

**99** 52:10 74:25

—————— A ——————

**a.m** 1:17 5:10

**A0** 39:8

**A091159** 39:11

**A093756** 14:25

**abbreviations**
24:8 43:15

**able** 7:9 14:8
20:3 28:10
29:15,21
42:17 50:25
53:15 54:4,18
56:5 65:13
66:16 71:16
76:10 83:1

**about** 7:17
9:9,10 12:15
14:16 16:10
19:19 21:14
22:17 23:6
28:21 31:22
40:20,23,24
42:6 43:18
45:14
47:22,23
57:18,19 58:7
60:4,22 61:14
64:5 65:19
66:16 67:15
68:20,24
70:8,17 74:3
75:10 76:8
78:1,12 80:4
82:21,22 83:7
86:6,8 89:14

**above** 56:10
73:18

**accepting**
55:13

**access** 7:9
28:6,7 29:21
36:15 50:25
51:9

**accident**
36:14,17 38:4
52:21 54:8

**55:9 56:13
64:3,17
65:4,13,15,20
70:9 74:24
75:6 79:20
83:10,12,14
86:5**

**accidents**
36:11 78:21

**accurate** 73:25
78:8

**Acknowledge**
39:21

**act** 68:25

**action**
92:13,14

**actually** 9:10
11:10
15:16,20 16:3
30:7 60:18

**add** 47:16

**ADD123** 34:24

**addition** 33:25
68:9

**additional**
23:12,13
25:15 33:11
34:21,22
55:11 68:6
84:25

**address** 28:15
38:15

**addresses**
25:12

**adequate** 17:4

**adjuster** 6:5
14:25 19:25
44:20,22 47:8



53:14 54:17 75:15 77:3 78:1

**Adjuster's** 7:6 9:6 17:21,22 48:21

**adjusting** 9:2 42:13

**admin** 34:12 39:16

**administration** 9:1

**advantage** 42:13

**adverse** 17:16

**advise** 69:25

**advised** 36:7 37:1

**after** 6:1 9:20 10:12 11:10 14:22 46:20 66:12 68:3 70:22,23 72:5,10 75:11 80:8 88:1 90:17

**afternoon** 49:20

**again** 16:10 21:9 23:4 37:18 40:22 43:4,15 44:25 46:11 50:1 53:13 56:9 58:12,18 63:25 66:3 70:18,22 72:4 74:2 75:11 76:23

87:10,13,25

**against** 30:17 90:9

**age** 10:6 24:20,25 27:2

**aggravated** 86:5

**aggravation** 85:16 86:13

**aggravators** 69:2

**ago** 7:18 22:19 57:1

**agree** 17:20,22 18:1 55:14,18 60:13

**agreed** 37:21

**agreement** 91:17

**ahead** 6:16 7:5 31:1 79:5

**airport** 7:3

**Alex** 69:6,7 76:5

**all** 1:18 6:14,21 7:2,20 8:13,25 9:5,9 10:6,23 11:5 15:23 16:23 18:4 22:24 24:11 25:1 26:7 27:5 29:14 32:18,20,24 33:8 34:18 35:25 38:15,19

39:21 41:15,21 42:2,11,23 43:24 44:1 45:13,24 46:13,20,24 47:6,20 48:24 49:16 50:16 52:5,13,17 53:7 55:5 57:9,17 62:13 63:11 67:18 74:16 76:2 77:1,9 79:6 84:4 85:8 91:10

**alleged** 56:10

**Allstate** 27:14 44:16,17 48:18 58:7,11,13,14

**already** 19:22,24 25:22 33:16 36:8,11,22,24 73:4

**ALS** 26:23

**also** 2:12 17:4 20:7 21:19 25:14 34:3 42:14 54:19 57:25 65:19 78:9,12 81:13,21 83:20 84:6

**always** 60:19 64:24 69:9

**am** 5:12 7:14 13:6 19:14 24:25 46:16

73:12 92:10,12,13

**AMA** 56:23

**Amiama** 1:15 3:2 5:1,7,25 6:5,17,19,20 46:12 77:25 79:9 93:6

**amicable** 70:4

**among** 83:12,16

**amount** 20:4 21:15 46:3 47:6 51:18 53:17

**analysis** 57:15 58:16,25

**and/or** 79:20

**another** 19:24 22:1 36:16 39:5,16 63:14 72:24

**answer** 27:5 53:21,24 56:5 60:3 61:9,10,11 63:6 69:10 71:19,22 85:5,6,23,24 86:22,24 87:3,8,9,11,1 2,14,24,25 88:7

**answered** 53:21 61:7 69:9 78:14 86:20 87:22 88:6

**answers** 87:7 91:1,2

**any** 10:18


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 124

16:18,19
19:18
20:11,19
21:1,18,22
22:16,17
25:14 26:9
27:15 28:4
29:15,21
30:22 31:8,10
35:12,13
40:11 47:9,14
48:3,4 53:3
56:11
59:8,15,19,21
60:2,6
61:2,5,16
62:5 63:4
64:1,6,13,18,
21,25 65:2,10
66:2 68:14
72:5,10 74:21
75:14 77:18
78:21,22
79:22 80:4,24
81:3,5,11
82:2,3,6
84:21
85:10,13 86:4
87:16 88:25
89:14
92:11,12

**anyone** 89:14

**anything** 29:20
31:3 57:18
68:9 73:18

**anyway** 85:5

**AOSC20-23** 1:19
5:14 93:7

**apologize**
42:17 72:2
79:1,5

**apparently**
28:21

**appear** 56:12

**appearance**
5:16

**APPEARANCES**
2:1

**appeared** 1:18
93:6

**appearing** 5:14

**appendix**
25:10,11
33:23,24
37:14

**apply** 46:2

**approach** 38:24

**appropriate**
21:15

**approximately**
5:10

**apps** 24:25

**April** 43:19
44:2

**area** 8:24

**areas** 64:17

**around** 44:12
59:9,16 60:4
64:2 65:3,22
85:2

**arrived** 18:15

**ask** 11:13
19:19 25:13
30:5 37:1
48:2 51:10
52:3 53:1
55:18 57:18
64:20

66:10,16
67:7,9
70:7,18,21,24
72:4 79:22
87:6,10,13,15
88:9,13

**asked** 30:21
31:2 53:20
60:9 61:6
63:1,7
66:2,17,20
67:14 77:25
78:12 82:22
83:7 85:19
86:20 88:6,13
89:21

**asking** 16:22
19:15 30:25
38:5 39:18
59:15 61:14
63:25 68:14
72:14 85:20
86:17 88:4
91:13,14

**assessment**
78:5 83:8

**assigned** 10:19
12:20 47:8
54:16 78:15

**assist** 20:11
21:19 78:1

**assume** 9:5,23
13:3 28:12
41:24 85:14
86:11

**assuming** 8:23
10:13 50:3
59:2

**assumption**
10:16

**ATA/T/T** 16:25

**ATT** 26:7

**attach** 91:8,11

**attempt** 33:17

**attorney** 11:12
12:18,19,20
18:5 24:6
30:6,10,16
32:6 33:13
40:3,7,9 44:7
45:2 57:21
58:2 59:19
60:8,15,18
61:16
63:13,19
64:24 66:7,12
69:13 70:19
71:10,11,17
74:21,22 76:6
79:23 80:8
82:24 89:2
92:11

**attorneys**
70:16 92:13

**Attorney's**
63:14 66:15
67:23 69:11

**authored** 15:12

**authority** 93:5

**authorization**
27:16 66:7,10
67:7,16,18
68:1 70:8
72:14 86:16
87:21
88:17,20

**authorizations**
87:18 88:5

**authorized**

 UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 125

92:7

**auto** 11:2,5 22:11

**automatically** 38:22 47:2 87:1

**available** 42:20 78:1,15,17

**Avaya** 13:15,17 14:6,7,9,14

**A-V-A-Y-A** 14:9

**aware** 36:22

**awful** 19:14

---

B

---

**B/C** 33:23

**back** 9:14 10:19 18:18 28:9,24 29:22 31:15 32:4 40:16 41:3 42:16 43:12 47:5 52:8 57:13 60:11 62:10,21,25 63:16,17 66:3,4 67:24 68:18,19 71:21 73:10,17 80:11 81:7 87:4 91:10

**background** 9:11

**bad** 31:2,16

**based** 12:9 18:9,12,17,20 19:2,7,9

20:4,6 22:8,12 24:20 34:25 41:18 50:5 51:20 52:20 54:2,3,5,6,20 55:12 56:10,18 57:14 58:4 60:8 67:21 70:15 71:8,14 73:25 78:10 80:10 88:12 89:12

**basic** 27:19 28:11

**basics** 31:8 89:20

**bate** 12:2

**Bates** 23:2 32:8 40:18 44:5 45:11 56:9 91:9,11

**BEACH** 2:4

**because** 6:13 8:3,23 33:18 36:24 39:24 42:18 46:12,15 51:10 52:18,24 53:6,16 54:24 55:7 59:1 61:13 65:9 66:22 68:16 71:19 76:21 77:9 89:16 91:9

**before** 7:19 13:2 15:22

16:2 18:11 28:22 29:5 30:20 39:9 48:8 63:25 64:3 65:4 66:2 73:13 75:21 87:5,6 88:5,8,13 93:6

**began** 23:4

**beginning** 20:24 39:3 54:1 71:6

**behalf** 1:16 2:2,7 5:20,21 66:25

**believe** 8:4,8,18 9:19 27:14 29:7 57:22 64:15 80:16 84:24 86:23

**benefit** 56:22

**benefits** 25:9

**besides** 89:1,15

**better** 56:6

**between** 25:22 64:13 74:25 75:3 77:5,6 80:25 91:17

**BI** 36:7 37:2 45:17 46:2 49:23 85:16

**BILL** 2:8

**bills** 21:4,14,15 57:22

**birth** 28:19

**BISCAYNE** 2:9

**bit** 11:21 14:22 15:21,23,25 32:4 35:25 56:6

**blow** 11:20

**bodily** 11:11 12:17 45:18 78:2,19 82:14

**BOLES** 2:8

**books** 10:7

**boss** 67:1

**both** 9:24 19:23 52:21,25 53:4

**bottom** 12:2 20:25 23:3 44:2 50:14 56:7 62:16

**BOULEVARD** 2:9

**breached** 56:14

**break** 61:25 63:2 64:1

**breakdown** 58:2,3

**bridge** 71:16

**brief** 77:21

**bringing** 70:3

**BROWARD** 92:3 93:3

**Bryan** 1:4 5:4 11:24 34:20 35:1

**Buckner** 12:8



26:18 28:21
29:22 32:25
41:25 45:19
49:23 52:6
55:20,21 56:1
57:20 59:8
60:4
64:2,14,21
65:2 67:6
68:2 69:21
71:4 72:7
74:23 78:13
80:1 82:4
83:5 85:2
87:19 88:15

**Buckner's**
27:11 31:21
72:12 79:23
80:7,9,15
81:22,25
83:19

**bulk**
54:2,12,13,14
,15,16,23

**B-U-L-K** 54:14

**by-the** 66:21

--- C ---

**call** 12:12
14:1 15:3
24:24,25
25:5,20 26:12
27:8 28:6
32:9 36:1
43:3,12
44:6,8,12,13,
14 48:17,25
49:4,9
50:17,18 61:4
63:16,17
67:24 71:12

75:24 76:9
80:11 81:6,19

**called** 6:1
14:2 21:8,10
22:2,3 44:24
63:14 66:12
67:23 68:17
69:8 80:23,24

**calling** 46:12
48:25 49:1

**calls** 14:8
60:16 62:7,10
63:6 75:14,15
80:20 81:3

**came** 18:24
38:2 57:15
88:8

**can** 7:16 8:19
9:5,23
12:3,4,9 13:2
16:21 18:1
20:8 28:5,7
30:12 36:13
39:2 40:13
41:24 47:5
48:10 51:16
53:21,22,23,2
4 55:14,18
56:8 61:9,10
62:17 67:7
68:22 69:3,18
70:17 71:12
79:7,9,16
80:10 81:18
85:6,23,24
86:18,21,23
87:9,10 88:7
90:23,24 91:2

**can't** 22:19
29:19 38:6
47:12 50:23

52:1 56:6,25
65:6 68:16
69:16 73:1
88:25

**capability**
60:11

**carrier** 25:9
27:10
44:16,18
48:18 58:5

**cars** 11:1,3

**case** 1:2 5:7
14:1 18:23
22:10,11,13
55:4 71:13
73:22 78:8
80:15 89:14

**cases** 19:3,4
55:5

**causally** 83:14

**caused** 11:3
65:15 86:5

**CC** 27:9
44:14,15

**cell** 33:1,5
49:5

**certain** 20:12
27:4 38:22

**CERTIFICATE**
92:1 93:1

**certify**
92:6,10 93:6

**cervical** 59:6
84:22

**chance** 70:20

**change** 48:21
58:22 61:20

**changes** 84:22
85:1

**charging** 21:5

**chat** 14:16

**check** 8:16
17:4

**choose** 60:14
91:3

**choosing** 71:4
72:8

**Cigna** 57:23

**citing** 55:23

**claim** 9:10
10:22 12:8,18
17:3,25 19:21
20:9,24
21:20,25
22:18
23:4,9,22,23,
24 24:1,17
25:5,17
26:15,21
29:16
30:5,16,17,19
31:8 33:16
34:3 36:16
37:7,12
38:1,7,17
42:12,15,22
50:24 53:5,18
55:6,8 57:10
65:11 66:16
67:3,11,20
69:23 70:1,3
74:6,8,22
77:16
78:13,16,23
79:20
80:5,9,14,15
81:6 82:3,9



