IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

BRYAN G. WOOD, and
KAYLEE M. WOOD,

      Plaintiff,

vs.                                  Case No. 2:21-cv-14172-JEM

PROGRESSIVE SELECT INS. CO.,

      Defendant.

_____/

### PLAINTIFFS, BRYAN WOOD AND KAYLEE WOOD'S RESPONSE IN OPPOSITION TO DEFENDANT PROGRESSIVE SELECT INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AND ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs, Bryan Wood and Kaylee Wood ("Plaintiffs"), by and through their undersigned counsel, hereby file this, their Response in Opposition (the "Response") to Defendant Progressive Select Insurance Company's ("Progressive") Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment (the "Motion" or "Motion for Summary Judgment"). In support of their Response, Plaintiffs state as follows:

## I.      INTRODUCTION

In its Motion, Progressive asks this Court to take the extraordinary step of finding as a matter of law that Progressive did not breach its duty of good faith in the handling of a bodily injury claim brought against the Plaintiffs. Yet on more than one occasion, the Florida Supreme Court has stated unequivocally that "the question of failure to act in good faith with due regard for the interests of the insured is for the jury," and that courts, not juries, make such determinations in rare cases[1]. The facts set forth below confirm that this is not one of those rare cases. Instead, there

_____

[1] *Berges v. Infinity Ins. Co.,* 896 So.2d 665, 672 (Fla. 2004); *see also, Harvey v. GEICO Gen. Ins. Co.,* 259 So.3d 1, 7 (Fla. 2018).

is substantial evidence from which a reasonable jury may conclude Progressive breached its duty of good faith in its handling of the Buckner claim including: (1) Progressive's failure to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business; (2) Progressive's failure to investigate Mr. Buckner's claim with due diligence considering Plaintiffs' nominal limits of liability insurance and Mr. Buckner's extensive and objective injuries; and (3) Progressive's failure to settle Mr. Buckner's claim when, under all the circumstances, it could and should have done so had it acted fairly and honestly toward its insured and with due regard for his interests.

## II.  STATEMENT OF DISPUTED MATERIAL FACTS

In addition to its Motion, Progressive filed a separate Statement of Material Facts in Support of Progressive's Motion for Summary Judgment [DE 37] containing argument, omissions of material facts as well as facts which are in dispute. Accordingly, Plaintiffs have separately filed their Statement of Disputed Material Facts and Additional Facts [DE 40].  In the paragraphs below, Plaintiffs identify disputed facts which warrant denial of Progressive's Motion.

Progressive's handling of this matter follows a motor vehicle collision occurring on October 21, 2015, when Plaintiff Kaylee Wood, age 16, lost control of her vehicle as she was making a left turn, striking Robert Buckner.  Upon investigating the collision, Progressive adjuster Nicole Knowles concluded that Ms. Wood was 100% liable for the collision. **Exhibit "1" at WOOD 005**. Seven days post-collision, on October 28, 2015, Mr. Buckner's counsel, Roger Messer, wrote to Ms. Knowles advising her that he would be willing to discuss settlement with Progressive as soon as he understood the full extent of Mr. Buckner's injuries. **Exhibit "1" at WOOD 096.**  On November 13, 2015, Progressive transferred the claims file to adjuster Yassel Amiama, an adjuster with two years' experience in claims handling, having previously worked in the hotel industry. **Exhibit "3" at 7:2-9**; After reviewing the facts of the case, Ms. Amiama also

2

concluded that Ms. Wood was solely liable for the collision, **Exhibit "1" at WOOD 013**.

As part of her initial work in the case, Ms. Amiama submitted a search of Mr. Buckner through the insurance industry Insurance Services Office ("ISO") database to determine whether Mr. Buckner had previously sustained similar injuries and submitted similar claims in the past. *Id.* The ISO search revealed that Mr. Buckner injured his back and neck sixteen (16) years ago, however, there was no indication Mr. Buckner had previously injured his spine or whether he suffered from lingering or chronic conditions from sixteen years prior.

Ms. Amiama wrote to Allstate Insurance Company, Mr. Buckner's PIP insurer, to obtain medical information regarding Mr. Buckner.  In order to provide Ms. Amiama with Mr. Buckner's medical records, Allstate required she obtain a medical authorization **Exhibit "1" at WOOD 013**. Ms. Amiama never requested a medical authorization from Mr. Messer to review the PIP file.