83:13,17,22
84:8 85:16
87:17 90:4

**Claimant** 12:21
15:14,15
16:15 17:8
24:6 27:24
30:5 33:12
37:19 43:9
44:6,16,18
56:11,12
88:23

**Claimant's**
17:20 48:17
82:12

**claimed** 83:13

**claiming** 15:14
27:10 64:16
65:12

**claims** 6:5 7:6
8:24
9:1,3,13,15,2
0,22
10:12,18,19,2
5
11:1,7,12,15,
24
12:14,16,19
13:4,16,22
19:22,23,24
20:4,11 28:4
29:9 34:11
37:9 38:23,25
39:5 53:13
54:3,4 70:15
78:2,19 82:14

**Claimstation**
13:15,18
14:13,17,19
24:22 28:8
41:11

42:12,14
51:1,2,4

**C-L-A-I-M-S-T-
A-T-I-O-N**
13:22

**classify** 57:9

**classroom** 9:24
10:3,6

**client** 18:2
24:4
69:15,21,24
73:9

**clients** 76:11
79:20

**client's** 60:12
69:22

**close** 15:21
44:18

**closed**
44:7,8,11
48:20

**CO** 1:7

**COD** 27:24

**code** 9:7
15:1,4,5,6,7

**coffee** 14:12

**collision**
83:8,11

**come** 21:23
50:2,3,17
51:6 73:17

**comes** 20:3,12

**comfortable**
54:24

**coming** 48:7

**comments**

52:5,6

**Commission**
93:18,19

**common** 91:5

**commonly** 82:13

**communicating**
77:7

**communications**
77:5

**Comp** 79:20

**company** 5:6,22
27:11 31:7

**compensable**
20:13

**Compensation**
82:9

**complaining**
66:22 67:2

**complaint**
29:19

**complete** 92:9

**completed** 7:22
9:21 17:25
40:6,8 54:20
84:25

**completely**
70:5

**completing**
33:20

**computer**
13:12,14
18:21 20:20
62:14 72:3
87:4

**concerns** 23:25

**concluded**

91:21

**conduct** 78:9

**confirm** 34:25

**confirmed**
34:18 36:4
37:14 44:17
48:20

**confused** 74:25

**connected**
92:13

**consciousness**
22:16

**conservative**
65:18

**consider** 52:23
53:5,9 54:5
55:4,7,11
65:14 69:2
83:16

**consideration**
83:20,24

**considered**
55:13 68:10
83:12 86:14

**considering**
22:8,9,10,12
51:19 52:18
53:8 54:6

**consistent**
91:1

**contact** 14:21
18:5 23:11
24:6 25:9,13
33:9,12 45:3
48:21 63:20
64:23 66:11
89:2

**contacted**

 UNIVERSAL
COURT REPORTING

63:20

**contacting**
24:4

**continue** 8:2
23:8 33:19

**continuing**
7:12,17,21
8:5

**control** 16:15
17:19

**conversation**
30:20 36:20
58:4 71:12
75:3

**cooperate**
89:7,10,18

**cooperating**
90:2,6

**cooperation**
90:15

**copy** 8:6 74:11
81:21,24

**core** 33:11

**correct**
6:10,12 7:13
9:4 11:4
12:22
13:6,21,24
14:7,10 15:1
17:5 26:6
27:12 28:25
30:20
31:13,17
39:13 45:19
56:9 71:5
77:11,14,17
78:11

**correctly** 6:19
14:21 16:11

26:13 27:21
45:17

**correspondence**
79:10,13
81:11 82:7,18

**could**
8:6,14,17
23:8 28:15
34:12 41:19
42:18 47:13
56:23 57:22
60:2 62:19
66:3 69:12
71:14 74:11
75:25 79:23
80:1 85:14,15
88:17

**couldn't** 29:10
44:23 64:23
66:11

**counsel** 2:1
5:15 25:22
82:13
92:11,13

**County** 18:22
92:3 93:3

**couple** 36:11
38:19

**course** 6:25
8:13 23:16,17
28:20 76:12

**courses** 7:21
8:5

**Court**
1:1,19,24
5:3,11,12,13,
19,23 62:25
71:24 72:2
85:16 91:14
92:5,21

93:7,17

**courtesy** 70:2

**coverage**
16:23,25
17:3,4
23:12,23
27:19 33:11
37:8 45:25
46:2 49:25

**coverages**
16:24

**covered** 37:3

**create** 33:22
34:12

**creating** 34:4
35:22

**cross** 3:4
77:23 90:12

**CS** 41:12

**CTC** 48:21

**cup** 14:11

**curious** 8:12
18:14 36:17
51:12 73:12

**current**
52:9,11 74:22

**currently** 7:19
20:5,9 24:1

**curse** 46:18

**customer** 25:13

**CV** 15:14 41:7

———————
D
———————

**dad** 24:4

**daily** 68:25

**damage**

10:22,25 11:1
17:13 20:8
83:19

**damaged** 11:3
17:11

**damages** 16:22
17:6 41:19
50:8

**Danny** 34:21

**dare** 44:11

**data** 22:13
51:13,21

**database** 13:12
19:10 20:20
28:6,7
29:15,23 31:3
74:4

**date** 5:9 28:19
29:19 31:7
48:7,8 59:22
60:24 61:2
65:20,21
74:25 79:9,11
80:8,18 82:18

**dated** 46:8
79:20

**dating** 80:17

**daughter**
35:16,17

**day** 13:13 27:8
28:21
40:19,21
44:9,24
47:14,21
48:16,24
49:19,21 73:7
92:15 93:8,9

**days**
38:19,20,22



39:21 47:21
48:2,5
75:21,22
76:18

**DEC** 17:21

**December** 48:17
49:20,21 51:7
62:5,6 63:4
66:4
67:13,17,19
68:3,20
72:6,10 73:7
77:6 79:21
88:1,8,14
90:8

**decision**
17:22,23
54:19

**deductible**
27:20

**Defendant** 1:8
2:7 5:20,22

**defending**
30:17

**degenerative**
84:22 85:1,7

**degree** 7:1
55:21

**demand** 46:3,7
47:1,6
55:19,25
64:19 66:18
67:14 68:5,6
69:20 71:7
75:5,11 80:18
82:19
84:7,10,13
88:1,8,10
89:15

90:17,19

**demands** 47:7

**department**
7:16

**depends** 20:7
65:6

**deposition**
1:15 5:1,6
62:24
90:24,25
91:21,22

**depositions**
32:23

**DESCRIPTION**
4:2

**Deshane** 34:21

**D-E-S-H-A-N-E**
34:21

**desk** 28:7

**detailed** 8:4
31:10

**details** 18:5
20:8 89:14

**determination**
51:22 53:16

**determinations**
54:5

**determine**
29:16 78:20

**developing**
21:19

**diagnosed**
52:14

**diary** 34:11
39:15

**didn't** 12:20

19:13 31:15
47:6 55:3,7
57:16,21,23,2
5 58:10 59:19
60:17,19
63:17 64:6,25
65:9,25
66:6,7,9
67:24 71:2
72:18
73:21,24 74:3
75:24 79:2
89:2,6,14,16,
17 91:8

**difference**
26:20

**different** 6:11
42:14 53:1
55:5 65:20

**digitally** 92:7

**direct** 3:3 6:3
8:19 87:7

**directed** 9:1

**direction**
52:24 53:17

**directly** 80:1

**disagreed**
57:11

**disc** 52:15
53:16
55:14,17
64:16

**disclaimed**
84:2

**disclosure**
25:10 33:14
40:8

**discovery** 40:6

**discs** 54:24
59:9,16
64:2,14
65:3,13

**discuss**
69:15,24
70:16 71:9
73:9,24 76:11
86:10

**discussed** 56:3

**discussing**
67:22

**discussion**
62:22

**discussions**
70:17

**disease** 26:22

**disk** 60:5
65:22

**disregard**
53:16

**disregarding**
54:24

**distinguishing**
10:5

**DISTRICT** 1:1

**diver** 38:21

**Dixon-Sampson**
48:13

**doctor** 60:14
65:19 71:4
72:7

**doctors** 67:5
87:19 88:4,15

**doctor's** 57:14

**document** 79:11



**documented**
75:15 77:5

**documents**
11:14
56:14,15,19
82:3,8 83:25

**doesn't** 26:8
75:5

**done** 22:20
48:5,8 62:2
73:19

**don't** 7:23
22:16,23
29:10 36:18
38:2,4 40:11
41:18 51:8,25
53:7 54:6
55:24 56:4,25
60:6 61:21,25
64:18 68:14
69:8 70:11
74:7,17,21
75:14
76:17,19
80:22
84:17,19
86:10,11
87:11

**door** 17:14

**down** 6:21
13:18 14:11
15:22 54:13
68:22 69:1
89:20

**driver** 27:25
28:16 36:9
37:17

**driver's** 17:10
30:6 36:5
44:7

**driving** 36:10
41:22,25 42:3

**dropping** 35:6
37:18

**due** 7:19
48:7,8 76:14

**DUKE** 2:8

**duly** 6:2 93:8

**during** 13:13
65:7 81:5

**duty** 89:24

**DY** 34:10

─────────────
E
─────────────

**ears** 15:9

**E-D-M-A-U-R-E**
48:12

**Edmaureen** 48:9

**education**
7:12,17,21
8:2,6

**EFF** 30:10

**effort** 8:10

**efforts** 7:12

**either** 10:6
29:11 47:2

**electronic**
30:11 34:3

**electronically**
30:12

**eligibility**
24:20

**eligible** 26:19
27:2

**else** 29:20

57:18

**elsewhere** 51:2

**e-mail** 38:8
72:11

**empathize**
36:13

**employee**
15:2,5
92:11,12

**employment**
23:17

**E-N** 48:12

**end** 26:22
73:14

**endorsement**
34:23

**enforced** 35:14

**enough** 27:8
37:13 48:9
49:10,12

**ensuing** 64:22

**entire** 17:6

**entry** 12:6

**enumerate** 88:4

**ER** 84:18

**ESQUIRE** 2:3,8
3:3,5,6

**essentially**
30:12

**estimate** 15:13
16:18 42:6

**ethics** 9:7

**evaluated** 54:4

**evaluating**
53:5,17 65:11

78:2 83:13,17

**evaluation** 9:2
21:1 23:9
50:1,2 58:22
64:15 65:8
66:16 67:20
70:24 71:1,8
78:8,10 80:15
84:4,8 86:4
88:12

**event** 16:12

**events** 64:19

**every** 38:21

**everybody**
11:22,25
62:14

**everything**
37:3 48:8
73:25

**exactly** 56:16
84:17,20

**exam** 84:25

**examination**
3:1,3,4,6 6:3
60:13 77:23
85:11

**examined** 71:4
72:7

**excess** 35:13
90:9,18

**exclusively**
78:5

**exhaust** 58:10

**exhausted**
44:18 58:8

**EXHIBIT** 4:2

**exhibits** 4:1,3


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 131

91:8,11

**existence**
80:13 83:22

**Exp** 93:19

**expenses** 20:17
54:8

**experience**
6:22
19:2,9,14,19
20:3 78:10
85:13

**experienced**
84:22

**expertise** 89:5

**expires** 46:3

**explain** 23:20
33:12 79:16

**explained**
90:19

**explaining**
36:21

**exposed**
90:9,17

**extending**
69:21

**extent** 24:7
33:13 53:23
57:11

---
F
---

**face** 25:4,5,6
39:23

**fact** 84:2

**factor** 83:20
86:3

**factors** 20:6

54:6 83:12

**facts** 37:16
67:3

**failed** 17:19

**fair** 27:8
37:13 48:9
49:10,12
78:10

**fairly** 21:5

**familiar** 19:25

**fancy** 40:13

**far** 22:8 24:12
26:20
51:18,23 57:7
65:21 67:22
88:11

**fast** 16:19

**faster** 15:8

**FAU** 6:24,25

**fax** 72:11

**faxed** 71:10

**feasible** 15:13

**February** 1:17
5:2,9 93:8

**feel** 71:13

**felt** 54:23

**fender** 17:13

**few** 9:19 10:12
20:6 27:23
33:21 34:16
44:13 47:21
48:2 54:6
62:15 77:20
80:12

**fields** 20:12
27:4

**figures** 78:6

**file** 15:18
30:11 33:24
34:3,4,7
35:23 39:5,15
45:2 54:11,21
63:19

**filed** 36:16
59:23,24
66:14 75:10
77:12

**files** 14:3
54:2,12,15,16
,23

**fill** 27:5

**final** 77:15

**financially**
92:14

**find** 18:24
53:14 70:14

**findings** 59:5
85:7 86:12

**fine** 22:25
91:7,14,19,20

**finish**
87:5,6,9

**first** 6:1 7:4
9:12,13 11:16
12:6,7 13:7
14:20
15:16,19
16:22 17:2
19:21 23:21
40:16 46:11
47:22
48:11,12
66:13 78:14
82:17 90:24
91:18