On November 10, 2016, Attorney Messer sent Ms. Amiama copies of all of Mr. Buckner's medical records currently in Attorney Messer's possession. **Exhibit "8" at WOOD 219-328**. These records informed Ms. Amiama of Mr. Buckner's yearlong treatment by various board-certified physicians.  Records provided to Progressive showed that Mr. Buckner suffered from herniated discs in multiple areas, resulting in numbness in his fingers and other complications. **Exhibit "1" at WOOD 018-020, Exhibit "8" at WOOD 262**.  Dr. Girard, one of Mr. Buckner's medical providers, concluded that his patient had reached maximum medical improvement having sustained a 12% permanent impairment based on AMA guidelines. **Exhibit "1" at WOOD 019, Exhibit "8" at WOOD 263**.  Dr. Girard found that Mr. Buckner also required ongoing evaluations and treatments costing $9,500. *Id.* Finally, Dr. Girard recommended Mr. Buckner consult with a spine specialist for surgical intervention at a cost of approximately $30,000. **Exhibit "8" at WOOD 263**.

On August 2, 2016, Mr. Buckner saw Dr. Harold Bach for a surgical consultation.  Dr.

Bach confirmed Mr. Buckner suffered from herniations at C3-4 and C5-6 and found Mr. Buckner was a candidate for anterior cervical discectomy and fusion which involves removing damaged disc material to relieve pressure on the spinal cord and nerve root.  Dr. Bach recommended this procedure to alleviate Mr. Buckner from pain, weakness, and tingling. **Exhibit "8" at WOOD 283-284**.

During this time, Progressive was informed that Mr. Buckner is an IT specialist who does not have a physically demanding job. Progressive also learned that Mr. Buckner had no prior history of cervical problems. **Exhibit "8" at WOOD 221.** Based on the clear liability, objective injuries and need for surgery, Attorney Messer demanded Progressive tender its limits of $50,000. *Id.*

Attorney Messer later testified that he waited to submit medical information to Progressive in order to obtain proof of the serious nature of Mr. Buckner's injuries. **Exhibit "12" at 99:6-16.** Once Attorney Messer realized his client was a surgical candidate, he forwarded all available records to Progressive. Attorney Messer's staff participated in multiple phone calls with Progressive sharing information regarding the status of Mr. Buckner's injuries, treatment and scheduling for surgery. **Exhibit "1" at WOOD 13, 17, 18.**

Progressive's response to Attorney Messer's policy limits demand consisted of an offer to settle for $4,350. **Exhibit "1" at WOOD 020**.  Ms. Amiama's file notes explain her reasoning for the nominal offer – she refused to place value on Mr. Buckner's herniated discs because of her conclusion that Mr. Buckner was injured in a minimal impact collision. **Exhibit "1" at WOOD 019**.  Even more, Ms. Amiama refused to consider Mr. Buckner's permanency rating because he did not miss time from work. *Id.*  Ms. Amiama makes no reference in the claims file regarding the existence of opinions of a medical professional (or medical literature) to support her conclusions. After considering Progressive's offer, Attorney Messer filed suit against the Woods on January 6,

2017.  Having learned of the suit, Progressive increased its offer by $1,082 to $5,432. **Exhibit "1" at WOOD 026**.

After Mr. Wood and Ms. Wood forwarded the suit to Progressive, Progressive assigned their defense to attorneys who were Progressive employees.  The Progressive employee lawyer who was assigned the defense of that suit took Mr. Buckner's deposition, reported what she had learned in that deposition to Progressive, and further reported what she learned during the deposition to the Woods. **Exhibit "1" at WOOD 030 and Exhibit "23" at WOOD 517-526.**

Progressive then learned that Mr. Buckner was involved in a prior collision, however, in that accident he hurt his low back which required only chiropractic treatment. **Exhibit "15" at 16:7-17:1, 19:5-20:18.**  The prior collision therefore resulted in soft tissue injuries without the presence of herniations as seen following the collision with Ms. Wood, and he did not have any chronic neck and back issues in those intervening 16 years. **Exhibit "15" at 17:23-20:30**. In early September 2017, counsel for Mr. Buckner wrote to the counsel for Progressive, seeking to re-start informal negotiations prior to court ordered mediation, but Progressive did not do so. **Exhibit "23" at WOOD 517**.

The parties attended a Court-ordered mediation on November 14, 2017. During mediation, Mr. Buckner reiterated that he was willing to accept the $50,000 Progressive policy limits as a full and final settlement of his claim against the Woods, but Progressive still refused to resolve the matter for that amount. **Exhibit "1" at WOOD 033 and Exhibit "12" at 40:2-18**.

During the course of the litigation, the Buckner claim fell under the supervision of Evan Jarvis, a Progressive claims manager.  On October 20, 2107, Mr. Jarvis reviewed the claim file and raised the reserve to $50,000, the policy limits.  Mr. Jarvis noted in the file that Mr. Buckner had medical expenses totaling $15,000 and a "soft" recommendation for surgery. **Exhibit "1" at WOOD 032**. Soon after, Brenda Sheffield, the Progressive litigation adjuster assigned to this

matter, noted that "we have no liability defense in this case." **Exhibit "1" at WOOD 033**.