**figures** 78:6

**five** 38:19
39:21 45:15

**Florida**
1:1,19,25
2:4,9 5:13
7:7 9:3,6
19:11 85:16
92:2,6,22
93:2,7,18

**FOL** 37:14

**folder** 30:11
34:12

**folks** 7:25
54:18

**follow** 75:16
76:9,22,23
77:20 81:20
85:10

**following** 30:6

**follows** 6:2

**Ford** 35:2

**foregoing** 92:8

**forget** 25:23

**form** 19:16
25:12 26:24
27:1 29:13
32:1 52:12
53:20 55:1
61:6 72:20
73:20 76:20

**forms** 34:13

**FORUM** 2:4

**forward** 39:20
67:23 70:3
76:5

**forwarded** 46:8
47:8 69:13



877.291.3376
www.UCRinc.com
WOOD 132

**found** 6:16 65:21

**four** 45:14

**frame** 76:12

**frankly** 19:13

**from** 11:15 12:9 16:21 19:18,21 20:9 22:18 26:19 28:7 29:18 30:4,5,13 35:5 36:1 37:18 38:2 39:5,24 41:5,10 42:24 43:7,9 47:5 52:10 53:3,25 54:22 56:3,11 57:15 59:3,19 61:16 62:7 63:21,23 64:16 65:13 67:6,11 69:10 70:20 75:15 80:10,14,17 82:8,18 84:18 86:11 87:16,17

**front** 17:13

**FSN** 24:16 25:3 39:22

**full** 24:8

**functions** 42:14

**further** 8:12 90:22 92:10

_____
G

**GABAY-BABYACK**

2:13

**Gabby** 5:11

**Gabriela** 1:24 71:21 92:5,21 93:5,17

**gap** 71:16

**gather** 33:17

**gave** 10:7 26:4 47:14 56:18 58:2 89:22

**general** 86:7,8

**Generalist** 9:13,15,20,22 10:12,19 11:7 12:14

**generalities** 86:10

**generated** 27:1 78:6

**gentleman's** 86:12

**Gerard** 26:4

**get** 7:5,9 8:6,10,14 14:11,12 17:3 18:6,25 19:18,25 20:3 22:7 23:21 24:8 38:25 41:1,9 43:21 48:5,7 52:15,19,22 54:2,18 62:10 64:23 65:25 66:11 70:8,17 73:10,13,24 74:10 80:11 82:15 86:18 88:17

89:2,14,20

**gets** 77:12,13

**getting** 9:24 32:22 33:20 36:17 44:17 62:6,7 87:7

**GG** 93:18

**give** 11:15 20:22 31:10 39:18 40:23 47:9 57:4 58:2 63:3,6 67:5,7 68:1 71:24 76:10 81:18 82:11 85:19 89:16

**given** 53:3

**gives** 8:17

**giving** 38:15 66:12

**go** 6:24 7:5 11:22 16:7 19:8 23:23 32:2,3 38:17 40:16 41:1,3 44:2 51:1,24 58:15 62:16 66:3 68:18,19 72:25 78:7 79:5,23 91:10

**goes** 44:5 90:15

**going** 6:13 7:15 11:16,20,22 14:16 15:20,22,23 16:19 19:5 22:3,24 23:22

24:25 28:6 32:3 36:24 40:12 43:2 52:3 59:13 61:23 62:1,15 66:3,20 68:11,18,22 69:1 71:18 76:13,22 77:2 78:24 85:5 87:12 90:3,12

**gone** 80:1

**Gonzales** 48:10

**Gonzalez** 1:24 5:11 92:5,21 93:5,17

**good** 10:10,14 17:6 22:25 24:12 25:17 29:3 39:1 41:14 43:22,23 52:7 62:1

**Google** 6:15

**gotten** 87:13

**Grant** 34:20

**great** 8:9

**guess** 17:7 31:8 36:5 41:15 52:7 61:11,13

**guidance** 18:25 19:18 22:18 47:14,16 53:3 54:22

**guides** 56:23

_____
H


UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 133

H/F 33:22,24

HA 44:18,19

had 7:14,16
9:6,17 12:21
13:3 18:25
19:22 22:20
26:9,22
28:10,12,21
29:2,25
36:16,21
37:22,25 39:9
43:6 44:8
48:24 50:8
52:5 54:1
55:8,12,21
56:1,2,3,19
57:20
59:9,20,23,24
60:15 61:17
63:24
65:19,20,21
67:3,15 68:25
70:19 73:25
74:3,24 75:19
77:16 78:22
84:18,21,24
85:2,14 89:1

hadn't 83:24

hair 6:14

hand 92:15
93:9

handle 20:1
47:3 72:24
89:5

handled
19:22,24
26:21 37:6,12
77:2

handling 11:11
12:18 20:3

22:17 23:8
30:4,16,19
37:7 44:20,22
54:19 70:15
74:22

happen 73:21

happened 71:16

Harbor 49:21

hard 33:24
34:4,7 35:22
39:4

has 12:2 27:4
51:24 56:13
58:6 68:2
74:14
86:21,23
87:22 91:23

have
6:11,14,25
7:19 8:16
10:4 12:5
13:25 14:1
16:18 18:9
19:13 20:5,19
21:3,22 22:16
23:25 28:11
29:5 32:5
34:7,16,18
35:12,13
38:7,20 39:17
40:11
42:13,23 43:6
45:2 46:21
47:17 48:7
50:13,15
51:1,3,5,24
52:2 53:10
54:16 56:22
57:13,23
59:8,15,20
60:2,6,11,19

61:16 63:8,19
64:1,6,8,15,1
8,21
65:2,10,25
66:2,3,6,8,9,
19 67:6
68:7,10 69:19
70:11 71:3,12
72:7 73:18
74:8 75:16,20
76:21
77:10,18,20
78:7,14
80:1,4 84:11
85:8,13 86:14
87:13,20
88:16 89:4
90:21 91:3,17

haven't 43:7,8
89:1

having 6:1
32:22
36:11,20 58:8
72:3

he 26:9,22
29:1,2,5,6,7,
8,11,25 42:3
50:11 52:6,7
55:9 56:2,19
57:23,25
58:1,3 59:15
65:9,18,19,24
68:24 74:1,24
75:5 81:3
82:1,10 84:18
85:14 86:13
88:11 89:8

head 18:25

health 57:19

hear 14:6

43:23 61:12

heard 21:13
34:2 43:7,8
66:13

heavier 53:12

heavyset 52:6

held 62:22

help 11:25
20:2 21:3,23
71:16

helped 64:15

helping 43:16

helps 20:2
78:20

her 24:4
36:7,21
37:18,21
38:15 41:10
43:6 49:5,8
67:1 69:25
85:19
87:5,6,9,13
90:24

here 5:4 11:19
41:1 47:11,18
50:13 52:1
58:15,25
60:22 65:1
76:21
79:17,18 80:5
81:17

hereby 92:6

Here's 68:1,19

herniated
52:14,15
54:24 55:16
59:9,16 60:5
64:2,14,16

 UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 134

65:3,13,22

**herniation**
53:9
55:7,13,14
65:14,15 85:2

**herniations**
52:18,24
53:6,16 55:4
59:6 83:9

**he's** 26:20
29:5

**Hey** 68:8 71:14

**Hilton** 7:3

**him** 52:3 59:13
65:22 70:18
72:14 75:4
87:20 88:16

**hired** 7:4
9:11,14

**his** 33:1 59:12
63:5,13
64:3,21
65:3,17,19
68:25 69:25
71:3 75:4
84:24 89:9

**historic** 22:13

**history** 31:12

**HNP** 52:14

**hold** 11:19
41:4 45:10,13
57:18 73:5

**home** 13:11
49:9

**homeowner** 11:1

**homework**
63:2,3

**honest** 26:25
50:23 51:8
53:7

**hotels** 7:4

**hour** 36:1
61:23

**household**
35:13

**hum** 35:18

**hurt** 29:6

---
I
---

**icons** 62:17

**I'd** 26:25

**ID** 36:8

**idea** 46:21

**I'll** 45:23
51:10 56:5
61:22 77:21
81:18 87:15
91:7

**I'm** 6:13,19
8:3 10:13
11:15,20,22
12:17 14:12
15:10,15
18:14,24
19:15,17 20:6
21:9,12
22:3,8,9,10,1
1,23 24:7
25:2 27:2
28:6
29:3,7,10
30:25 31:1,13
32:3,22 33:4
36:17 37:7
38:4,6
40:8,12 41:20

42:9,24
43:14,15
44:12 45:22
48:10 49:2
50:2
51:12,14,18
52:3
53:1,8,14,22
54:4 57:7,18
58:12,25
59:2,15
60:21,24
61:14,20
62:14 64:17
67:2,13,19
68:8,11,18
69:21
70:3,14,20
71:15 72:3
75:3 76:2
78:24,25
81:16 84:19
85:20 87:7,12
88:25 89:20
91:14,19

**impact**
52:18,25
53:6,9,10,12,
17 54:7,25
55:9 83:8

**impairment**
56:23 57:4

**impolite** 46:16

**important**
80:14

**impression**
53:15

**Inbound** 36:1

**include** 24:4
90:7

**indeed** 75:1

**independent**
78:9

**INDEX** 3:1 4:1

**indicate** 31:4
63:5 64:1
84:16

**indicating**
49:13

**indication**
18:12 59:8,15
61:2

**individual**
37:17

**info** 27:16,19
48:21 60:20

**inform** 82:7
83:4

**information**
8:17 14:21
18:9 20:21
25:14,15
26:4,13 28:12
30:5 31:6,11
33:18,20
40:24 43:13
48:22 50:8
51:17 55:8,12
59:3,19 60:17
61:4,16 62:7
63:6,16 64:1
65:2 66:8,18
67:21 68:7,15
69:12
70:18,22 74:9
78:6,14
79:17,24
80:4,9,11
82:16 83:2
87:1 88:9,11



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 135

89:15,17,21
90:7,20

**informed** 27:15
49:5 58:5
75:19 76:24

**informing** 43:8

**initiated** 77:9

**injured** 12:21

**injuries** 23:6
26:7,10 31:9
33:13 50:9
52:9,10,11
56:10 60:13
82:16 83:2,13
85:15 86:4

**injury** 11:11
12:18
18:4,10,19
21:20,24 22:9
23:20 24:7
26:12 27:16
28:21 29:2,17
30:2,8
31:4,5,14,22
33:12 43:12
45:18 50:7
51:18 53:11
55:15,17,22
56:2,20
57:10,11
59:20 61:17
63:16,22 75:1
78:2,13,19,22
79:18
80:11,14
82:14 83:5,23
84:3,8 85:17
88:9

**input** 24:16
25:3 26:5

27:1

**INS** 1:7

**instructions**
47:9 48:16

**insurance**
5:6,22 23:13
27:11 31:7
34:1,18 35:12
37:14 57:19

**insured** 16:14
17:6,9,13,17,
19 23:11,22
25:10,11
32:11 33:9
34:20,22 36:9
37:4,19
41:6,7 49:4
75:25 86:5
88:22

**Insureds** 34:19

**Insured's**
75:18 76:24

**intentions**
69:25

**interaction**
89:12

**interested**
92:14

**interim** 64:7
81:19 88:19

**internal** 14:25

**internet** 38:15

**interstate** 7:3

**into**
13:9,11,12,15
,23 14:13,14
17:3 18:14
21:19 22:6

25:5 28:10,12
42:12,14,22
51:13,17
70:17 86:3

**introduce** 37:6

**investigate**
78:18

**investigating**
82:14

**involved** 12:8
36:15 53:12
74:5 78:21,22

**involvement**
77:16 81:5

**irrelevant**
64:12

**isn't** 15:17
19:12 40:20
58:20

**ISO** 27:24
28:1,3,6,7,10
29:15,22
31:3,6 52:8
63:21 65:21
74:4,11 78:17

**I-S-O** 27:24

**issues** 16:25
72:3

**it'll** 30:13

**it's** 8:9 9:22
10:4 11:25
12:1 14:7
15:5,21 17:5
18:22 19:9
20:6,24 21:10
22:3,4,8,19
23:10
24:18,19
25:17 27:23

29:18 37:11
38:6 43:23
46:17,21
48:11 49:3
50:13 51:8
52:15 56:9
57:3,7 59:14
61:8,25 71:19
72:5 74:13,25
77:2 78:8,20
79:4,6 91:5

**itself** 50:9
57:24 58:7
83:12

**IV** 16:14

**I've** 40:15
43:20 46:12
60:3 66:20
81:17

---

J

**Jamie** 35:1
36:2 38:8,14

**January** 75:17
77:7

**Jeff** 5:17 8:20
85:10

**JEFFREY** 2:3
3:3,6

**JFL0002** 34:10

**JLIGGIO@LIGGIO
LAW.COM** 2:5

**Joanne** 35:19

**job** 6:11
9:12,13,17,25
12:13 27:5

**judgment**
90:9,18



877.291.3376
www.UCRinc.com
WOOD 136

Amiama ,Yassel  02-17-2022     Page 16 of 37

**Julie** 25:21,22 26:4 30:21 43:4,8 44:24 63:15 69:13 76:6 80:23 82:22,23,24 83:1,4

**July** 44:14 45:10 63:18 81:13

**jumped** 31:1

**Jury** 28:2

**just** 6:24 9:20 10:2 11:20,21,25 14:13 15:22 20:9 23:23 24:18 27:1 33:21 34:16 35:19 36:10,17,20 38:4,7 42:9 43:2 46:15 47:23 49:2,13,15 51:20 53:8 54:7 60:4 61:14 63:22 67:2 70:15,19,21 73:12,21 77:20 81:18 82:11 84:17 86:6,8,11 89:20 90:24,25