On May 22, 2108, Ms. Sheffield noted in the claim file that Mr. Buckner either had surgery or is scheduled to have surgery. Armed with this knowledge, Ms. Sheffield nevertheless stays firm on her offer of $5,432 because she did not want to bid against herself. **Exhibit "1" at WOOD 44; 46**. On June 8, 2018, Mr. Messer made one final attempt at settling for policy limits of $50,000, providing Progressive with twenty-one (21) days to respond. Progressive made no additional offer. **Exhibit "16" at 472**.

Three months later, on September 20, 2018, Mr. Buckner underwent surgery. On October 21, 2018, Progressive offered policy limits of $50,000, however, the offer was rejected as untimely. **Exhibit "18" at WOOD 475**.

Mr. Messer informed Progressive on November 20, 2018, that he settled with Allstate, Mr. Buckner's uninsured carrier, for the policy limits of $100,000. **Exhibit "14" at WOOD 443.** This settlement confirmed Allstate valued Mr. Buckner's claim at $150,000 consisting of the $50,000 in underlying liability coverage plus the $100,000 in uninsured/underinsured motorist coverage.

Shortly thereafter, Progressive decided to assign different, outside counsel to represent Mr. Wood and Ms. Wood in the lawsuit. That new counsel immediately recognized that Mr. Wood and Ms. Wood were exposed to a judgment in excess of the policy limits. That new, outside counsel drafted a letter that Mr. Wood sent to Progressive in January 2019, recounting the history of the negotiations with Mr. Buckner, and insisting that Progressive "do what it needs to do" to protect him and his daughter, Ms. Wood, from an excess judgment. **Exhibit "24" at WOOD 527, 528.** Those letters were to no avail. Progressive, alerted to the fact that it had exposed the Woods to an inevitable excess judgment, for at least 18 months, still did not attempt to protect the Woods, even if it meant, at that late juncture, paying some amount in excess of the $50,000 policy limits.

During the litigation with Mr. Buckner, Progressive hired Dr. Zeide to provide a

compulsory medical examination of Mr. Buckner. Because Dr. Zeide is not a surgeon, Progressive also hired Dr. Jacobs to opine on Mr. Buckner's medical condition. Dr. Jacobs concluded that at a minimum, the collision with Ms. Wood aggravated Mr. Buckner's pre-existing conditions. Dr. Jacobs concluded that surgery was appropriate wherein Progressive quickly withdrew him as an expert. **Exhibit "1" at WOOD 066.**

Mr. Buckner eventually proceeded to trial where he obtained a verdict in the amount of $267,608 and a final judgment against the Woods for $313,695. **Exhibit "25" and "26" at WOOD 529-532.**

### III. MEMORANDUM OF LAW

#### A. Summary Judgment Standard

Summary judgment is only appropriate when the movant has shown that there is no genuine dispute as to any material fact and is thus entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Micosukee Tribe of Indians of Fla. v. United States,* 516 F.3d 1235, 1243 (11th Cir. 2008)(internal citations omitted). A fact is material if it "might affect the outcome of the suit under governing law." *Id.* The moving party carries the burden of showing the absence of a genuine issue of material fact. *See Shiver v. Chertoff,* 549 F.3d 1342, 1343 (11th Cir. 2008). For purposes of summary judgment, the court may not "weigh conflicting evidence or make credibility determinations." *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir. 1996). Instead, "[t]he evidence of the non-movant is to be believed, and all justiciable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

#### B. Florida Law on Bad Faith

In Florida, an insurer owes a duty of good faith to its insureds in handling their claims. *Ilias v. USAA Gen. Indem. Co.,* 545 F.Supp.3d 1296, 1301 (M.D. Fla. 2021), citing *Harvey v. GEICO*

7

*Gen. Ins. Co.,* 259 So.3d 1, 6 (Fla. 2018). Florida law allows an insured to sue its insurer for breaching its duty of good faith.  *See* Fla. Stat. § 624.155; *QBE Ins. Corp. v. Chalfonte Cond Apartments Ass'n, Inc.,* 94 So. 3d 541, 546 (Fla. 2012).  The duty of good faith requires the insurer to exercise "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Harvey,* 259 So.3d at 6.  The insurer must "investigate facts … and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id.* at 7.  In instances "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Powell v. Prudential Prop. & Cas. Ins. Co.,* 584 So.2d 12, 14 (Fla. 3d DCA 1991).

Whether an insurer has breached its duty of good faith is determined under the "totality of the circumstances." *Harvey,* 259 So.3d at 7.  "[T]he critical inquiry in a bad faith [action] is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Id.* Regarding an insurer's failure to settle, the issue is "whether, under all the circumstances, the insurer could and should have settled the claim within the policy limits had it acted fairly and honestly towards its insured with due regard for his interests." *Ilias, supra., citing Berges v. Infinity Ins. Co.,* 896 So.2d 665, 679 (Fla. 2004).