——————————
K
——————————

**Karen** 35:7

**Kaylee** 1:4 5:5 23:16 24:2

36:9,14 38:3 41:21 48:25 49:5 58:20

**Kaylee's** 36:5

**keep** 7:20,23 15:20,23 22:24 43:19 68:22 69:1

**kept** 34:4 90:3

**kid** 29:2,6,12 36:10 49:1

**kidding** 44:12

**kind** 8:3 19:14 20:14,24 22:15 38:21 48:11 49:15 73:12

**kindly** 11:14

**kinds** 54:9

**knew** 63:21

**know** 6:14 9:11 10:4,5 13:10 15:8,11 16:7 18:22 19:14,18 22:15,16,19 23:24 24:2,24 25:22 26:8 27:4 28:1 29:10,25 30:21 31:15 37:7,8 38:1,4,5,7 39:8,11 41:17,18,21 42:9,18,23 43:14 46:19 48:4,6 49:16,17,20

51:8,12,13,14 ,20,25 53:7,25 55:24 56:25 57:2,7,20 61:12 64:25 65:22,25 66:19 67:3 68:17,24 70:11 71:14,19 74:17 76:19 85:13

**knowing** 51:23

**knowledge** 22:5 57:13

**Knowles** 39:12

**Kurtosh** 25:23 43:4 61:3 67:4,9,17 71:3 72:7,12 82:23 89:9

——————————
L
——————————

**L/COV** 45:21 49:24

**labeled** 12:2

**Lapra** 35:20

**L-A-P-R-A** 35:20

**last** 7:14,15 32:19 68:3 77:16 87:20 88:16

**later** 10:13 15:25 16:10 27:23 33:22 34:16 35:25 38:19,20

39:21 42:24 43:18 44:14 45:15 47:21 48:2

**latest** 62:2

**law** 2:3 14:2 79:15

**Lawyer** 8:7 12:21 31:21 52:2 66:23 72:18 74:7 88:22

**lawyers** 62:8 74:5,19 91:17

**learn** 54:19

**learned** 28:20 31:13 72:23

**least** 74:5 77:6

**leave** 72:19

**left** 16:14 32:25 33:18 62:16

**Legal** 14:2

**length** 68:21

**less** 36:1

**let's** 6:24 9:9 11:19,22 15:17 16:11 22:24 44:2 48:5 52:13 56:7 57:17 59:17 68:18 72:4 85:14

**letter** 8:7 24:13 30:12,18,24 33:13



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

WOOD 137

39:14,19,20
40:3,16
45:8,9,10,14
63:12 67:25
68:12 70:7,12
72:11
73:4,8,9
80:5,8
81:9,11,14,20
,21 82:7
86:17 87:17
88:3,14 90:19

**letters** 40:15

**letting** 67:2

**liability**
17:5,16,23
18:1 23:6
58:19,23

**liable** 17:16

**license** 7:6
8:25 28:16
36:5

**licensed** 7:10

**licensing** 7:9

**lien**
57:20,21,22,2
4

**Liggio** 2:3
3:3,6 5:17
6:4 8:21,23
19:17 27:3
29:14 32:2
43:24 44:1
52:13 54:10
61:8,10 62:13
63:1 64:12
71:21,25
72:1,2,4,21
74:2,14,16,17
77:4,18,22

78:25 79:4
85:4,9,12,19,
23 86:3,21
87:3,7,12,15,
24 88:3,7
90:14,16,21
91:8,16

**limit** 46:7
47:7

**limits** 47:1
67:14

**line** 16:25
45:24 49:25
90:13

**line-by-line**
78:7

**link** 28:9

**LinkedIn**
6:16,17

**list** 7:21,23
8:1 19:11
23:10 35:15
67:5 68:2
72:12 74:5,19
86:17

**listed** 16:24
59:11 74:7

**Listen** 32:22

**litigation**
12:15
72:23,25 77:3
89:3,4

**little** 11:21
14:22
15:21,22,25
32:4 35:25
56:6 61:23
63:2

**living** 68:25

**LMOVM** 32:18

**LNAV**
22:4,5,7,18,2
1 50:21
51:1,6,13,17

**L-N-A-V** 22:4

**located** 30:8
59:20

**log** 11:15
13:4,12,14,15
28:10 40:23
57:25
81:22,25

**logged** 77:10

**long** 9:18 11:7
22:19 29:18
38:6 51:8,24
57:1

**longer** 89:1

**look** 8:12,14
14:20 18:22
34:17
38:17,22
45:23 47:13
51:6
56:4,7,23
62:4 68:16
69:18 73:1,3
74:10 75:4

**looked** 45:9

**looking**
11:14,24
14:15 28:13
32:3 40:17
48:10 53:8
58:25 65:16
69:18 70:3,20
74:1 86:11

**looks** 12:5,10
16:3 41:19
42:4 48:14
49:17

**LOR** 24:13

**loss** 16:11
35:3,4,9
37:15,16

**lost** 16:14

**lot** 19:14 54:3
58:5

**Lovely** 39:24
46:21,22 47:9

**low** 28:24
31:15 52:8
53:10 55:9
73:14

**Lucie** 18:22

---

M

**ma'am** 21:2

**Madam** 91:14

**made** 14:17,18
16:14 28:4
29:16 34:16
43:20 44:8,13
54:23 62:5
67:19 68:23
70:22,23 71:8
78:13,15,17
80:20 82:3

**mail** 25:10,11
37:14 38:12
41:4,9 46:8
67:25

**mailed**
30:7,9,13
40:7,9 67:12

 **UNIVERSAL COURT REPORTING**

877.291.3376
www.UCRinc.com
WOOD 138

mainly 10:21

maintain 17:19

make 11:21
  14:8 17:3,5
  21:4 24:7
  26:20 30:14
  37:3 41:10
  42:11 43:21
  46:17 51:21
  53:15 54:4,19
  55:24 61:4
  69:9,12 73:25
  75:14,21 76:9
  78:4,7

making 33:17
  43:22 61:15
  62:1

man 26:18 52:7
  65:12

management
  13:23 14:1

manually 22:20

many 75:15

March 43:3
  92:15 93:9

MARKED 4:3

materials 7:8
  8:13

math 29:3

matter 5:4
  47:6

may 7:19 12:5
  48:12 57:23
  67:6 68:9
  69:25 78:13

maybe 13:11
  19:19 29:9

31:2 79:2

MDP 21:8,10,13
  47:22 48:15
  50:19,20

M-D-P 21:12

me 6:18
  8:6,14,20
  9:10 11:15
  12:6 13:2
  14:3,21 15:12
  20:2
  22:5,6,12
  24:9 30:14
  31:13,21
  34:12,13
  36:21 37:1
  41:3 42:20
  43:8,12,16,19
  45:3,17,23
  48:2 51:20
  53:1 55:11,18
  56:8 62:10
  63:3,16,20
  65:13
  66:15,20
  67:21,24
  68:1,15,16
  71:8,20,24
  73:10 74:11
  78:25
  79:9,16,22
  82:11 89:2
  91:12,13 93:6

mean 12:20,21
  19:13 20:14
  23:12 26:9
  49:15 55:4
  67:11 70:25
  73:21
  76:17,18 85:1
  90:12

meaning 19:23
  20:25

means 17:2
  23:21 37:8
  46:1

meant 49:18

med 27:20

medical 20:17
  21:5,14,15
  26:8 27:16
  29:21,24
  31:10,12 50:5
  54:8 55:21,25
  57:4,8 58:1
  59:1,3,11,18
  60:9 65:16
  66:6,9
  67:7,16,18
  68:1,2
  70:8,24 71:1
  72:13,14
  74:24 79:19
  84:6,11,23
  85:20
  86:12,15,17
  87:18,20
  88:4,17,19

medicals 27:16

Medicare
  24:16,17,18,1
  9,21 26:16,19
  27:7

meds 40:24

memory 72:5

mention 20:7

mentioned
  84:24

message 32:19
  76:5

messenger
  89:13

Messer 30:18
  31:21 40:23
  45:8 55:25
  60:12 61:3
  63:5 66:21
  67:5,9,18
  71:2 72:6,11
  73:17 75:24
  79:15
  81:1,6,10,24
  82:2,6,18
  84:2,21 87:18
  88:14
  89:6,8,22
  90:1,5

Messer's 25:24
  40:17 44:25
  77:5
  80:20,21,24
  81:14 82:23
  83:2 89:9

MIAMI 2:9

microphone
  62:17,20

might 8:4
  24:25

mind 85:25

minor 24:3
  35:15

minus 29:4

minute 41:1
  61:21,22

minutes 16:10
  27:23 33:22
  34:16 62:15

mirror 17:10

 UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

WOOD 139

**miss** 56:11

**missed** 12:5
  68:15

**mistake** 50:13

**Mitigators**
  69:2

**mom** 37:21

**moment** 81:18
  82:11

**month-and-a-**
  **half** 43:18

**months** 9:19
  10:13 42:24
  44:14 45:15

**more** 6:24
  15:21,23
  18:14 20:3,25
  38:24
  53:10,11
  54:7,17 58:5
  73:14 86:1
  87:15 89:12

**morning** 14:23
  23:4 32:5
  36:1

**most** 8:25 39:2
  80:23

**motor** 65:20
  75:6

**move** 67:23
  71:18

**MRI** 59:5
  84:13,16,20

**much** 12:25
  37:13 60:20
  75:8

**multiple** 59:16

**must** 13:10
  29:5

**Mustang** 35:2
  41:22

**mute** 62:18,20

**M-V-P** 21:11

**my** 5:11,17,21
  6:25 7:9 8:2
  9:13 13:14,25
  15:1,5,9,16
  16:21 18:1
  19:9,21,23
  20:25 23:10
  24:4 38:24
  46:20,23 56:5
  57:13 58:4
  60:16 61:11
  64:15 67:11
  68:7,16 70:20
  71:22 73:1
  75:16 76:21
  78:8,24
  80:10,22
  81:19 84:18
  87:3,8 88:12
  89:12 90:11
  92:9,15 93:9

**myself** 33:19
  37:6 39:10
  43:21 51:9

―――――――――――
             N
―――――――――――
**Nadine** 2:13
  12:1

**name**
  5:11,17,21
  11:16 12:6
  21:7 28:13,15
  46:12,20
  48:11,12

69:10 74:5,19
  76:23 82:23
  88:15

**named** 32:9,11
  36:1 37:4
  41:5,6,7 49:4

**names** 87:19

**nature** 24:6
  33:13
  52:18,24 53:6
  54:25 83:8,11

**near** 54:12

**necessarily**
  85:1

**neck** 28:24
  31:15 52:8
  64:3,14,21
  65:3 80:13
  83:5,23 84:3

**need** 18:4
  19:3,5 43:12
  65:14 88:22

**needed** 8:1
  23:8 67:23
  68:24

**needs** 23:7
  54:20

**negotiation**
  45:18 49:23
  77:2

**never** 60:16,18
  63:20 66:15
  70:19 71:16
  81:2 84:2
  86:16,17
  89:8,13,22

**new** 16:11 33:6
  90:12

**newer** 54:18

**next** 16:8
  23:24 25:16
  26:12 32:2
  33:21 35:19
  37:9 42:24
  44:1,13 45:14
  48:16 49:19

**nine-year**
  29:11

**nine-year-old**
  29:2,6

**NMM** 45:8

**no** 1:2 4:3
  7:23 8:11
  9:10 12:17
  16:25
  19:10,12
  21:12,21
  27:19,20
  29:24 34:24
  37:5,13 38:24
  40:8 43:8,17
  45:9 46:21
  49:3,22 52:11
  53:13,25
  55:8,16
  58:18,24
  59:19,24 60:6
  61:8,18,19
  64:4,6,7 65:9
  66:6,24 67:2
  68:4
  70:9,10,21
  72:8,9,15,16,
  22 73:8 74:21
  75:16
  76:17,18,21
  77:4 78:7
  79:25 80:3,6
  81:2,4,8,12,1



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 140

6
82:5,8,10,25
83:3 86:21
87:12,16,24
88:1,5,18,19
89:11
90:6,7,18,21
93:18

**None** 77:9

**non-responsive**
71:19

**nope** 16:3

**nor** 92:11,13

**normally** 22:13

**Northwood**
7:1,2

**not**
8:4,9,13,25
10:3 13:10
14:12 15:16
19:17 21:21
24:20 25:13
26:19 27:2
29:3,7,9,24
31:1,6,10
33:4
35:9,12,13
37:11 38:8
41:20 42:25
44:11,18
46:16
49:18,22
50:7,20,24
51:23 52:1,17
53:5 54:6,7
55:13,15,17
56:11,12,13
57:7,8,12
58:9,24 59:24
60:10