Nine (9) days ago the Eleventh Circuit issued a decision in *McNamara Gov't Emps. Ins. Co.* __, 4th __, 2022 WL 1013043 (11th Cir. Apr. 5, 2022) reversing the district court's entry of summary judgment entered for the insurer in a bad faith case.  There the court reminds us that an insurer's duty in a bad faith context includes "giving fair consideration to a settlement offer that is not unreasonable under the facts, and settl[ing], if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id.* *6 (Internal citations

omitted).  Equally relevant here, the court in *McNamara* notes that while there is "no single way of proving causation," "showing the existence of an excess judgment is generally the most straightforward way to prove causation."  *Id.* at *7.

### C.  Progressive Failed to Settle Mr. Buckner's Injury Claim When It Could and Should Have Done So

Bad faith may be inferred from a delay in settlement negotiations which is willful and without reasonable cause.  *Powell v. Prudential Prop. & Cas. Ins. Co.,* 584 So.2d 12, 14 (Fla. 3d DCA 1991), citing 46 C.J.S. *Insurance* § 1408 (1946).  Progressive received Attorney Messer's policy limits demand on November 10, 2016.  On January 17, 2017, Progressive offered to settle for $5,432.  On June 8, 2018, Attorney Messer advised Progressive his limits demand would remain open until June 29, 2018. This means Progressive was given nineteen (19) months and nine days to settle Mr. Buckner's claim.

As early as November 10, 2016, Progressive knew the following:

1.  Both adjusters working on the Buckner claim concluded that Progressive's insured was 100% liable for the collision;

2.  A board-certified physician concluded Mr. Buckner sustained injuries resulting in a 12% permanency rating;

3.  Mr. Buckner was a candidate for cervical discectomy and fusion;

4.  Mr. Buckner's medical expenses totaled approximately $10,000, however, medical reports confirm the need for ongoing medical care at an annual cost of approximately $9,500 with surgical costs of $30,000; and,

5.  Mr. Buckner was diagnosed as sustaining multiple herniated discs due to the collision with Ms. Wood.  **Exhibit "22" at WOOD 505.**

Armed with this knowledge, Progressive's initial adjuster, Ms. Amiama, made two erroneous and unfounded assumptions which explains in part why Progressive failed to timely

9

settle this matter. **Exhibit "22" at WOOD 506.** First, Ms. Amiama refused to consider Mr. Buckner's disc herniations in her case evaluations because she felt the impact was too minimal to cause herniations.  Next, Ms. Amiama refused to consider Mr. Buckner's permanency rating because Mr. Buckner did not miss work providing IT support. **Exhibit "22" at WOOD 506.**  Ms. Amiama's conclusions, which lacked any basis in fact, represent a lack of good faith in her handling of Mr. Buckner's claim.  *See Doe v. Allstate Ins. Co.,* 653 So.2d 371, 374 (Fla. 1995)(stating that the obligation of an insurance company toward its insured is a fiduciary duty requiring the exercise of good faith.)

Ms. Amiama's deposition testimony makes clear that lack of good faith basis for rejecting Mr. Buckner's disc herniation diagnosis:

Q:      Were you given any guidance from Progressive supervisors or your
        training or both, that you should in evaluating a claim, not consider
        herniations because of the nature of the impact?

A:      I don't recall to be honest.  All I do know is that just looking at this,
        if I'm considering a soft tissue, which I wouldn't consider if the impact
        is a low impact, usually to have a more … I wouldn't say more serious
        injury, but more to speak on the injury, if there was a heavier impact
        involved.

**Exhibit "3" at 53:3 – 12**.  Here, Ms. Amiama discloses her guiding thought process for claim evaluations. If a claimant such as Mr. Buckner is involved in what Ms. Amiama describes as a "low impact" collision, then the only injuries the claimant can sustain are soft tissue injuries, not herniated discs. This unsubstantiated claim analysis resulted in this case going to trial and the Woods receiving a judgment against them in excess of their policy limits.  The collision between Ms. Wood and Mr. Buckner was certainly not a "minimal impact," given Mr. Buckner's vehicle sustained $2,361.99 in property damage and Ms. Wood's vehicle was a total loss. **Exhibit "1" at WOOD 016; Exhibit "7" at WOOD 206-218**.