61:3,8,12,18,
20 66:8,25
67:2 68:10,12
70:10,21,23
75:3 82:1,10
83:6,15 86:21
87:7,12,13,16
88:2,13,23,25
89:10 90:6
92:10

**Notary** 1:25
92:5,22 93:18

**notate** 69:10
75:5

**note** 13:7
14:20
15:16,19
16:8,22,24
23:4
25:4,6,7,16
30:6 32:2,4,8
33:8,21 35:19
39:23 41:18
42:20,24
44:5,13 45:14
47:10,16,22
49:19 50:14
52:17 60:25
62:6,10
63:8,14
68:16,19,23
75:16
76:14,21

**noted** 73:4

**notes** 11:25
12:10 13:3
14:15,16,18
18:12
22:16,22 25:5
29:9 32:3
34:17 43:20

49:3 50:11
56:5 57:16
59:4 61:5
62:4 63:4
67:11
68:18,19
70:20
73:1,2,3
80:10,17,19,2
2 84:18,21
92:9

**nothing** 31:9

**notice** 58:15

**notify** 23:22

**November** 12:7
13:7 14:22
23:5 31:14
32:4 39:4
40:19 41:4
45:15 69:20
79:11
80:18,19,25
81:9 82:19

**now** 5:3 7:15
10:9 12:11
13:2,10 20:23
22:25 23:2
26:18 33:8
34:16 38:19
39:16 41:4,15
42:23 44:1,13
45:10,13
49:19 50:11
51:9 52:5
58:15 59:14
62:1,13 63:1
65:1 67:13
69:14 70:11
72:3 75:8
79:4 90:21
91:3

**nowadays** 32:23

**number** 5:7
14:25 15:2,5
18:8,15,16
19:1 28:16
32:13 33:6,7
34:17 38:22
42:24 49:6,9

**numbered** 91:11

**numbers** 32:15
91:9

---

### O

**OATH** 93:1

**OBC** 25:17,19
27:8

**Object** 19:16
29:13 32:1
52:12 53:20
55:1 61:6
72:20 73:20
76:20

**objected**
85:21,22

**Objection**
26:24 85:4,18
86:20 87:22
88:6

**obtain** 79:24
80:8

**obviously** 42:3

**occurred** 52:21
64:16

**occurring**
23:25

**o'clock** 14:23
62:2

**October** 40:22



**off** 18:25 35:6 37:18 62:22 74:11

**offer** 66:13 67:20,22 68:7,8 69:14,22,24 70:16,22,23 71:9,10,11 72:19,22 75:17,21 76:6,18,22 77:1

**offering** 73:8

**office** 13:10,25 20:10 21:23 30:13 40:17 44:7 46:25 56:24 63:5,15 64:24 66:15 67:23 69:11 77:6 80:20,21,25 81:14 82:24 89:9

**Offices** 79:15

**Oh** 15:17,24 16:3 40:10 50:19 51:16 53:22 76:1 78:25 79:2

**okay** 5:3 6:11,21 7:2,10,20,24 8:12 9:5,9,15,17,2 2 10:4,10,23 11:5,9,13,17, 18,21 12:5,15,23

13:6,9 14:11,20 15:3,6,11,17 16:8,23 17:24 18:4,14,22 19:5,7,10 21:13 22:2,5,21 23:1,11,14 24:2,6,9 25:1,6,9,16 26:7,12,15 27:13 28:1,5,11,18, 20 29:1,11,14 30:14,23 31:18,24 32:12,16,18,2 0,23 33:3,8 34:8 35:2,5,10,25 36:19,23 37:10,17,24 38:14 39:14,24 40:14,22 41:2,3,8,14,1 5 42:2,6,23,25 43:11,14,18 44:12,23 45:13 46:1,3,8,15,2 1,24 47:20,25 48:16,24 49:7,19,23 50:10 51:5,10,11 52:4,13 53:25 55:18 56:7 57:6,17,19 58:15,16,25 59:25 60:2,23

61:24 62:3,11,12,21 63:21,25 68:11 69:1,3 70:11 73:3,12,14,23 74:2,4,10,14, 23 76:12,16 77:12,15,22 78:12,24 79:2,7 80:17 81:17 82:2,21 91:3,6,8

**old** 15:11 29:12 42:4 52:6

**older** 42:2

**omnibus** 25:15 34:1,18 35:9 37:18

**on** 1:16 2:2,7 5:3,19,21 8:16 9:25 10:2 11:19 12:9 13:7 15:18 17:25 18:1,9,12,17, 20 19:2,7,9,17,2 5 20:4,6,7 22:8,12 23:4,5,22,25 24:20 25:2,16 26:15 27:24 28:20 31:1,11,14 32:4,8,19 33:1,6,7,16 34:23,25 35:5 37:8,17 39:4 40:7 41:4,18 42:12,25

43:2,19 44:2,5 45:10,13,15 47:14,21 48:4,24 49:15,19,20 50:5,9,23 51:7,20,22 52:9,20 53:11 54:2,3,5,6,20 55:8,12 56:10,18 57:14,18 58:4,20 59:4,13,18 60:8 62:14,25 63:2,8,14,24 64:18,19 65:6,21,24 66:25 67:11,21 69:16,19 70:15 71:8,12,15 73:5,7 74:1 75:4,16,17 76:1,2,13,21, 22 77:7 78:5,10 79:11 80:10 81:1 82:16 88:12,21 89:5,12 90:3,20 93:8

**Once** 72:22

**one** 11:19 13:20 15:18,23,24 16:2,6 18:11 22:20 25:7 27:6 32:14 34:18,22


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 142

48:11 49:14 50:20 51:21 59:11 60:6 61:20 62:17 71:24 86:1,6,9 87:15 89:1

**ongoing** 7:17 64:13

**online** 10:2,3,9 38:17

**only** 25:13 27:19 31:7 54:7 83:15 88:10

**open** 44:17

**operates** 22:6

**operator** 35:3 41:5

**opine** 55:20

**opined** 56:2

**opinion** 85:20

**opportunity** 13:3

**opposed** 66:23

**option** 56:4

**Order** 1:19 5:13 93:7

**ortho** 26:1 57:16 84:19,24

**orthopedist** 26:2

**other** 8:9 21:22 24:4 27:3,6 28:4

31:11 34:17 35:12 36:16 37:13 42:13,16 47:10,14 50:11,20 52:22 62:18 68:14 73:9 78:21,22 79:22,23 80:4,5

**our** 13:17 23:22 30:13 53:25 54:2,19 71:4 72:18 82:15

**ourselves** 86:18 88:18

**out** 12:1 18:24 22:4,7 23:11 25:15 30:13,15 33:11 34:1 35:9 37:18 50:6 51:1,14 53:14 71:2,9 74:19,21 75:24 80:7 82:6,12

**outbound** 25:20 27:8 32:5,9 43:3 44:6,14 48:17,25 49:3

**out-of-pocket** 58:1

**outside** 59:18

**over** 23:23 33:18 43:2 61:23 73:25 80:17

**own** 54:19 57:14

**owner** 27:25 32:10,11 34:20 41:6 44:6 49:4

**owner/spouse** 36:2

**owner-driver** 43:9

**owners** 34:25 35:1

———————————
          P
———————————

**P.A** 2:3,8

**p.m** 1:17 44:7 91:21

**package** 55:19,25

**packet** 84:10,14

**page** 3:2 4:2 6:16,17 12:1 23:3 32:8 44:2,6 56:7,9 75:4

**pages** 40:13

**paid** 48:20 57:23 58:3,5

**pain** 28:24 52:9 64:14,18

**PALM** 2:4

**paper** 34:4

**paralegal** 25:24 60:19 64:25 66:22 71:3

**parent** 36:13

**part** 31:15 52:23

**particular** 9:10 18:15 21:18 25:6 42:12 55:4,6 86:12

**parties** 1:18 35:14 92:11,12

**pass** 17:7

**passage** 17:7

**passed** 15:20

**passenger** 17:7

**past** 28:4

**pay** 27:20

**paying** 21:5

**payout** 44:23 58:14

**PBI** 56:20

**PDF** 12:1

**Pearl** 49:21

**pending** 69:22

**people** 6:15 15:8 46:20

**per** 34:21 37:11 52:8 79:20

**perfect** 5:19,23 6:20 48:23

**perhaps** 90:10

**permanent** 30:2 31:4 55:22



56:2,12,20,23 57:10

**person** 8:4 28:13 35:22 39:6,18 47:3 48:14 49:4 61:17 78:22

**personnel** 42:13

**person's** 31:11 48:12

**pertaining** 79:19

**pertinent** 65:10 84:7

**PGR001** 40:18

**PGR002** 45:11

**PGR488** 12:3

**PGR494** 44:6

**phone** 13:17 14:7 32:14 33:1,5 49:6 62:9 63:6 69:9,10 75:14,15 76:9 80:19 81:1,6 82:12

**photographs** 41:9,10

**photos** 38:1 52:20

**physical** 56:14,19 57:15

**physician** 55:20 56:1

**pick** 62:21

81:6

**picked** 49:4

**picking** 19:17 31:1 42:25 49:15 82:12

**pics** 15:13 37:19 41:7

**picture** 58:19,23

**pictures** 15:13 16:22 37:21,25 38:3,7

**PIP** 25:9 27:19 40:23 44:17,23 48:20,21 57:25 58:8,14 81:22,25

**place** 2:4 18:21 47:13

**placed** 43:3

**Plaintiff** 1:5,16 2:2 5:16

**Plaintiffs** 5:18

**Plaintiff's** 62:8

**PLAMER** 2:8

**please** 5:16 15:13 33:22 39:20 68:1,10 69:14,24 71:23 73:9 79:18 87:25

**plus** 50:9

71:10

**pocket** 50:7

**pockets** 22:11

**point** 22:17 68:5 77:1 80:2,24 81:5,11 82:2

**policies** 35:12,14

**policy** 25:10 33:14 34:23 35:2 37:8 47:1 67:14 74:1

**portion** 37:7

**portions** 84:6

**positive** 59:5

**possible** 38:25

**potential** 34:18 80:13 83:22

**potentially** 90:18

**PP** 84:19

**PPI** 56:17

**practice** 14:2

**predicate** 85:4

**prepare** 25:10 33:14

**present** 2:12 5:12 30:19 31:21

**presented** 75:17

**presenting** 68:8

**pre-suit** 60:13 70:24 71:1

**pretty** 60:21 91:5

**previous** 17:21 36:14 40:19 54:17 85:16 86:4

**primary** 82:15

**print** 74:11

**prior** 19:22 26:9 30:8 31:14,22 55:8 59:12,20 60:9 61:17 62:4,5 63:4,13 64:17,25 65:19 66:18 70:9 72:13 75:6 78:13 80:5,9,13,14 82:3,8 83:22 84:3 86:15

**priors** 26:9 30:9,22 52:8 54:8 70:18 88:9

**private** 31:11

**probability** 55:21

**probably** 7:18 61:11

**problem** 38:8 43:17

**proceed** 69:25

**proceedings** 92:8

**process** 19:25



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

WOOD 144

23:20 33:12 36:7,8,22 37:2,9 46:24 47:5 65:5 74:18

**processed** 48:15

**produced** 74:13

**professional** 57:8 70:2

**professionals** 57:4

**program** 24:22 25:1,2 27:4 28:3,8 34:24 47:22 50:16 51:25

**programs** 24:24 78:1,4,6

**progress** 43:22

**Progressive** 1:7 5:5,22 6:6,9 7:4,5,25 9:11 12:20 36:15 40:17 53:4 72:14 88:21

**Progressive's** 72:8

**prompt** 70:4

**prompts** 71:11

**proper** 23:8 69:16

**property** 10:21,25

**proposed** 19:11 20:19 21:24

87:18

**protect** 75:25 86:18 88:22

**protocol** 46:25 74:18

**protocols** 9:2

**provide** 8:1 27:15 29:24 31:6 35:1 37:24 44:23 55:25 57:21,23,25 59:19 60:17 61:3 66:7 69:12 72:14 79:18 81:24 82:2 83:1 90:20