Progressive's nominal offers, despite compelling evidence of the severity of Mr. Buckner's injuries, evidence Progressive's lack of good faith. *See Cotton States Mut. Ins. Co. v. Trevethan,* 390 So.2d 724 (Fla. 5th DCA)(jury finding of breach of duty of good faith supported by evidence where insurer failed to respond to settlement offer for approximately one month even though adjuster had verified victim's damages). Plaintiffs' expert will testify at trial that an experienced adjuster, and certainly Ms. Amiama's supervisor, should know that the nature of an impact in a collision is never the sole determining factor regarding the seriousness of a claimant's injury. **[Exhibit "21" at WOOD 487].** Experienced adjusters know that claimants may experience few, if any, injuries following a devastating collision, yet other claimants may sustain serious objective injuries where the property damage is relatively minor. *Id.* Ms. Amiama possessed but ignored multiple records from board certified physicians describing the extent of Mr. Buckner's injuries. *Id.* Mr. Buchner's MRI report dated December 19, 2015, taken approximately two (2) months post-collision, diagnosed Mr. Buckner with herniated discs with impingement at C3-4, C4-5 and C5-6.

Impact aside, Ms. Amiama ignored Mr. Buckner's permanency rating finding the treating doctor's opinion invalid. Here is Ms. Amiama's explanation on why she would not consider Mr. Buckner's 12% permanent impairment rating:

> Threshold based on the alleged injuries above, the Claimant did not miss any time from work, therefore does not appear the claimant sustained permanent as a result of this accident.

**Exhibit "3" at Tr. 56:10 – 16**.

Progressive failed to consider Mr. Buckner's 12% permanency rating because Mr. Buckner, who works in information technology, did not miss any time from work. At trial, Plaintiffs' expert, Mr. Doucette, will testify consistent with his report as follows:

> It is difficult to understand her [Ms. Amiama] linking the permanency rating to whether he missed work. Mr. Messer noted in his 11/10/16 letter that Buckner was employed as an IT specialist

11

and that his work was not physically demanding. Essentially, he was a desk worker. Unlike a manual laborer, a neck injury would not necessarily prevent a desk worker from continuing their duties. Ignoring the permanency rating because he did not submit a wage claim is totally unsupported. **Exhibit "22" at 506.**

When asked about her decision to ignore the permanency rating, she testified that her decision was based in part that the rating came from a physical therapist, not a doctor:

> Q:    Did you classify this as a permanent injury claim when you received it then, whether you disagreed with the extent of the injury or not?

> A:    For my knowledge back then, it would have been based on the doctor's recommendation on their own analysis. But this rating came from a physical therapist, I didn't see that with the ortho notes. **Exhibit "3" at 57:9-16.**

Here again, Ms. Amiama is mistaken.  Dr. Pierre Girard prepared an office note following his September 12, 2016 examination with Mr. Buckner. There he concluded:

> I will place them at MMI with a 12% impairment rating based on the American Medical Association guidelines.  **Exhibit "8" at WOOD 263.**

Asked whether she had AMA permanency guidelines to refer to at Progressive, Ms. Amiama testified "I don't know."  **Exhibit "3" at 56:22 – 25.**  Asked if she knew what the AMA guidelines are, she testified: "I want to say it's something that medical professionals use to give that impairment rating."  **Exhibit "3" at 57:2 – 5.**  Ms. Amiama's decision to ignore the permanency rating because Mr. Buckner did not miss work lacks any factual basis and provides the jury with sufficient evidence to find Progressive acted in bad faith.

Progressive had a duty to act diligently and promptly and when faced with serious injuries and liability, to proactively offer their limits promptly.  *See Harvey* 259 So. 3d at 7 ("[T]he critical inquiry in a bad faith [action] is whether the insurer acted diligently …")  Progressive was given nineteen months to tender limits yet never moved passed nominal settlement offers based on its "low" valuation of $4,346 and "high" valuation of $5,921. **Exhibit "1" at WOOD 018.**

Progressive knew Mr. Buckner had multiple herniations and a recommendation for surgery. Even if Mr. Buckner elected not to have the surgery, his future medical care was projected to cost $9,500 per year on an ongoing basis. **Exhibit "8" at WOOD 263**. Considering the totality of the circumstances, including the clear liability, MRI films confirming herniation, need for surgery, prior medical expenses totaling $10,000, ongoing medical expenses and 12% impairment rating, Progressive's offer of $4,350 lacks any reasonable basis. *Id.*

### D. Progressive's Lack of Proper Investigation Resulted in a Flawed Evaluation of the Claim

Ms. Amiama initially sought additional medical information from Mr. Buckner's insurer, Allstate.  However, she never sought the medical authorization required to obtain the needed records. **Exhibit "1" at WOOD 013.** Progressive puts great emphasis on the fact that Ms. Amiama contacted Attorney Messer's office multiple times soon after the loss occurred trying to gain information.  These efforts, however, are of no moment because once Ms. Amiama received the requested information in the form of a demand packet, she unilaterally rejected the opinions of highly qualified medical professionals.  Had she requested medical authorizations from Mr. Buckner, she could have determined whether her assumptions were accurate. Progressive notes that Ms. Amiama never spoke to Attorney Messer.  This too provides no justification for its actions as Progressive spoke regularly with Attorney Messer's paralegal who shared whatever information was available.