**provided** 7:8 11:15 21:6 27:19 29:19 48:21 50:6 60:10 64:19 65:7,17,24 83:24 84:7 86:14 91:2

**provider** 21:5 75:4

**providers** 68:2 72:13 86:17

**provides** 28:3 31:7 60:9

**PT** 56:14

**Public** 1:25 92:6,22 93:18

**pull** 11:16 45:2 63:19

**purposes** 5:15

**pursuant** 1:19 5:13 93:7

**put** 20:12,21 22:6,10,11 24:8 28:12,13 33:19 34:12 42:14 45:23 47:17 48:4 51:13,16 52:7 80:5 89:19

**puts** 42:22

**putting** 25:4

———————
Q
———————

**question** 21:1 27:5 31:2 37:1 53:1 54:1 56:5 58:18 61:13 66:17,21 71:21,22 77:18 86:1 87:3,4,8,10,13,23

**questionnaire** 33:25

**questions** 23:25 60:3 64:9 66:4 73:8 77:21,25 78:12 82:22 83:7 85:8 90:13,22

**quickly** 38:25

———————
R
———————

**ran** 27:23,24 34:24

**range** 20:13,22 21:19,24

50:1,2,17 51:7 65:11 73:15

**rated** 57:7

**rating** 56:18,21 57:5,15

**Rav4** 41:25

**RBI** 46:1 50:1

**reach** 30:15 71:2 74:19,21 75:24 80:7 82:6

**reached** 71:9

**reaching** 82:12

**read** 14:21 15:12 16:11 26:13 27:21 28:2 42:17 45:17 56:8 59:1 70:4 71:21 77:19 87:4 90:22,23,24

**reading** 23:3 25:7 46:15 84:13,16 91:22

**reads** 79:11

**realize** 79:3

**really** 47:6 60:17 65:23 86:10 89:13

**Rear** 17:10

**reason** 11:13 55:3,6

**reasonable**



877.291.3376
www.UCRinc.com
WOOD 145

55:20

**re-assigned**
54:18

**recall** 12:9
16:21 36:18
38:2 47:5,12
50:23 53:7
69:8 74:7
84:14 88:25

**receive** 24:19
63:17

**received** 39:4
40:3 41:4
46:6 50:9
57:10 75:19
76:24 80:19
82:17,19
84:10

**recommendation**
57:14

**recommended**
20:22

**record** 5:4,15
55:23 59:18
62:23,25
63:24 74:24
92:9

**records** 26:8
28:3 29:22,24
50:6 55:25
58:1
59:2,4,11
60:10 63:13
64:18,25
65:7,9,16,23
66:1 67:8
79:16,19 82:8
84:7,11,23
86:12,15
88:18

**recover** 85:15

**RE-DIRECT** 3:6
85:11

**reduced** 72:5

**reduction** 21:4

**referred** 91:9

**reflecting**
80:19

**regard** 7:11
9:6 19:20
26:21 36:16
42:15 81:9

**regarding** 54:1

**regardless**
86:24

**rejected** 67:14

**related** 80:9
82:3
83:2,9,14

**relative**
92:10,12

**released** 35:14

**relevant** 64:8
83:23 84:4

**relieved** 87:17

**rely** 78:5

**remember** 7:16
19:22
22:19,23
29:18,19 30:4
36:20 38:7
52:1 53:19
56:3,4,6,25
68:17 69:16
73:1 78:2
80:10,21,22
81:15

84:17,18,20

**reminder** 48:3

**remotely** 1:18
2:6,11,13
5:14 93:6

**renal** 26:22

**rep** 15:1,5,6,7
39:9 89:4

**repair** 42:6

**repeating** 86:1

**report** 7:16
48:15 92:7

**reported** 1:24
31:8,9

**Reporter** 1:24
5:3,12,19,23
62:25 71:24
72:2 91:14
92:1,5,21
93:17

**reporting** 5:12
7:11

**represent** 5:18

**representation**
11:12 24:14
33:14
39:14,19 40:4

**representative**
72:24

**represented**
12:18,19

**request** 25:14
26:8 30:9
67:12 72:6
81:21 87:1
88:2 90:2,6

**requested**

60:17 89:17

**requesting**
63:12 72:12

**requests** 8:19
30:7

**requirements**
7:17

**reserve**
18:8,18 19:3

**reserves**
18:5,10,23
19:11 23:7

**reserving** 20:4

**resolution**
20:19,22 70:4

**resolve** 66:4

**resolved** 38:25

**respond** 76:17

**responding**
62:7 68:6
88:23

**response** 66:13
68:12 69:20
75:12 81:11
88:10

**result** 29:17
56:12

**resumed** 62:24

**return** 61:4
62:9

**returned** 60:16

**revealed** 59:5

**review** 13:3
15:18 17:3
19:23 52:20
54:3 60:10



877.291.3376
www.UCRinc.com
WOOD 146

81:18 84:11

**reviewed** 16:11 47:7 54:20 71:7 81:13

**reviewing** 20:23 41:19 58:1 59:12

**Rich** 11:25 53:22 77:18

**Richard** 2:8 3:5 5:21

**right** 6:6,9,21 7:2,12,20 8:2,7,10,11 9:3,5,9 10:15,17,23 11:5 12:2,22 13:19,24,25 14:5,9 15:12,14 16:4,6,16,17,23 17:8,13,17,18 18:2,4,7 20:4,23 21:16,17 22:24 23:9,10,18,19 24:11 25:1,16,24 26:7,11,17 27:6 28:7,8,14 29:2,6,14 30:1,2,19 31:16,19,22,23,25 32:6,13,18,20,24 33:8 34:2,5,6 35:11,16,25

36:12 37:22,23 38:12,15,19 39:6,12,13,19,21 40:7,18,20,24,25 41:12,15,21 42:2,11,23 43:4,5,24 44:1,10 45:11,13,24 46:13,17,24 47:20,24 48:1,24 49:13,16 50:5,16 52:5,13,16,17 53:19 54:25 57:9,17 58:8,11,13,20,21 59:2,3,7 60:22,25 62:13 63:11,21 64:10 68:25 70:24 72:3,19,21 73:10,11,12,15,16 74:16 75:12,22 76:2 77:7,8 79:6 81:17 86:19 89:7,18,22,23,25 91:10

**righty** 15:23

**RO** 23:11

**Robert** 49:24 69:21

**Robin** 41:15 42:18

**Roger** 25:23 45:2 63:19 81:1

**role** 88:25

**rounding** 42:8

**rule** 23:11 25:15 33:11 34:1 35:9 37:18

**rules** 9:2

**run** 28:10 76:13

**runs** 75:22

**RWELDY@FLALAWY ER.NET** 2:10

---
S
---

**safely** 41:24

**said** 9:15 12:11,15 18:20 33:9 38:11,14 45:5,14 49:8 50:10,11 54:10 59:14 62:9 63:15,19,22 67:15 68:7 73:17 74:17,24 84:17,20 87:2 89:21

**same** 26:8,12 27:8,15 36:4,7 40:21 44:24 50:14 61:12 64:17 73:7

**saw** 11:16 12:6

13:20 29:9 50:10 75:5

**say** 7:18 10:25 12:19 13:15 14:6 15:3 18:22 19:7 20:2 21:9 22:21 26:25 29:3 30:9 31:21 33:6 46:11 53:10 54:11 55:2,3,16 57:3 58:12 59:17 60:11 66:9 70:10 71:3 73:2 86:25 89:17

**saying** 6:19 14:13 16:2 25:16 51:15 56:19 65:17 86:2

**says** 18:11 27:23 30:7,21 41:8 49:3 50:12 68:8 69:3,6,14 76:14,21 79:18 80:22

**scene** 38:4

**school** 35:5 37:18

**scope** 23:16,17 33:12 90:11

**screen** 6:13 11:23 24:16,17,18,19,21 27:7 62:15,16


**UNIVERSAL COURT REPORTING**

877.291.3376
www.UCRinc.com
WOOD 147

68:11 69:19 74:11 78:24

**script** 37:2,5,11

**scroll** 6:21 32:4

**se** 37:11

**search** 28:12 35:1

**searches** 28:10

**sec** 11:19

**second** 11:15 71:24 73:5 75:1

**secure** 24:13 33:13

**see** 8:5,16 11:19,21 12:3,4 14:21 15:12,24 16:11 20:9 21:15 23:16,24 36:15 40:10,12 45:22 46:20 47:13,22 48:10 50:14 51:6 52:13 54:4 56:8 57:16,17,22 62:5 65:14 68:14 69:3 75:25 76:3 79:7 91:16,17

**seeing** 64:17 71:15

**seek** 22:18

**seeking** 79:17

**seen** 37:19 68:2

**sees** 11:22

**Select** 1:7 5:5

**self-imposed** 48:6

**selling** 46:13

**send** 8:6 25:14 30:12 37:19,21 47:3 66:21 67:4,16,17,25 68:10 72:11 81:10 88:2,3,4,14

**sending** 30:18 79:13

**sent** 34:10,11 38:8 39:15 40:19 45:8 58:9 63:12 67:20,21 71:8 72:22 73:4,7,25 74:23 75:11 81:14 86:16,17

**serious** 53:11

**service** 13:17 14:7 89:13

**services** 21:6

**settle** 22:13

**settlement** 20:18 21:19,24 65:11 69:22 70:1

**several** 65:3

**severity** 50:7

**share** 6:13 11:22 68:11 78:24

**sharing** 7:15 62:15 79:1

**she** 34:12 35:22 36:21 37:24 46:23 47:10,14,15,17 49:5,11,13 60:19 63:15,18,19 64:25 66:25 75:18 76:24 83:6 85:23,24 86:23 87:9,22

**sheet** 25:4,5,7 36:4 39:23 44:24

**Sheffield** 77:13

**she's** 36:11

**short** 62:22

**should** 13:15 20:2 33:6 46:19 50:14 53:5

**shouldn't** 52:23

**show** 56:1 62:10 68:15

**showed** 70:21 81:10

**side** 17:7,10

**sign** 13:11,23 14:13 42:12

87:20 88:16

**signed** 36:4

**signing** 91:22

**silence** 76:17,18

**similar** 14:3

**since** 7:10 8:24 33:8 36:8 59:9,16 65:25 74:25 77:2,6

**sit** 14:11

**sitting** 65:1

**situation** 89:1

**slow** 13:18 16:7 19:8 54:13

**smart** 52:2

**Social** 28:19

**soft** 18:9,13,23 22:9,10 53:8 55:9,15,17 65:17 84:8

**software** 20:11,20

**some** 8:13 9:6 11:14 18:21,25 20:21 28:11 32:23 34:17 38:21 40:24 47:13 48:16 50:11 60:3 77:25 78:12 80:17,19 82:22 83:7



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

WOOD 148

84:19,22

**somebody** 35:19
41:16

**someone** 39:5
42:22
85:14,15

**something**
12:15 14:2
22:22 28:20
37:15 46:14
47:17 54:11
55:11 57:3,23
63:22 80:14
82:13 83:23

**sometime** 10:13

**somewhere** 34:4

**sorry** 12:17
15:10,15 16:4
20:7 21:9,12
22:23 29:7
38:6 40:8
45:22 48:10
50:7 52:4
53:2,22 56:20
57:8 58:12
70:25 76:2
78:25 81:16
84:19 85:25

**sort** 19:15
20:11,19
33:15 48:3,4

**sounded** 49:11

**sounds** 14:3
46:18 61:14

**source** 79:22

**sources** 83:15

**SOUTH** 2:9

**SOUTHERN** 1:1

**speak** 53:11
65:6 81:1

**speaking** 82:22

**specialty**
73:24

**specific** 10:18
60:24 66:20
71:22 86:6,9

**specifically**
70:10

**spell** 22:4
25:23 54:13

**spine** 84:23

**split** 51:14

**spoke** 25:21
43:4 60:18
63:15 66:15
69:6,7 75:18
76:5,23
80:21,22 89:8

**spoken** 60:15

**sponsor** 7:5

**spun** 16:15

**St** 18:22

**stack** 27:20

**stage** 26:22

**stages** 20:24
71:6

**stamp** 45:11

**stamped** 12:2
23:3 32:8
40:18 44:6
56:9 91:9,11

**standard** 18:15

**stands** 25:20
27:10 34:11

45:24

**start** 20:25

**started** 11:11
13:14 65:4

**starts** 18:10
19:23

**state** 1:25
5:16 7:6,11
92:2,6,22
93:2,18

**STATES** 1:1

**status** 9:23
45:5,9

**steps** 23:24
37:9

**still** 6:8 23:2
26:15 32:22
51:21 71:6

**stop** 7:15
61:21
62:15,19,20
79:1 87:3,6

**stopped** 16:15
17:20 23:6
77:1,7

**straight** 87:14

**strange** 49:17

**stream** 22:15

**strike** 71:19

**struck** 16:15
17:20

**struggling**
43:14,15

**stuff** 16:20
19:15 90:15

**submitted**

71:15

**subro** 41:20

**subrogation**
41:17

**suddenly** 30:25

**suffering**
26:19,20

**suggestions**
47:10

**suit** 59:23,24
66:14 73:13
75:10 77:12

**SUITE** 2:9

**summary** 33:15

**summons** 75:19
76:25

**supervising**
47:4

**supervisor**
9:25 46:23
47:2,7

**supervisors**
10:1 19:18
53:4

**support** 39:16
68:24

**Supreme** 1:19
5:13 93:7

**sure** 8:21
11:21 17:3,5
21:4 27:2
30:15 33:4
37:3 41:10,20
42:11 43:21
46:17 55:24
59:14 61:15
69:2,9,12



73:25 75:3
78:8 86:3
91:1

**sustained**
56:12 83:19

**switch** 40:13
68:19

**sworn** 6:2 93:8

**system**
13:11,12,23
14:1 27:1,3
30:8 38:21
41:11 48:3,4
51:9

---

T

**take** 41:9
44:11
61:21,22,25
72:19 81:3

**taken** 1:16 8:5
84:11

**tale** 71:20

**talk** 6:15
9:9,10 15:8
22:17 37:4
70:7 72:17,18
86:8 89:14

**talked** 23:6
40:20,23
47:23 60:4
66:22 74:2
82:21

**talking** 21:14
23:2 57:19
60:22 64:5
66:25 67:13
68:20 75:10
86:6

**talks** 47:22

**Tammany** 41:16
42:19

**Tanya** 39:24
46:21,22

**tasks** 33:20

**tea** 14:12

**technology**
52:8

**telephone**
71:12

**tell** 22:5,6,12
24:9 29:10
31:21 40:23
51:16,17,25
61:22 66:20
71:20 79:9
87:18 88:15
90:1,5,8,16
91:12

**telling** 89:10

**tenured** 54:17

**terms** 89:19

**terrible** 46:19

**Terrific** 34:14

**testified** 6:2
89:6

**text** 72:11

**than** 36:1
47:10 65:21
73:9,14 79:23
80:5

**thank** 5:19,23
8:21 12:25
16:23 31:22
32:20 33:21
34:14 37:13

40:10 42:21
43:16 45:5
49:12 70:1
72:1 75:8
90:21

**thanked** 49:8

**that** 6:6
7:12,13,14,22
,25
8:1,4,10,17,2
3 9:5,17
10:2,5,10,13,
19,21
11:13,14,21
12:3,4,6,7,11
13:6,9,12,20,
23
14:3,6,9,10,1
5,16,18,24,25
15:25
16:2,6,18,19,
24,25
17:1,2,4,5,8,
23
18:1,8,12,13,
14,15,16,18,2
4
19:1,6,7,8,19
,20,24
20:2,9,10,20,
21
21:1,4,5,7,8,
16,18,22,23
22:3,10,11,13
,20
23:3,4,7,8,20
,21 24:3,8,19
25:3,7,11,12,
16,19,22
26:1,4,5,9
27:1,4,10,11
28:3,6,21