It is not uncommon for an insurer to communicate with a paralegal, not counsel, when seeking treatment status updates. **Exhibit "21" at WOOD 487.**  Speaking to a paralegal did not prevent Ms. Amiama from requesting a medical authorization, yet she never made the request. As her testimony reveals, Ms. Amiama rejected Mr. Buckner's permanency rating, yet she does not recall consulting AMA guidelines that support the rating. She also rejected the permanency rating

13

based on her mistaken assumption that it came from a physical therapist, not a doctor, yet this too was wrong as records within the demand show Dr. Girard established the impairment rating. Ms. Amiama's investigation led her to conclude this was a "minimal impact" collision when the property damage records in the file clearly show otherwise. **Exhibit "1" at WOOD 019.**

In a relatively recent decision, the Eleventh Circuit in *Aldana v. Progressive Am. Ins. Co.,* 828 Fed. Appx. 663 (11th Cir. 2020),  reversed the district court's summary judgment entered in favor of the insurer, despite undisputed evidence that: (1) the claimant's attorney never responded to the insurer's repeated request to schedule a global settlement conference; (2) the insurer followed up at least five times with its insureds to retrieve financial affidavits; (3) the insurer sent eight letters, many unanswered, to the claimant's attorney offering to globally tender the insured's policy limits; and (4) the claimants never offered to settle their claims within the insureds' limits. *Id.* at 664-66.  Despite this evidence, the court, citing testimony of Plaintiff's expert, concluded that the insurer had failed to "exercise the requisite care, diligence and prudence … in its handling of the claims" and criticized the district court's apparent disregard of the expert's testimony.  *Id.* at 671.   The *Aldana* court also disapproved of the district court's reliance on the non-responsiveness of the claimant's attorney as a basis for granting summary judgment, reminding us that "the focus in a bad faith case is not on the actions of the claimant …"  *Id.* at n. 5, quoting *Harvey*, 259 So.3d 7, 10-12.  Finally, the court noted it is "for the jury to decide whether the insurer failed to act in good faith with due regarding for the interests of the insured."  *Id.* quoting *Harvey,* 259 So.3d at 7.

> **E.**     **Progressive Provided Inadequate Supervision Allowing the Adjuster to Make Significant Mistakes Contrary to Custom and Practice in the Industry**

In *Harvey v. Geico Gen. Ins. Co.,* 259 So.3d 1, 5 (Fla. 2018), the court focused on the claims adjuster's performance and supervision when evaluating a bad faith action against the insurer:

> At the time of [plaintiff's] claim, Korkus [claim's adjuster] was handling approximately 130 claims. Her personnel file showed that she had trouble managing her claims properly, which included communication failures. In a performance appraisal from 2005, a year before Harvey's accident, a performance review indicated that "[her] productivity numbers fell below average ... there is now exposure to our insured and to GEICO for extra contractual damage ... [and she] could use help with her organizational skills, filtering her emails, along with organizing her desk." A year later, another performance review stated that Korkus "has struggled throughout the year with desk management, which is magnified in her low quality rating."

Similarly, in *Turner v. Geico Indemnity Co,* No. 11-20546-CIV-Martinez/McAlily (S.D.Fla. Sept. 8, 2011), the court found the personnel files of the adjusters handling the claim in a bad faith case relevant as they pertained to "training, supervision and control of those GEICO employees; the competence of the employees assigned to this claim; [and] GEICO's knowledge of their professional abilities and shortcomings …"

Ms. Amiama testified Tanya Lovely was her supervisor overseeing her handling of Mr. Buckner's claim. **Exhibit "3" at Tr. 46:19 – 23**.  Review of the claims notes shows Ms. Amiama began working on the claim on November 13, 2015.  **Exhibit "1" at WOOD 012.**  On November 13, 2015, Ms. Amiama notes in the file that she is unable to obtain information from Mr. Buckner's PIP carrier without a medical authorization.  During Ms. Amiama's handling of the claim, her supervisor only enters three entries in the claims notes on November 20, 2015, November 23, 2015 and one year later on November 17, 2016.  **Exhibit "1" at WOOD 015-018**.  None of Ms. Lovely's claim entries in the file provide guidance to Ms. Amiama regarding her handling of the claim.  This is significant as it shows Ms. Amiama was never instructed to seek a medical authorization to obtain the PIP file, nor was Ms. Amiama's decisions to ignore the disc herniations or permanency ever challenged.