29:16,17
30:6,7,8,16
31:4,6,11
32:12,14
33:4,5,6,7,8,
16,17,20,23,2
5
34:4,6,10,11,
22,23,24
35:1,10,19,25
36:13,14,16,2
1,22
37:2,15,22,24
,25 38:21
39:7,9,11,16,
18,22
40:20,21
41:5,10,16,18
,21,24,25
42:15,16,20,2
2,25
43:2,6,20,21
44:2,8,24
45:9,10,14,21
,22,24
46:2,16,25
47:14,16,20,2
1,22,23
48:4,6,8,10,1
1,12,13,15,24
49:1,5,18,19
50:2,4,5,6,11
,16,17,18,23
51:2,9,24
52:1,19,20,22
,23 53:4,8,15
54:1,3,9,16,2
0
55:2,3,8,14,2
0,23,24
56:1,2,14,18,
19,23
57:3,4,16,20,



877.291.3376
www.UCRinc.com
WOOD 150

22
58:6,10,12,20
59:4,8,15,20
60:2,3,6,10,14,15
61:2,5,12,13,15,17 62:6
63:5,6,15,21
64:1,5,6,8,15,20,24
65:1,2,4,7,10,12,18,21
66:3,7,13,14,17,18
67:5,10,15
68:2,5,7,9,19,20 69:16,25
70:7,10,11,21
71:11,13,16
72:23
73:4,7,8,13,18,21
74:3,5,6,7,8,11,18 75:5,19
76:4,14,24
77:1,13,15
78:2,8,10,14,18,20,21
79:22 80:20
81:10,11,15,18
82:7,13,17,18
83:4,12,16
84:2,3,4,7,10,13,14,16,21,24 85:1
86:1,5,25
87:1,19
88:2,13,15,25
89:1,10,15,17
90:1,5,7,17,19,20
91:1,2,10,19

92:6,8,10
93:6

**that's** 6:18
10:10 12:22
13:20,21,22
14:7 15:1,15
16:17,21 17:9
19:15 21:14
25:4,12,23
26:6 27:12
30:11
32:13,14 38:9
39:5,16,24
41:6,11 42:25
43:14 45:18
46:2,19 48:18
49:18 50:3,12
52:2,14 58:21
60:9 61:18,20
63:12 67:18
69:11 70:17
72:18,22
75:11,18
76:8,23
77:14,15,17
81:17 82:15
85:8 88:11
91:6

**their** 5:16
19:19 23:23
24:1,20 35:15
37:8 57:14
67:20 69:10
76:11 82:16

**them** 6:15
8:6,13,14,15
19:19 23:23
24:24,25
25:1,5,13
37:6,7 38:2
65:4 66:17
67:16,20,25

68:14,17
71:9,14 74:20
76:10 80:23
86:18 88:4,24
89:12 90:3,10
91:12

**themselves**
47:3

**then** 9:19
11:10 12:13
17:4 18:18
22:11 28:9
31:20 32:8
33:24 36:15
37:9 40:22
41:9 43:3,18
44:13,24
47:2,6,8,21
49:8 51:20
52:17
54:17,19
57:10,13,18
60:11
63:13,18
69:15 71:14
72:22 75:17
77:12 84:19
86:8 87:10
89:3

**therapist**
57:16

**therapy**
56:15,19

**there** 8:17
10:18 13:11
18:12,21
19:12
29:15,16
30:21 31:3,14
34:13 36:14
37:2 40:16

45:24
46:24,25
47:13,15,17
48:3 53:12
55:7,8
57:19,21
58:15,18 61:2
63:4,18,22,24
64:7,9,10,13
65:9 68:6
69:11 74:8
75:1 77:4
78:21 79:22
82:8
84:3,6,13,15,21 90:12,20

**therefore**
56:11,13

**there're** 38:1

**there's** 14:3
19:10 22:1
28:4,9 32:8
34:2 37:5
41:15 57:17
62:17 63:13
68:5,9 73:8

**Thereupon** 5:24
62:22

**these**
14:15,16,18
20:4 23:7
32:3,23 38:25
46:20 52:9
60:3 78:4
85:14

**they** 7:8 8:1
10:7 14:1
20:1 23:25
24:19 31:8
36:10,21,24
37:22,24,25



41:19 43:6,8 44:8,11 48:14 51:25 54:9,18 56:3,18 58:5 59:12,20 60:16,17 62:9 63:15,20 64:18 65:20 66:14 67:21,24 69:9,10 71:8,13,15 72:18 75:19 76:17,24 78:22 83:15 86:14 89:16,17 90:9,17

**they'll** 28:2

**they're** 27:2 47:3 50:6 64:16

**thing** 26:16 46:19 66:13

**things** 22:6 23:7 34:17 43:20 48:5 54:9 61:21 83:16

**think** 10:9 11:16 16:5,21 24:3 37:11 40:15 45:9 51:24 53:25 56:4 64:9 66:25 68:23 74:13 81:13 82:11,21,23 90:14

**this** 6:14,16 7:15,19 9:10

10:10 13:6 15:18 16:7 17:2 18:11 19:5,15,21 22:17,20 25:6,17 26:4,8,15 27:7 28:2 29:1 30:4 33:15 34:3 38:11,14 40:6,16,19 41:14,24 42:3 43:20 45:10 46:17 48:3 50:10,11,24 51:7 52:17 53:8 55:4,6,12,19 56:13 57:9,15 58:8 59:1,3,22 60:25 61:14,15,16 62:21 64:16 65:5,13,14 66:2,17,20 68:8,11 69:24 70:1,3,9,19 71:15,17 73:13,22 78:14,15 79:9,13,24 80:2,4,5,8,15 81:5,19,21 83:8,13,17 84:8 85:20 86:6,9,11 87:17,20,22 89:1 90:11,24 92:15 93:9

**THOMPSON** 2:8

**those** 8:14,19 12:9 14:24 19:3,4 22:14 33:20 38:20 41:9 52:10,11 54:3,4,5,9 57:2 64:18 66:1,4 70:17 78:6 83:24 84:11,23 86:15 89:5,19

**though** 6:14 8:4 12:11 22:25 33:15 83:24

**thought** 16:5

**three** 16:24 34:22 75:21 87:23

**threshold** 29:25 30:1 56:8,10,13

**through** 28:7 29:22 36:24 44:5 51:1,4,24 78:17 90:25

**tickler** 38:21 48:3

**till** 87:16

**time** 5:10 6:7,8 7:14,15 10:2,21 12:11 13:10 16:18 17:2 19:13 20:10 21:23 23:17 24:3 26:8 29:1 34:6 35:4,9 37:2 42:16

45:6 46:7,23,25 47:1,7 49:2 50:6 53:13 55:12 56:11 58:10 60:15 61:5,14,15 62:2 64:8 65:7,12 67:14,15 72:5,10 73:18 74:18 76:10,12 79:24 82:17 84:11 86:1 87:15,16 90:17

**times** 27:20 80:12,23 87:23

**tissue** 18:10,13,23 22:9,10 53:9 55:10,15,17 65:17 84:8

**title** 6:11 9:12,13,17 12:13

**TLB0038** 40:1

**TLD** 46:6

**today** 5:4 6:9 13:2 14:16 65:1,2,6

**Today's** 5:9

**to-do** 75:16

**to-do-list** 33:19

**together** 41:14 48:11



TOL 35:3

told 36:21
  43:6 65:19
  89:21

took 6:25 38:3
  59:4

tool
  21:3,7,8,18
  22:1,20 50:18
  78:18,20
  82:13

tools 21:1,22
  60:2,6 66:2,6
  67:15 74:3

top 18:25
  25:12 32:9

towards 9:1
  20:25

Toyota 41:24

trained 88:21

trainee
  9:14,15,22,23

training 7:24
  8:25
  9:6,20,24,25
  10:3,6 19:23
  52:23 53:4
  54:2,10,22

transcribe
  92:8

transcript
  90:25 92:9

transferred
  72:24 77:13

treated 67:6
  84:18 87:19
  88:11,16

treating 26:1
  55:19 56:1
  65:25 72:12
  83:5

treatment
  43:13 45:4,5
  51:18 54:7,9
  55:9 56:4
  59:13 63:16
  64:7,13,21
  65:10,17,18,2
  4 70:8
  79:17,19
  80:11 82:16
  84:3 86:13
  88:9

tried 16:7

trouble 10:5
  32:22 68:25

true 92:9

try 38:24 39:2
  40:12 48:7
  78:24 80:8

trying 18:24
  24:7 30:15
  46:16 53:14
  61:12,20
  70:14 89:20

turn 16:14
  79:4

two 7:18
  11:10,11
  27:20 34:22
  53:14 62:17
  64:9

TX 45:3

type 9:24
  16:19 31:11
  35:3

types 10:18

typically 19:3

───────────
       U
───────────
Uh-huh 17:10

um 27:20 35:17

umbrella
  23:12,15
  35:13

um-hum 6:23
  10:8,11,24
  11:6 16:13,17
  17:12,15
  23:15 24:15
  25:18,25 26:3
  27:18 28:23
  32:7,21 33:10
  34:9,15
  35:8,21
  36:3,6,25
  38:13,16,18
  40:2,5 41:23
  42:5,10
  43:1,25 44:4
  45:1,7,12,16,
  20 46:5 58:17
  61:1 70:13
  73:6 75:13,23
  76:7 79:8

unable 27:15

under 56:8

undersigned
  93:5

understand
  12:25 28:2
  30:15 31:1
  61:15

unfortunately
  58:19 60:16

unit 41:17

UNITED 1:1

Universal 5:11

University 7:1

unknown
  18:4,11 26:7
  65:23

unless 65:23
  68:15

unsuccessful
  33:19

until 80:18

up 11:16,20
  15:21 20:12
  21:23 28:13
  42:8 48:7
  49:5 50:3,17
  51:6 61:2,5
  62:6,21 75:17
  76:9,22,23
  77:21 80:18
  81:6,20 82:12

update 45:5

updated 90:3

upload 15:13

uploaded
  41:8,11

ups 85:10

uptake 24:16

urgency 48:4

us 20:2 21:3
  39:18
  40:23,24
  67:5,7 68:10
  88:15
  89:11,21
  91:10



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 153

use 14:2
21:1,18 22:3
37:3 57:4
60:3 74:4
78:18

used 21:13
22:20,21
32:22 50:23
51:3,6,13,23
52:1 66:3
82:13

using 30:8

usually 8:17
18:10 37:5
53:10 70:16
71:11 76:10
82:15 87:2

utilize 18:16
20:10,21
21:22 50:16
78:4

_____ V _____

vague 60:21

value
20:13,14,18,1
9 51:22 71:13

valuing 20:11

various 19:11
40:15

vehicle
15:14,15
16:14,15
17:6,8,9,13,1
7,19,20 34:20
35:2 37:19,20
41:7,25
42:2,4 65:20
75:6 83:20

vehicles
16:19,24 20:8
34:25 37:22
38:3 50:8
52:21

venue 18:17,21
19:6,9 20:7
22:12 50:9
51:21

venues 19:11
22:14

verified
58:6,7,13,14

verifies 24:19

verify 25:9
58:11 60:12

via 2:6,11,13
5:14 30:10
46:8

video 62:18,20

videotaped
1:15 5:1,6

virtual 34:7

visit 75:5

visiting 13:2

voicemail
32:19,25

vs 1:6 5:5
12:8

_____ W _____

waited 72:17

waive 77:19
90:22
91:2,4,7

waived 91:23

walking

59:9,16 60:4
64:2 65:3,22
85:2

want 6:14,15
7:18 8:3
23:16 28:5
42:11
43:19,21
46:16
51:10,13,17
55:24 57:3
60:12
62:4,10,13
70:7 71:20,22
77:13,19
86:11 88:23
89:19
91:10,12

wanted 8:14
34:17 51:5
68:24 69:11
74:10 91:16

wasn't 11:1
19:21 29:8
34:6 39:14
49:15
64:13,19
65:24 66:16
90:2

way 27:6 35:5
37:6,12,17
39:11 52:7
53:1 58:18
66:21 74:4,23
82:6 85:9
88:23
91:12,14,20

we 5:14 10:25
11:14
13:14,25
14:1,2 16:11

18:1,12,18
19:3,23,25
21:3 23:6,22
25:5,21 28:1
30:12 32:2,3
34:18
39:11,16
40:20,23
41:3,21,24
42:23
45:9,13,23
47:13,21,23
50:17,18
54:2,5,6
60:12,14
61:21,22,25
62:10 67:7
68:22 69:25
70:7,11,17
71:6,12,18
73:4,13,24
74:2,21 75:10
76:18 80:17
81:13,17
82:15,21
86:6,18 88:17
90:12
91:8,9,10,17,
20

webinar 10:10

website 8:16
28:9

we'd 71:3 87:2

week 26:12

welcome 13:1
75:9 91:4

Weldy 2:8 3:5
5:21 8:19
19:16 26:24
29:13 32:1
43:23 51:10



877.291.3376
www.UCRinc.com
WOOD 154

52:12
53:20,23 55:1
61:6,9 64:9
72:20 73:20
74:13,15
76:20
77:20,24
79:2,6,7
85:6,8,10,18,
21,24
86:20,23
87:5,9,22,25
88:6 90:11,23
91:4,13,19