At trial, Plaintiffs' expert, Mr. Doucette, will testify that Ms. Amiama's ignoring Mr. Buckner's permanency rating demonstrates both a lack of training and supervision. **Exhibit "21" at WOOD 487.** Ms. Amiama's actions reflect either a lack of training or improper training by Progressive. *Id.* A claims manager who should be actively monitoring her analysis of the Buckner claim should have intervened and corrected her analysis when valuing the Buckner claim. *Id.* Ms. Lovely has two primary roles as claims supervisor: mentor and teach Ms. Amiama how to properly handle a claim and monitor the claim handling process to correct errors before they result in improper claim handling. *Id.* Further, a claims manager would know that while the nature of the vehicle impact is relevant, property damage is never absolute when determining the seriousness of the claimant's injuries. *Id.* Ms. Lovely allowed her direct report, Ms. Amiama, to significantly undervalue the Buckner claim on the erroneous assumption that $2,400 in property damage nullifies MRI findings showing herniated discs.

F.     **Progressive's Eventual Tender of Policy Limits Does Not Insulate it from Bad Faith Liability**

Progressive relies heavily on the fact that it ultimately tendered policy limits over a year after receiving Mr. Buckner's demand. "[T]he ultimate tender of policy limits does not automatically insulate an insurer from liability for bad faith." *Powell v. Prudential Prop. & Cas. Ins. Co.,* 584 So.2d 12, 15 (Fla. 3d DCA 1991)(finding that because there was sufficient evidence of bad faith to take the case to the jury, it should not have been decided as a matter of law.") Progressive should have resolved this case in 2016 when it had an opportunity to do so within policy limits. Allstate, Mr. Buckner's uninsured motorist insurer, paid $100,000 over and above Progressive's $50,000 limits. **Exhibit "14" at WOOD 443.** This signifies that Allstate was evaluating the case at no less than $150,000 when Progressive evaluated the case at $5,432.

Allstate made its evaluation having records which Progressive never sought to obtain through a medical authorization.

Mr. Buckner was willing to settle his clients' claims for limits up through June 8, 2018; however, Progressive's inadequate evaluation and failure to supervise allowed this settlement opportunity to lapse and the case proceed to trial.  Progressive's bad faith settlement negotiations leaves Plaintiffs with an excess judgment in excess of $250,000 which could have been avoided. Progressive is now liable for its actions and the damages sustained by its insureds.  *See Boston Old Colony Insurance Co. v. Gutierrez,* 386 So.2d 783 (Fla. 1980)(Recognizing "where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.")(citations omitted).  In *Florida Physicians Ins. Reciprocal v. Avila,* 473 So.2d 756, 757 (Fla. 4th DCA 1985), the Fourth DCA reminds us that "[t]he easy case for application of these rules occurs when a judgment in excess of policy limits is entered against the insured where the insurer had either a clear duty to defend and refused or, having undertaken the defense, wrongfully refused to accept an offer of settlement within policy limits."

### G.      Plaintiffs' Bad Faith Claims Involve Material Facts in Dispute Which Should Not be Resolved Through Summary Judgment

"The question of failure to act in good faith with due regard for the interests of the insured is for the jury."  *Boston Old Colony Ins. Co. v. Gutierrez,* 386 So.2d 783, 785 (Fla. 1980); *see Campbell v. Gov't Employees Ins. Co.,* 306 So.2d 525, 530-31 (Fla. 1974)("[R]easonable diligence and ordinary care [are] material in determining bad faith.  Traditionally, reasonable diligence and ordinary care are considerations of fact – not of law.")  Progressive contends that it "at all times [] act[ed] with such haste and diligence in investigating, evaluating and handling the [Buckner] claim …" Motion at p. 9.  The Florida Supreme Court in *Campbell, supra.,* found that "[b]ad faith in a factual situation of this kind is not a matter of law but is a question of fact for the jury."  *Id.* at 525.

17

Like the factual situation in *Campbell,* the facts here too create questions for the jury to decide.  For example, Progressive contends that it "used the same degree of care and diligence that a person of ordinary care and prudence would exercise in the management of his or her own business."  Motion at p. 16.  Yet Plaintiffs' expert, Daniel R. Doucette, concludes that Progressives' actions fell far short of the standard of care.

A central issue in this case is whether Progressive used the same diligence and care as an ordinary and prudent person would in operating his or her own business. Plaintiffs' contentions above, as provided by Plaintiffs' expert, Mr. Doucette, stand in stark contrast to Progressive's contentions regarding its handling of Mr. Buckner's claim.  The parties' conflicting interpretation of the facts underlying Plaintiffs' bad faith claim create fact questions which the jury should decide.  *See* Fla. Std. Jury Instr. (Civ) 404.4 whereby the jury will be instructed by the Court that "bad faith on the part of an insurance company is failing to settle a claim when, under all of the circumstances, it could and should have been do so, had it acted fairly and honestly towards its insureds and with due regard for their interests."  *See also, Powell v. Prudential Prop. & Cas. Ins. Co.,* 584 So.2d 12, 14 (Fla. 3d DCA 1991)("Whether Prudential's delay in responding to Goldner's attorney's requests and its failure to inform Powell of the ten-day deadline … were reasonable under the circumstances … are … material issues of fact to be submitted to the jury.")