**we'll** 40:16
41:1 45:2
62:2,21 68:19
73:3 86:8

**went** 6:15,24
44:3 47:2
58:4 59:1
80:17 89:3

**were**
10:12,18,19
11:7,14 12:12
15:22 16:19
19:24 22:17
23:7 28:13
29:15
30:14,18,21
33:16 34:3
36:21,24
41:3,11,19
44:8 47:7
48:14,25
50:6,25
53:3,13,15
59:12 64:9
65:7,9,23
67:3 71:6
74:5 75:10
77:4,25 78:15

82:8,21
83:7,14,15
84:7 86:1,4
87:17 90:9

**we're** 11:24
14:15,16
20:23 21:4
22:25 23:2,3
25:7 40:17
43:21 64:5
65:1 66:3

**Were** 29:21
63:4 84:6,21

**We're** 5:3,4
22:24,25
41:14 43:2
54:6 62:1,25

**weren't** 30:15
62:6,7

**WEST** 2:4

**we've** 61:22
68:20

**what** 8:5 9:12
12:9,12
14:24,25
15:3,19
16:21,24,25
18:18
19:2,7,8,21
20:5,14 21:15
22:6,7,8,13
23:20,21,24
24:17 25:3,19
26:19 28:1,2
29:9,18
30:1,4,10,14,
25
31:13,15,20
32:13,18
33:15,22,23

34:10,22,23
37:5,7,8,9
38:11,14
39:22 40:6
41:5,8,11
42:13,17,18
44:21 46:6,20
47:5,10
49:13,18
50:17,18
51:5,12,13,14
,17
54:5,11,15,20
56:3,14 57:2
58:3 59:13,18
60:8 61:22
62:13 66:19
67:3,22 68:23
69:16,17
70:20,25
71:8,13,15
72:17 73:18
74:1,3,17
75:3 76:8,14
79:16 80:5,10
81:19
84:16,17,20
88:11,12,21
89:10,21 90:3

**whatever**
20:8,18 33:18
52:14

**what's** 17:21
21:7 22:2
23:22,25
25:3,11 35:3
36:8 37:15
44:18 45:3,21
56:17 61:13

**when** 6:15
7:4,14,15
9:14 10:5,25

12:7,19
13:9,11,13,14
15:3 17:2
18:20 19:22
20:3,25 22:17
23:21 29:2,6
30:9 36:14
37:1,3 41:8
42:11 44:11
46:25 54:12
57:10,25
59:12 62:10
63:14 65:16
66:9
67:3,12,13
69:10,11
72:18,22,25
73:2,13
75:10,11,18
76:17,22,23
77:12 78:4,15
80:23,24
84:10 88:8,22

**where** 10:6
11:16 12:6
15:22
20:12,23
30:7,21 36:8
41:3 45:22
50:2,3,10
52:19,22
53:14
62:17,18
63:12,18
68:8,15
69:3,6 70:17
76:2,3 89:2

**whether** 14:12
18:24 26:9,22
29:16 31:4
57:11 58:8
60:4 68:24

UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com
WOOD 155

82:7 83:9,13
85:14 86:4

**which** 54:23
55:23 58:5
75:20 88:10

**while** 9:23
43:9

**white** 6:14

**who** 12:21
30:19 34:25
35:22 39:9
46:21 47:2
48:9,14 49:4
54:17 79:13
80:21

**whoever** 69:8
75:5

**who's** 27:9
32:9 39:15
41:16 44:15
48:13 52:2
69:7

**why** 16:21
19:15 35:14
43:14 48:25
49:1 52:2
55:12 60:9
61:21,25

**wife** 75:18
76:24

**will** 8:21
13:23 24:10
26:12 37:14
43:12 47:2
49:8 60:13
68:23 70:16
73:2 76:5

**with** 5:11 7:6
11:12 12:8

13:2 16:7
17:21,22
19:25 20:12
21:3,23 23:22
25:2,21 26:1
30:20
36:13,20
41:5,6
43:12,15 45:3
48:16
50:2,4,17
51:6 52:14
54:2 57:11,16
58:4,7,11,13,
14 59:9,13,16
60:5,19 63:16
64:2,23,24
65:3,22 66:11
67:6 68:25
69:15,24,25
70:16,19
71:10,17 73:9
76:5,11 77:16
78:8 80:21
81:9,24
82:3,22,23
83:1 84:19
85:2 87:19
88:10,11,16
89:2,7,10,12,
18
90:2,3,6,15
91:1,10,14,19
,20 92:13

**within** 48:5
55:20 84:13
90:11

**without** 27:16

**witness** 3:2
6:1 43:25
53:22 85:25
86:25

91:3,6,23
92:15 93:9

**Wood** 1:4
5:5,18 11:24
12:8 24:4
32:12,17 33:1
34:20,21
35:15,17
38:9,14 41:21
42:17 48:25

**Woods** 58:20
86:18 89:24
90:1,5,8,16

**Wood's** 24:2

**word** 13:20
46:18

**wording** 69:16

**words** 8:9
24:7,8 27:3
42:16 52:22

**work** 6:8 13:9
56:11

**worked** 7:3

**Workers** 79:20
82:8

**working** 13:13
35:9

**would** 5:15
8:16
18:16,18,20,2
1,24 19:2,3
20:20,21,22
22:10,11,12,1
3,21 25:11
26:20 27:11
37:3,6 38:20
41:9,10
42:12,16,20
46:2 47:16,17

48:4,6,7
51:3,5,14,16,
17,20,21,25
54:23
55:2,3,16,23
57:7,13 60:8
61:3,11
63:15,19
64:7,15,19
65:14,23 68:7
71:13
73:17,18 74:8
75:20 77:10
78:5,7,9
81:19 83:9
84:10 86:14
87:1 89:4
91:6

**wouldn't**
53:9,10
55:2,3 61:4
62:9 63:5
65:25 86:25
90:7

**writing** 25:14
66:17 68:7
69:14 71:11

**written** 33:25

**wrong** 24:8
29:10 31:13

**wrote** 31:20
40:22 42:19
47:10 52:17
60:25

---
Y
---

**Yassel** 1:15
3:2 5:1,7,25
6:17
46:9,13,14,15
,18 93:6



877.291.3376
www.UCRinc.com
WOOD 156

**yeah** 6:19 8:8
 10:21 12:24
 13:21 15:1,7
 16:1,5,6 17:9
 18:17 23:15
 25:8 26:25
 27:15
 28:15,17 30:3
 32:11,14,17
 33:1,7 35:17
 36:5
 39:7,9,11,20
 40:21
 42:7,8,9
 47:15,19
 49:18,23
 50:1,13,22
 52:15 55:2
 59:6 63:10,24
 64:11 69:5
 74:12,15
 76:13,15
 81:19 82:15
 91:4,19

**year** 7:19 11:8
 42:3

**years** 7:18
 11:10,11
 28:22 29:4
 42:4 46:20
 52:6 53:14
 60:5 64:3,22
 65:4,10,23
 68:3 70:9
 72:13 75:1
 85:3,15 87:20
 88:16

**Yep** 48:19

**yes** 6:7,10,18
 7:8 9:8,16
 11:4 12:10

13:5,8 14:18
15:15 16:9
18:3 21:2,3
24:5,23
25:2,8 26:14
27:7,22 30:24
33:2 35:24
38:10 41:13
42:1,20
46:10,18 63:3
68:4,13
70:6,9 71:24
72:8,15 73:21
78:3,20 81:23
82:20
83:18,21
84:1,5,9,12,2
4 85:7,24
87:16,24
88:5,18,19
89:11,24
90:6,18

**yesterday**
 75:19

**yet** 60:1

**you** 5:19,23
 6:8,11,14,24
 7:3,4,5,14,16
 ,20,22,25
 8:4,6,14,17,1
 9,22,24
 9:5,11,15,17
 10:4,5,7,12,1
 9,20,25
 11:7,21,25
 12:3,7,11,12,
 15,19,20,25
 13:9,10,11,12
 ,23
 14:4,11,12,13
 ,17
 15:3,8,11,12,

20,22
16:7,10,18,23
18:6,16,20,21
,22,24,25
19:13,14,17,1
8
20:10,11,12,1
4,19,20,21,22
21:13,18,19,2
2,23
22:6,7,15,16,
17,18,19,21
23:7,8,12,16
24:2,9,24,25
25:2,11,16,17
26:5
27:4,5,23
28:1,5,6,9,12
,13,15,20
29:3,10,15,21
,25
30:9,14,15,18
,21,25
31:1,2,13,15,
20,22
32:5,20,25
33:9,15,21
34:2,3,14,16,
17 35:15,23
36:7,15
37:1,3,4,13,2
1,25
38:5,11,14,20
39:8 40:10
41:8,9,10,17
42:9,11,13,16
,18,21,23,24,
25
43:3,4,6,7,14
,16
44:3,7,13,24
45:5,6,8,13,2
2 46:12,19,20

47:9,14
48:2,4,10,23,
24,25
49:1,12,15,16
,17,20
50:2,3,16,25
51:1,6,12,14,
16,24,25
52:2,5,14,17,
19,22,23
53:3,5,13,15,
19,21,23,24,2
5
54:1,10,11,22
,23
55:14,18,19
56:22,23
57:2,9,10,11,
18,20
58:7,9,13,15,
22,25
59:1,8,15
60:2,3,11,13,
24
61:3,4,9,10,2
2
62:4,5,6,9,10
,16,17,18
63:2,3,6,21,2
2,25
64:1,8,12,20
65:1,22
66:2,3,9,10,1
9,21,22,25
67:2,4,9,13,1
5,16,17,25
68:3,14,23,24
69:3,18,19
70:1,7,16,20,
23,25 71:2,20
72:1,4,5,10,1
7,18
73:1,4,7,18



Amiama ,Yassel 02-17-2022 Page 37 of 37

74:3,11,13,24
75:4,8,11,14,
15,21,24,25
76:2,3,9
77:5,7,9,16,1
8,19,25
78:1,2,4,5,9,
13,15,18
79:7,9,13,16,
22,23
80:1,4,5,7,20
,21,24,25
81:7,10,14,18
,21,24
82:2,7,11,17,
18,21,22
83:1,4,7,12,1
6,24
84:10,11,14
85:6,13,19,21
,25
86:1,3,16,21
87:5,6,10,11,
15,16
88:3,7,13,14,
21,23
89:6,7,10,16,
17,18,19,21,2
2
90:1,5,8,16,1
7,21,23,24
91:2,10,12,13
,15

**you'd** 28:11
38:22 74:19

**you'll** 50:14

**young** 2:8 15:8
26:18 36:10

**your** 6:16,22
7:6,11,17
8:6,24,25
9:11,12,25

10:5 11:16
12:6
13:3,6,22
14:11,12,20,2
4 18:25 21:1
22:5 24:8,24
27:5 28:7
40:16 44:12
46:11 47:22
52:23 53:4
54:22
58:16,22,25
60:12 61:4
62:4,9,16,20
63:6 68:12
69:15,19,20,2
1,22,24 70:1
73:14 74:18
75:25 76:18
77:15 78:10
79:4,19 80:14
81:3,5
83:7,23
84:4,8 86:3,5
88:22 89:24
90:2,6 91:1

**you're** 6:5
9:23,24
13:1,10,13
16:2,3,6 19:5
20:24 24:12
26:15 39:18
42:8 46:13
48:10 54:12
55:23 60:21
61:12,13,14
62:14 66:20
69:18 75:9
78:12 79:17
85:4 89:10
91:4

**yourself** 7:21

56:24

**you've** 7:10,11
8:5,24 13:3

**yup** 6:20,25

**YXM0013** 39:15

---
Z
---
**Zoom** 2:6,11,13
5:14



877.291.3376
www.UCRinc.com
WOOD 158