Finally, the nature of bad faith litigation tends to make such claims less suitable for summary judgment.  *See Boston Old Colony Ins. Co. v. Gutierez,* 386 So.2d 783, 785 (Fla. 1980), recognizing that "negligence is relevant to the question of good faith."  Negligence actions, by nature, are highly dependent on the resolution of questions of fact.  The similarities between negligence and bad faith actions provides further support for allowing this matter to proceed to trial.  *Id. citing Campbell v. Government Employees Ins. Co.,* 306 So.2d 525 (Fla. 1974)("The

question of failure to act in good faith with due regard for the interests of the insured is for the jury.")

**H.      Partial Summary Judgment is Not Appropriate as  Progressive Could Have Settled the Buckner Claim After the June 2018 Demand Deadline Expired**

Progressive relies on *Novoa v. GEICO,* 2013 WL 179213 *4, *6 (S.D.Fla. 2013) for the proposition that none of Progressive's actions or inactions could have hindered settlement to support a bad faith claim. Motion at p. 18.  The facts in *Novoa* stand in stark contrast to the facts here.  In *Novoa,* the court found:

> The record establishes that GEICO acted quickly to evaluate the potential claims arising from the accident and, without having received a demand, offered Novoa the full amount of coverage available under the bodily-injury section of the policy only seventeen days after the accident occurred.

*Id.* Her attorney testified that Novoa decided to hire an attorney on January 9, however, by that date he testified Novoa was unlikely to accept the $10,000 policy limits.  *Id.* at *2. The Florida Supreme Court in *Harvey v. GEICO,* 259 So.3d. at 11 was rather critical of *Novoa* and rejected the causal connection argument Progressive makes here:

> While this Court has stated that "there must be a causal connection between the damages claimed and the insurer's bad faith," *Perera*, 35 So.3d at 902, this Court has never held or even suggested that an insured's actions can let the insurer off the hook when the evidence clearly establishes that the insurer acted in bad faith in handling the insured's claim.

Although *Novoa* was affirmed on appeal[2], 542 Fed. App'x 794 (11th Cir. 2013), the supreme court in *Harvey* that the insurer there "relied on a nonbinding decision of the Eleventh Circuit Court of Appeals which cannot be reconciled with this Court's bad faith jurisprudence."

---

[2] The Eleventh Circuit recently reminded district courts that "unpublished opinions may be cited as persuasive authority," but "they are not considered binding precedent." *McNamara Gov't Emps. Ins. Co.* __, 4th __, 2022 WL 1013043, at *4 (11th Cir. Apr. 5, 2022).

## IV.   CONCLUSION

As demonstrated above, there is more than sufficient evidence from which a reasonable jury could find Progressive failed to settle Mr. Buckner's claims against its insureds when it could and should have done so had it been acting fairly, honestly and with due regard for its insureds' interests.  Furthermore, as in *Harvey* and *Aldana*, Plaintiffs have presented expert testimony that Progressive's handling of Mr. Buckner's claim did not comply with applicable insurance industry custom and practice.  As the Eleventh Circuit stated in *Moore v. GEICO Gen. Ins. Co.,* 633 Fed. Appx. 924, 931-32 (11th Cir. 2016):

> In the end, [the plaintiff] might not prevail on his bad faith claim. There are, after all, numerous aspects of the record that support the conclusion that [the insurer] acted in good faith. But there are also aspects of the record that contradict that conclusion, and this is precisely the sort of situation in which Florida law makes clear that a jury trial is necessary.

(Internal citations omitted).  Accordingly, Plaintiffs respectfully request this Court deny.

WHEREFORE, Plaintiffs Bryan G. Wood and Kaylee M. Wood, respectfully request this Court deny Progressive's Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment and grant such other relief the Court deems just and appropriate.

Respectfully submitted,

BY: */s/ L. Jason Cornell*
JEFFREY M. LIGGIO
Florida Bar No.: 357741
L. JASON CORNELL, ESQ.
Florida Bar No.: 84102
LIGGIO & CORNELL, P.A.
The Barristers Building, Ste. 3B
1615 Forum Place
West Palm Beach, FL 33401
Telephone: (561) 616-3333
Facsimile: (561) 616-3266
Email: emailservice@liggiolaw.com
        jliggio@liggiolaw.com
        jcornell@liggiolaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 14 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice to: B. Richard Young, Esq., Richard W. Weldy, Esq. and Adam Duke, Esq., YOUNG, BILL, BOLES, PALMER, DUKE & THOMPSON, P.A., 2 South Biscayne Boulevard, Suite 3195, Miami, FL 33131; bryoung@flalawyer.net; aduke@flalawyer.net and rweldy@flalawyer.net.

BY: */s/ L. Jason Cornell*_____
L. JASON CORNELL, ESQ.
Florida Bar No.: 84102